# EXHIBIT A





**Entity Name: IOVANCE BIOTHERAPEUTICS, INC.**

**Jurisdiction:** CA

**Date:** 2/10/2020

**Receipt Method:** Certified Mail

**Case Number:** N/A

**Plaintiff:** SOLOMON SHARRBAT ET AL.

**Defendant:** IOVANCE BIOTHERAPEUTIC, INC. ET AL.

**Document Type:** Summons

DOS 470 (Rev. 10/09)



U.S.POSTAG

ZIP 12231
02  1W
0000139183

**DEPARTME**

One Com

99 Washington Avenue
Albany, NY 12231-0001

**Return Services Requested**



PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS FOLD AT DOTTED LINE

*USPS CERTIFIED MAIL*

**USPS CERTIFIED MAIL**

9214 8969 0059 7931 8675 35

202002030313
PARACORP INCORPORATED
2804 GATEWAY OAKS DR. #100
SACRAMENTO CA,95833

State of New York - Department of State
Division of Corporations

Party Served:                                    Plaintiff/Petitioner:
 IOVANCE BIOTHERAPEUTICS, INC.                     SHARBAT, SOLOMON


PARACORP INCORPORATED
2804 GATEWAY OAKS DR. #100
SACRAMENTO,  CA 95833


Dear Sir/Madam:
Enclosed herewith is a legal document which was served upon the Secretary of
State on 01/17/2020 pursuant to SECTION 306 OF THE BUSINESS CORPORATION LAW.
 This copy is being transmitted pursuant to such statute to the address
provided for such purpose.


                                          Very truly yours,
                                     Division of Corporations

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------x

|  |  |
|---|---|
| | : |
| SOLOMON SHARBAT, SOLOMON | : |
| CAPITAL LLC, SOLOMON CAPITAL | : |
| 401k TRUST, SHELHAV RAFF | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : |
| -against- | : |
| | : |
| IOVANCE BIOTHERAPEUTICS, INC., | : |
| f/k/a LION BIOTECHNOLOGIES INC. | : |
| f/k/a GENESIS BIOPHARMA INC., and | : |
| MANISH SINGH, | : |
| Defendants. | : |

-------------------------------------------------------x

Index No.:
Date Purchased

**SUMMONS**

Plaintiff designates New
York as the place for trial

Basis of Venue:
CPLR 503(a) – residence of Defendant

TO: THE ABOVE NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve

a copy of your answer, or, if the Amended Complaint is not served with this Summons, to serve a

notice of appearance, on the undersigned attorneys for Plaintiff within 20 days after the service of

this summons, exclusive of the day of service (or within 30 days after the service is complete if

this summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief demanded

in the Amended Complaint.

Dated: New York, New York
          September 27, 2019

CARMEL, MILAZZO & DiCHIARA, LLP

By:___/s/_____
          Michael D. Nacht, Esq.
55 West 39th Floor, 18th Floor
New York, New York 10018
(212) 658-0458

*Attorneys for Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------x

SOLOMON SHARBAT, SOLOMON
CAPITAL LLC, SOLOMON CAPITAL
401k TRUST, SHELHAV RAFF

Plaintiffs,

     -against-

IOVANCE BIOTHERAPEUTICS, INC.,
f/k/a LION BIOTECHNOLOGIES INC.
f/k/a GENESIS BIOPHARMA INC., and
MANISH SINGH,

Defendants.

--------------------------------------------------------x

Index No.:

**COMPLAINT**

Plaintiffs Solomon Sharbat ("Sharbat"), Solomon Capital LLC ("SC"), Solomon Capital 401k Trust ("The Trust"), and Shelhav Raff ("Raff") (collectively referred to herein as the "Plaintiffs"), by and through their attorneys, Carmel, Milazzo & DiChiara LLP, alleges for their Complaint against Defendants Iovance Biotherapeutics, Inc. f/k/a Lion Biotechnologies Inc. f/k/a Genesis Biopharma Inc. ("Lion Bio") and Manish Singh ("Singh") (collectively, the "Defendants") as follows:

<u>Nature of the Action</u>

1.    This action arises from Defendants' willful failure and refusal to pay fees earned by the Plaintiffs, pursuant to agreements between the parties, and in connection with successful introductions made by Plaintiffs for the benefit of Lion Bio, which introductions resulted in the successful investments into Defendant pursuant to said agreement.  As a result of those successful introductions and investments, Plaintiffs were entitled to certain fees.  Moreover, Defendant Singh at all pertinent times acted with a fraudulent intention to deprive Plaintiffs of the benefit of their

hard work and secretly kept for himself shares of Lion which should have been made available to Plaintiffs in connection with the foregoing, through warrant coverage, of an approximate value of six million dollars.  Finally Plaintiffs are due fees and expenses forwarded by Plaintiffs for the benefit of Lion Bio in connection with a merger, which fees were never paid to Plaintiffs and which Plaintiffs are owed.  Based upon the foregoing, Plaintiff asserts claims for, *inter alia*, breach of contract, fraud, unjust enrichment.

### The Parties

2.      Plaintiff Sharbat is an individual, and was at all pertinent times a resident of the State of New York, County of New York.

3.      Plaintiff Raff is an Israeli citizen who contractually agreed to work with Genesis from 2012 to 2013, and at all times material hereto, conducted business in New York.

4.      Plaintiff SC is a domestic limited liability company organized and existing pursuant to the laws of the State of New York with its place of business located at 67-34 Kessel Street, Foreset Hills, New York.

5.      Plaintiff Solomon Capital 401k Trust is a qualified retirement trust organized under the laws of the State of New York.  Sharbat serves as the trustee of the trust.  The Trust's principal place of business is New York, New York.

6.      Upon information and belief, Defendant Lion Bio is a corporation organized under the laws of the State of Nevada and existing pursuant to the laws of the State of Delaware, with its principal place of business located at 112 West 34th Street, New York, New York.

7.      Upon information and belief, Iovance Biotherapeutics Inc. is the successor-in-interest to Lion Biotechnologies Inc.

8.     Upon information and belief Lion Biotechnologies Inc. is the successor-in-interest to Genesis Biopharma Inc.

9.     Upon information and belief, Defendant Singh is an individual, residing .

### Jurisdiction and Venue

10.     This Court has personal jurisdiction over Defendants pursuant to CPLR 301 in that Defendants reside in New York, and they continuously and systematically do business within the State of New York, and the damages alleged occurred within the State of New York.

11.     Venue in the County of New York is proper under CPLR 503(a) as Defendant Lion Bio has its principal place of business in the County of New York.

### Choice of Law

12.     Pursuant to the agreements between the parties, as described and defined below, the claims in this action are to be governed and the agreements construed under the laws of the State of California.

### Facts Common to All Claims

### Background

13.     Plaintiffs are in the business of, *inter alia*, assisting and consulting firms with respect to fundraising, mergers, and strategic alliances and introductions.

14.     Defendant Lion Bio is a late stage biotechnology company focused on the development and commercialization of novel cancer immunotherapies.  Defendant Singh was the Chief Executive Officer of Lion Bio at all times material times prior to the subject funds were raised.

15.     In or around the summer of 2012, Plaintiffs were introduced to Mark Beychok ("Beychok"), chief executive officer and managing member of MBA Holdings, LLC ("MBA"), a California consulting firm.

16.     Through MBA, Plaintiffs were introduced to the then CFO of Lion Bio, Michael Handelman, who also served on its board of directors.

17.     At or around this time Lion Bio had certain international rights to employ a biomedical technology but required an injection of capital to fund its endeavor.

18.     Mr. Handelman discussed with Plaintiffs the development of Genesis, the potential role Plaintiffs would play in its growth, to wit, their assistance in helping Lion Bio raise $30,000,000 to expand and develop their intellectual property, and explained that the company needed the help of Plaintiffs because while it had promise, it lacked the capital continue its normal operations.  The thirty million was needed for start-up costs, and advancing the research and technology for their property.  Handelman further advised and acknowledged that Plaintiffs could earn substantial fees in connection with their assistance.

19.     Further, Handelman acknowledged that Plaintiffs would work along side of MBA and acknowledged their entitlement, given a qualified introduction, to the fees described below.

20.     On or about June 15, 2012, Lion Bio and MBA entered into an agreement (the "Letter Agreement") whereby MBA was to act as consultant to Lion Bio and "act as finder to seek financing and other strategic relationships for Genesis."

21.     Pursuant to the Letter Agreement, MBA, and thereby Plaintiffs would receive a "finder's fee:  (i) in cash equal to ten percent (10%) of the gross proceeds of the Financing; and (ii) in five (5) year cashless warrants to purchase the Company's common stock in an amount equal

- 4 -

to 10% of the gross proceeds of the Financing at a strike price equal to the investment purchase price."

22.     Thus in total, Plaintiffs were to earn twenty percent (20%) of any financing from qualified investors.

23.     The finders fee would be due upon Lion Bio receiving any Financing from a Qualified Introduction. A Qualified Introduction is defined, under the Letter Agreement, to mean "a Person introduced to the Company by Consultant or through another Person introduced to the Company by Consultant."

24.     At pertinent times, based on the intent of the parties, as evidenced through the assurances of Lion Bio's executives and as evidenced through the conduct of the parties, and as evidenced through subsequent writings, Plaintiffs were direct parties to the Letter Agreement.

25.     In the alternative, Plaintiffs were intended beneficiaries of the Letter Agreement, as similarly evidenced.

26.     The foregoing was confirmed in an email in which Lion Bio's then attorney confirmed that MBA and SC were to share in all proceeds, both cash and securities, in connection with the financing anticipated by the Letter Agreement.

27.     Further, and thereafter, Lion Bio's CEO's Anthony Cataldo and Defendant Singh, and Lion Bio's CFO acknowledged the terms of the Letter Agreement and regularly communicated via phone, email, and text messages regarding Plaintiffs' efforts in introducing potential investors to Lion Bio, as well as the agreed upon compensation Plaintiffs would receive.

28.     Subsequently Beychok withdrew from participation in the financing of Lion Bio. However the continuing contractual relationship whereby Plaintiffs would be compensated for

financing by qualified investors was confirmed by Lion Bio to Plaintiffs and to Plaintiffs' agents, representatives, and partners.[1]

29.     For example, Merrill McPeak, on behalf of Lion Bio acknowledged to Plaintiffs' to an agent and/or representative and/or partner that Plaintiffs will continue to be entitled to a finder's fee for the investors they introduced to Lion Bio.

**Plaintiffs Perform Pursuant to the Letter Agreement**

30.     Plaintiffs began to perform pursuant to the Letter Agreement by way of seeking out potential investors.

31.     To that extent, in or about August of 2012, Plaintiffs contacted New World Merchant Partners LLC ("New World"), a New York merchant banking firm for the purpose of assisting them in identifying potential investors for the Lion Bio financing.

32.     On August 28, 2012, (the "New World Agreement"), New World agreed to act as non-exclusive financial and strategic advisor to Lion Bio.  New World agreed to conduct due diligence of Lion Bio and to evaluate its growth and financial alternatives.

33.     It was understood and agreed between all the parties that any funds that were raised upon Plaintiffs' introductions, notwithstanding the involvement of New World, would still be attributed to Plaintiffs.

34.     Before performing any services, New World required a $35,000 retainer due diligence fee. Lion Bio lacked the funds to pay this fee and requested that Raff make the payment for it.  Handelman and Cataldo, on behalf of Lion Bio, told Raff that this payment would be considered an investment in Lion Bio. Handelman promised Plaintiff Raff that upon making the

---

[1] Plaintiffs make no affirmative or negative allegation as to whether the Letter Agreement was terminated and a new agreement between the parties was formed, or whether the parties simply continued to perform under the Letter Agreement, as same is to be a conclusion of law.

payment he would receive (i) a promissory note in the company for $35,000; (ii) one-half (1/2) a common share for each dollar, *i.e.*, 17,500 shares; and (iii) the right to convert the note in Genesis's next financing.

35.     Agreeing to the above terms, Plaintiff Raff paid the $35,000 due diligence fee to New World ("New World Payment") on Genesis's behalf.

36.     On or about August 13, 2012, Handelman formally acknowledged Plaintiff Raff's payment of $35,000 and recognized his payment to New World as a direct investment in Genesis. In an email dated August 30, 2012, Handelman e-mailed to Plaintiff and attached the following documents to the e-mail in confirmation of the terms of the agreement: (i) an unsigned secured promissory note; (ii) an unsigned bridge note subscription agreement; and (iii) an unsigned bridge loan term sheet.

37.     On or about November 13, 2012, Handelman e-mailed Plaintiff Raff to confirm again that Plaintiff Raff tendered payment to New World on behalf of Genesis in the amount of $35,000. Attached to the e-mail was an invoice from New World memorializing the due diligence payment of $35,000. Therein, Handelman re-confirmed the terms of Plaintiff Raff's investment in Genesis' convertible note offering, which are as follows: (i) a "note in the Genesis company [of $35,000]"; (ii) "[one-half (1/2)] a common share for each dollar[, *i.e.*,] 17,500 shares"; and (iii) "the right to convert into the next financing of the company [(Genesis)] on the same terms."

38.     To date, Genesis has failed to deliver to Plaintiff Raff an executed secured promissory note and the promised common shares, and has otherwise refused to reimburse Plaintiff Raff for the $35,000 Plaintiff Raff laid out on behalf of the Company.

39.     Asdf

**Plaintiffs Make Qualified Introductions**

40.     Following the formation of the agreement(s), Plaintiffs identified several potential investors and strategic relationships for Lion Bio.

41.     Upon information and belief, in or about November of 2013, the qualified investors which Plaintiffs introduced to Lion Bio, and/or those who were introduced to Lion Bio by individuals or entities introduced to Lion Bio by Plaintiffs invested approximately $23,300,000 into Lion Bio.

42.     In 2014, one of these investors invested another $17,000,000 into Lion Bio.

43.     In 2012, one of the investors introduced to Lion Bio by Plaintiffs, Highline Research Advisors, LLC ("Highline") introduced Lion Bio to investors ready and willing to invest an additional $10,000,000.

44.     Finally, Plaintiffs introduced Genesis to Lion, which two companies eventually merged.  Lion received 2.7 million Genesis shares (after reverse stock split), then valued at $13.5 million dollars.  Plaintiffs are therefore entitled to a commission of 270,000 shares or $1.3 million, plus warrants, under the Letter Agreement in consideration of their introduction of Lion to Genesis.

**Manish Singh is Appointed Chief Executive and Perpetrates a Fraud and Converts Shares**

45.     As previously alleged, Plaintiffs introduced Defendant to Highline.  However, prior to injecting any funds, Highline required that Lion Bio, then Genesis, install an appropriate management team.  Highline suggested Singh be installed as CEO.

46.     Eventually Singh replaced Cataldo as CEO of Lion Bio.

47.     Thereafter, Singh gathered the qualified introductions made by Plaintiffs and carried out the aforementioned financing.

48.     Once at the helm, Manish continued, like his predecessor, to update Plaintiffs about meetings held with investors.

49.    With respect to discussions concerning a company called Ruth Capital, Singh sought to convince the Plaintiffs to take a course of action by which they would agree with Ruth Capital that Ruth Capital would pay Plaintiffs their fees, evidencing Plaintiffs' entitlement to such fees, but in an attempt to relieve Lion Bio of that responsibility.

50.    Plaintiffs had discussions with Singh regarding other of the qualified introductions made by Plaintiffs in which Singh acknowledged that fees were owed to Plaintiffs with respect to certain of them but disputed Plaintiffs' rights with respect to certain others.   While Plaintiffs dispute the validity of Singh's denials, the acknowledgements demonstrate that the parties understood there to be an agreement by which they were bound with respect to Plaintiffs' qualified introductions.

51.    However, as time went on, updates with respect to some prospective investors, which would have been qualified introductions, were hidden from Plaintiffs by Singh.

52.    Next, Singh began to attempt to limit the class of qualified introductions for which Plaintiffs would be entitled to fees, despite Lion Bio previously acknowledging same.  This was the case, for example, with financing raised through Highline and New World.  Plaintiffs fees in connection with same had previously been approved by Lion Bio.

53.    During the ensuing days, weeks, and months, Singh would misrepresent to the amounts expected to be raised from Plaintiffs' qualified introductions.

54.    Further, Singh began to omit material facts concerning the development of the investment by Highline from Plaintiffs.

55.    Next, there came a time when Singh sent a correspondence to Plaintiffs, while Plaintiffs were working on bringing in investors, stating the conditions, before a reverse split, would be four cents per share with an additional one half option for each share.  Plaintiffs sent

these conditions to various investors around the world.  These conditions caused some concern to some of the potential qualified introductions that Plaintiffs could have made, because of the high valuation.  Plaintiffs discussed with Singh that at such a high valuation, fund raising would be impossible and all of Plaintiffs' work would be worthless.  Plaintiffs asked Singh to reconsider his position concerning the value of the company, Singh refused to do so.

56.     However, in emails as of October 14, 2013, Singh stated that it was still too early to determine the value of the company and that the final valuation should only be made the day before closing the deal.  He further stated that the expected price per share would be in the range of $4-$5.

57.     Approximately two weeks later, a deal for shares at a price of $2 per share was published.

58.     Upon information and belief, Singh provided Plaintiffs with incorrect and misleading information in an effort to make it impossible for them to attract investors, all while trying to attract investors of his own for his own personal gain.

59.     Finally, following the financing, Singh received 608,000 shares of stock which were valued at approximately six million dollars.  Upon information and belief, these were shares that should have been offered to Plaintiffs and were their rightful property.

60.     Thereafter, Singh, knowing the fundraising stage had been completed, began purchasing company shares with his own money.

**Plaintiff Raff Reimbursed Investor on Behalf of Genesis**

61.     In or about November 2012, Plaintiff Raff invested, through Liron Ben Ami ("Ami"), $7,850 in the Lion Bio convertible note offering.  However, despite repeated demands, Raff never received the notes.

**Plaintiffs' Related Business Expenses Paid on Behalf of Genesis**

62.     To recruit potential investors for the benefit of Lion Bio, Plaintiffs paid and/or advanced business related expenses, including but not limited to flights, hotels, catering, transportation and costs related to business presentations.

63.     Relying on the agreement between the parties that provides for reimbursement of expenses, coupled with the parties' subsequent agreements and Defendants' confirmation of reimbursement concerning payment of expenses, Plaintiffs paid the company's business expenses.

64.     Plaintiffs submitted expenses to Handelman in the amount of $136,058.

65.     With respect to flights, Plaintiffs paid a total of $12,680 for Lion Bio CEO Cataldo and other of its agents and employees to fly to Israel to meet interested investors.

66.     Plaintiffs paid a total of $24,500 in ground transportation expenses for interested investors and Lion Bio employees when meetings were scheduled in Israel between June and November 2012.

67.     With respect to daily long-distance phone calls and conference calls made between Lion Bio and Plaintiffs between June and November 2012, which were necessary to discuss a strategy for identifying potential investors, Plaintiffs paid a total of $3,888.

68.     With respect to dinners and catering services for meetings and presentations for potential investors, Plaintiffs paid a total of $6,400 between June and November 2012.

69.     With respect to accommodations, Plaintiffs paid a total of $70,000 for overnight stays in hotels and for conference rooms to hold meetings with potential investors and Lion Bio employees in Israel.

70.     Plaintiffs incurred $7,500 when Plaintiffs paid a retained medical consultant, Professor Jacob Schacter of Israel's Sheba Medical Center, on behalf of Lion Bio.  At the time,

Lion Bio did not have sufficient funds to pay the retained consultant for his research and services on Genesis's Scientific Advisory Board.

71.    Plaintiffs incurred other miscellaneous costs of $4,890 for printing and copying costs of brochures and invitations to the conferences and meetings held by Plaintiffs.

72.    Plaintiffs also incurred $6,200 in Lion Bio's legal fees because it retained the services of Sarit Molcho at S. Friedman & Co. Advocates, an Israeli law firm, to draft consultancy agreements.

73.    On or about November 13, 2012, Handelman reviewed Plaintiffs' business expenses from June 2012 to November 2012.  In an e-mail dated that same day, Handelman thanked Plaintiffs for their "support and hard work."  Handelman then stated that the purpose of the e-mail was to confirm that Plaintiffs' expenses of $135,000, including "air flights, [h]otel bills, dinners and 3 major presentations with catering and bars, taxi and driver expenses, etc[.] will be converted into the present bridge terms."

74.    Handelman stated that Plaintiffs would receive: (i) a note in the company for any payments made, *i.e.*, $135,000; (ii) one-half (1/2) a common share for each dollar, i.e. 67,500 shares; and (iii) the right to convert the note in the next financing of the company.

75.    As of this date, Defendant has failed to issue any shares to plaintiffs or otherwise reimburse them.

**Solomon's Advance of $145,000**

76.    In addition, on August 22, 2012 and shortly thereafter, Solomon invested $145,000 in Lion.  $45,000 of the funds was wired directly to Lion Bio, and $100,000 was delivered via the purchase of (then) Genesis shares on the open market.

77.     In an email dated August 22, 2012, Cataldo confirmed that the funds were in consideration for the following: (i) a note in the company for $145,000 at 12% interest; (ii) one-half (1/2) a common share for each dollar, i.e. 72,500 shares; and (iii) the right to convert them in the next financing of the Company.

78.     Cataldo requested that $100,000 of the $145,000 be used to purchase (then) Genesis treasury shares on the open market, but would be treated as an investment in the Company's notes. In an SMS dated February 21, 2013, Cataldo confirmed that the open market purchases would be treated as an investment in the senior secured note.

79.     As of this date, Defendant has failed to issue any shares to Solomon or otherwise reimburse it.

**Solomon's Consulting Shares**

80.     On July 9, 2012, Lion and MBA entered into a consulting agreement pursuant to which MBA agreed "to oversee and further develop and expand [Lion Bio's] relationship with the Chaim Sheba Medical Center at Tel Hashomer[, Israel]."

81.     Lion Bio agreed to compensate MBA with 1,500,000 non-restricted, free trading (then ) Genesis shares pursuant to an S-8 registration statement Genesis agreed to file.

82.     MBA, with the assistance of Solomon, set up numerous meetings with the staff at Sheba Medical Center, including cancer specialist Professor Jacob Schecter and laboratory director Dr. Michelle Besser.

83.     Lion Bio breached this agreement by issuing restricted shares, half to MBA and half to Solomon, as an intended third party beneficiary who assisted in the provision of the consulting services.

- 13 -

84.     As a result of the violation of the agreement to deliver registered, unrestricted shares, Solomon and MBA were damaged in the amount of $1,000,000.

**Exclusive Israeli License Due Plaintiffs**

85.     In addition to the terms of the Letter Agreement, Lion Bio promised that if Plaintiffs raised $3-5 million for it, Plaintiffs would be granted an exclusive license to distribute Lion Bio's cancer treatment methods in Israel (the "License"). The License has a minimum value of $10 million.

86.     Lion Bio breached its promise to deliver the License to Plaintiffs.

## AS AND FOR A FIRST CAUSE OF ACTION – BREACH OF CONTRACT

### (Against Lion Bio)

87.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 86 as if set forth in full herein.

88.     At all pertinent times, a valid and enforceable contract existed between Plaintiffs and Lion Bio requiring Lion Bio to pay Plaintiffs a fee upon the completed financing by any qualified introduction, as that term is defined in the Letter Agreement.

89.     In the alternative, Plaintiffs were third-party beneficiaries to the Letter Agreement, and were understood and intended to be such by Lion Bio and MBA at all pertinent times.

90.     In the further alternative, an agreement was formed between Plaintiffs and Lion Bio through future writings, understandings, and agreements, and pursuant to the conduct of the parties.

91.     Pursuant to the agreement(s) between the parties, Plaintiffs were entitled to receive fees in connection with the financing by qualified investors.

92.     At all pertinent times Plaintiffs have been in compliance with all of their obligations under the agreement(s).

93.     Lion Bio's failure to pay the money and issue the warrants owed to Plaintiffs as fees for the financing made by the qualified introductions constitutes a breach of the agreement(s) made directly between Plaintiffs and Lion Bio.

94.     Lion Bio's failure to pay the money and issue the warrants it owes to Plaintiffs, which is more than $60,000,000, constitutes breach of its contract with MBA, of which Plaintiffs are intended third-party beneficiaries.

95.     Lion Bio knew and agreed that, pursuant to the Letter Agreement, Plaintiffs would receive payment for its services.

96.     Upon information and belief, Lion Bio contemplated Plaintiffs' involvement during the execution of the contract.

97.     On numerous occasions, Lion Bio repeatedly acknowledged that Plaintiffs were facilitating qualified introductions and acting as a finder for Lion Bio pursuant to the Letter Agreement. Lion Bio's understanding concerning Plaintiffs' role is confirmed in communications between the parties.

98.     Lion Bio knew that its breach of contract with MBA would result in injury to Plaintiffs, in that Plaintiffs would not receive compensation for the services that it rendered.

99.     Despite demands by both Plaintiffs, Lion has not fulfilled its contractual obligations.

100.    As a result, Plaintiffs have been damaged in an amount to be determined at trial, but which in no instance is less than $60,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION – BREACH OF CONTRACT

**(Failure to Compensate Plaintiffs for Investment in Convertible Note)**

101.    Plaintiff Raff repeats and realleges the allegations set forth above in paragraphs 1 through 100 as if set forth in full herein.

102.    Plaintiffs invested a total of $325,000 in Genesis convertible notes.

103.    The payment was accepted and acknowledged by Genesis.

104.    Genesis and Plaintiffs entered into an agreement providing that Plaintiff's payment of $325,000 would be considered a direct investment in Genesis.

105.    The terms of the investment were as follows: (i) a note of $325,000 in the company, payable at a rate of 12% per annum; (ii) one-half (1/2) a common share for each dollar, *i.e.*, 162,500 shares; and (iv) the right to convert the notes in the next financing of the Company on the same terms.

106.    Genesis accepted and acknowledged Plaintiffs' investment.

107.    Despite repeated demands, Defendant has failed to comply with the terms of the agreement.

108.    To date, Plaintiff Raff has not received a note in the company payable at an interest rate of 12% per annum.  Plaintiffs are entitled to the issuance of the notes, plus the default rate of interest of 15%.

109.    Defendant has also failed to tender any shares to Plaintiff Raff or afford Plaintiff Raff the right to convert at the next financing of the company on the same terms.

110.    As a result, Plaintiff Raff has suffered damages in an amount to be determined at trial, but no less than $7 million.

## AS AND FOR A THIRD CAUSE OF ACTION – BREACH OF CONTRACT

### (Failure to Deliver $1.5 Million Free-Trading Shares)

111.   Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 110 as if set forth in full herein.

112.   At all pertinent times, a valid and enforceable contract existed between Lion Bio and Plaintiffs.

113.   Plaintiffs at all pertinent times were in compliance with the contract.

114.   Lion Bio breached this agreement by failing to issue 1.5 million restricted shares, half to MBA and half to Solomon, as an intended third party beneficiary who assisted in the provision of the consulting services.

115.   As a result of the violation of the agreement to deliver registered, unrestricted shares, Solomon and MBA were damaged in the amount to be determined at trial but in no event less than $1,000,000.

## AS AND FOR A FOURTH CAUSE OF ACTION – BREACH OF CONTRACT

### (Failure to Transfer Genesis Technology Israeli License)

116.   Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 116 as if set forth in full herein.

117.   A valid and enforceable contract existed between Plaintiffs and Lion Bio.   In consideration of Plaintiffs' efforts on behalf of Lion Bio, it promised to grant the License to Plaintiffs.

118.   At all pertinent times, Plaintiff was in compliance with its obligations under the contract.

119.   Genesis breached its promise to deliver the License to Plaintiffs.

120.   As a result, Plaintiffs have been damaged in an amount to be determined at trial but in no event less than $10 million.

## AS AND FOR A FIFTH CAUSE OF ACTION – UNJUST ENRICHMENT

121.   Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 120 as if set forth in full herein.

122.   Lion Bio engaged Plaintiffs to assist them in meeting potential investors and to secure financing.  Plaintiffs did so at the request and behest of Lion Bio and with Lion Bio's knowledge and understanding that Plaintiffs would be compensated for their work by receiving a fee or a portion of that fee that would be due and owing to MBA.

123.   Plaintiffs performed services for Lion Bio at its request and provided additional monies to help Lion Bio secure investments.

124.   Lion Bio received a benefit as a result of Plaintiffs' substantial endeavors and services performed.

125.   Lion Bio has not compensated Plaintiffs for their substantial endeavors and services performed and, to the contrary, has interfered with Plaintiffs' being compensated in the manner contemplated by the parties.

126.   Plaintiffs have been damaged as a result of Lion Bio's failure to pay the agreed-upon compensation and expenses paid on behalf of Lion Bio.

127.   Plaintiffs have performed services for Lion Bio at the request of Lion Bio, and Lion Bio knowingly accepted the benefits of those services with knowledge that Plaintiffs expected to be paid for their work.  The services performed by Plaintiffs, for which Lion Bio has failed and refused to pay, are reasonably worth millions of dollars, and the benefit of those services to Lion Bio was worth millions of dollars.  Lion Bio has not paid those monies, though Plaintiffs have

demanded payment. Lion Bio may not retain the benefits of those services in equity and good conscience without paying to Plaintiffs an amount to be determined at trial.

128. By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but which in no instance is less than $6.3 million.

## AS AND FOR A SIXTH CAUSE OF ACTION – FRAUD

### (Against Manish Singh)

129. Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 128 as if set forth in full herein.

130. In connection with all of the foregoing, Manish Singh made material misrepresentations and omissions concerning the qualified introduction parties brought in by Plaintiffs and concerning the value of the shares.

131. Upon information and belief, Singh purposefully misrepresented the price per share as to be too high so that Plaintiffs would be unable to secure any further qualified introductions and would be unable to earn fees from the financing. Singh did this while omitting to inform Plaintiffs of what was going on with other of their qualified introductions.

132. Upon information and belief, Singh engaged in this pattern of conduct in order to keep fees for himself, to deprive Plaintiffs of their fees, and to gain for himself fees, a bonus, and/or other valuable consideration.

133. Plaintiffs justifiably relied on his representations as truthful and complete as they had no reason to believe he was acting untruthfully, they thought they were on the same team.

134. This reliance was to their detriment, as a result of pitching an artificially high price, Plaintiffs were unable to secure potential investments from other connections they had, and as a

result were unable to earn fees on same.  Further, the reliance regarding omissions was to their detriment as they were unaware of what was happening with their qualified introductions.

135.    As a result of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but which in no instance is less than $6.3 million.

## AS AND FOR A SEVENTH CAUSE OF ACTION – CONVERSION

136.    Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 135 as if set forth in full herein.

137.    Plaintiffs had a right of possession to specific and identifiable warrants and/or shares in Lion Bio in connection with the financing gained from their qualified introductions.

138.    Defendant Singh has taken those shares and/or warrants for himself, and by that has exercised an unauthorized dominion over same to the exclusion of Plaintiffs' rights to same.

139.    By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but which in no instance is less than $6.3 million.

## AS AND FOR AN EIGHTH CAUSE OF ACTION – INDEMNIFICATION

140.    Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 139 as if set forth in full herein.

141.    Lion Bio promised to indemnify MBA under the Letter Agreement for any litigation costs arising out of the Letter Agreement.

142.    Plaintiffs are entitled to indemnification as third party beneficiaries of the Letter Agreement.

143.    Plaintiffs have and will continue to incur litigation costs in connection with this litigation, which arises out of the Letter Agreement.

144.    Plaintiffs are entitled to the reimbursement of legal fees and costs in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs prays for judgment of this Court:

(1)    On the First Cause of Action, finding Defendant to have breached the agreement(s), and awarding Plaintiffs damages in an amount to be determined at trial but presently believed to be in excess of $60 million;

(2)    On the Second Cause of Action, finding Defendant to have breached the terms of the Plaintiffs' purchase of convertible notes and awarding Plaintiffs damages in an amount no less than $7 million;

(3)    On the Third Cause of Action, finding Defendant breached its promise to deliver 1.5 million free-trading, registered shares and awarding damages in an amount no less than $1 million;

(4)    On the Fourth Cause of Action, finding that Lion Bio breached its agreement to award Plaintiffs an exclusive Israeli license to Lion Bio's technology and awarding damages in an amount no less than $10 million;

(5)    On the Fifth Cause of Action, finding that Plaintiffs are entitled to the reasonable value of the monies, work, and services expended or performed for or on behalf of Defendant as described above, in an amount to be determined at trial, but no less than $6.3 million;

(6)    On the Sixth Cause of Action, finding that Singh committed a fraud against Plaintiffs and awarding damages in an amount to be determined at trial;

(7)    On the Seventh Cause of Action, finding that Singh converted the Plaintiff's

property and awarding damages in an amount no less than $6.3 million; and

(8)    On the Eighth Cause of Action, awarding Plaintiffs reasonable attorneys' fees and

costs; and

(10)    Such other and further relief as the Court deems just and proper.

Dated: New York, New York
      September 27, 2019

CARMEL, MILAZZO & DiCHIARA, LLP

By:___/s/_____
        Michael D. Nacht, Esq.
55 West 39th Street, 18th Floor
New York, New York 10018
(212) 658-0458

*Attorneys for Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------x
                                  :     Index No.:    655668/2019

SOLOMON SHARBAT, SOLOMON    :
CAPITAL LLC, SOLOMON CAPITAL   :
401k TRUST, SHELHAV RAFF     :
                                  :
                       Plaintiffs,   :     **AMENDED COMPLAINT**

   -against-              :

IOVANCE BIOTHERAPEUTICS, INC., :
f/k/a LION BIOTECHNOLOGIES INC. :
f/k/a GENESIS BIOPHARMA INC., and :
MANISH SINGH,              :
                    Defendants.  :
------------------------------------------------------x

      Plaintiffs Solomon Sharbat ("Sharbat"), Solomon Capital LLC ("SC"), Solomon Capital

401k Trust ("The Trust"), and Shelhav Raff ("Raff") (collectively referred to herein as the

"Plaintiffs"), by and through their attorneys, Carmel, Milazzo & DiChiara LLP, alleges for their

Complaint against Defendants Iovance Biotherapeutics, Inc. f/k/a Lion Biotechnologies Inc. f/k/a

Genesis Biopharma Inc. ("Lion Bio") and Manish Singh ("Singh") (collectively, the "Defendants")

as follows:

**Nature of the Action**

    1.    This action arises from Defendants' willful failure and refusal to pay fees earned

by the Plaintiffs, pursuant to agreements between the parties, and in connection with successful

introductions made by Plaintiffs for the benefit of Lion Bio.  Those introductions resulted in the

successful investments of tremendous sums of money into Defendant Lion Bio, as contemplated

by those agreements.  In fact, Lion Bio, then Genesis Biopharma Inc., was without sufficient

capital and was in desperate need of investments and at times even direct loans from Plaintiffs and

others in order to keep the doors open.  The company is now worth tens of billions of dollars.  As a result of those successful introductions and investments, Plaintiffs were entitled to certain fees. Moreover, Defendant Singh at all pertinent times acted with a fraudulent intention to deprive Plaintiffs of the benefit of their hard work and secretly kept for himself shares of Lion which should have been made available to Plaintiffs in connection with the foregoing, through warrant coverage, of an approximate value of sixteen and a half million dollars.  Finally Plaintiffs are due fees and expenses forwarded by Plaintiffs for the benefit of Lion Bio in connection with a merger, which fees were never paid to Plaintiffs and which Plaintiffs are owed.  Based upon the foregoing, Plaintiff asserts claims for, *inter alia*, breach of contract, fraud, unjust enrichment.

### The Parties

2.      Plaintiff Sharbat is an individual, and was at all pertinent times a resident of the Country of Israel.

3.      Plaintiff Raff is an Israeli citizen who contractually agreed to work with Genesis from 2012 to 2013.

4.      Plaintiff SC is a domestic limited liability company organized and existing pursuant to the laws of the State of New York with its place of business located at 67-34 Kessel Street, Foreset Hills, New York.

5.      Plaintiff Solomon Capital 401k Trust is a qualified retirement trust organized under the laws of the State of New York.  Sharbat serves as the trustee of the trust.  The Trust's principal place of business is New York, New York.

6.      Upon information and belief, Defendant Lion Bio is a corporation organized under the laws of the State of Nevada and existing pursuant to the laws of the State of Delaware, with its principal place of business located at 112 West 34th Street, New York, New York.

7.     Upon information and belief, Iovance Biotherapeutics Inc. is the successor-in-interest to Lion Biotechnologies Inc.

8.     Upon information and belief Lion Biotechnologies Inc. is the successor-in-interest to Genesis Biopharma Inc.

9.     Upon information and belief, Defendant Singh is an individual, residing in the State of California.

## Jurisdiction and Venue

10.     This Court has personal jurisdiction over Defendants pursuant to CPLR 301 in that Defendants reside in New York, and they continuously and systematically do business within the State of New York.

11.     Venue in the County of New York is proper under CPLR 503(a) as Defendant Lion Bio has its principal place of business in the County of New York.

## Choice of Law

12.     Pursuant to the agreements between the parties, as described and defined below, the claims in this action are to be governed and the agreements construed under the laws of the State of California.

## Facts Common to All Claims

### Background

13.     Plaintiffs are in the business of, *inter alia*, assisting and consulting firms with respect to fundraising, mergers, and strategic alliances and introductions.

14.     Defendant Lion Bio is a late stage biotechnology company focused on the development and commercialization of novel cancer immunotherapies.  Defendant Singh was the

- 3 -

Chief Executive Officer of Lion Bio subsequent to Anthony Cataldo, and the two held such positions at all times material times prior to the subject funds being raised.

15.     In or around the summer of 2012, Plaintiffs were introduced to Mark Beychok ("Beychok"), chief executive officer and managing member of MBA Holdings, LLC ("MBA"), a California based consulting firm.

16.     Through MBA, Plaintiffs were introduced to the then CFO of Lion Bio, Michael Handelman, who also served on its board of directors, and Lion's then CEO Anthony Cataldo who also served on Lion's board of directors.

17.     At or around this time Lion Bio had certain international rights to employ a biomedical technology but required an immediate injection of capital to fund its endeavor, and in reality to continue operating at all.

18.     Mr. Handelman discussed with Plaintiffs the development of Genesis, the potential role Plaintiffs would play in its growth, to wit, their assistance in helping Lion Bio raise $30,000,000 to expand and develop their intellectual property, and explained that the company needed the help of Plaintiffs because while it had promise, it lacked the capital continue its normal operations.  The thirty million was needed for start-up costs, and advancing the research and technology for their property.  Handelman further advised and acknowledged that Plaintiffs could earn substantial fees in connection with their assistance.

19.     Further, Handelman acknowledged that Plaintiffs would work along side of MBA and acknowledged their entitlement, given a qualified introduction, to the fees described below.

20.     On or about June 15, 2012, Lion Bio and MBA entered into an agreement (the "Letter Agreement") whereby MBA was to act as consultant to Lion Bio and "act as finder to seek financing and other strategic relationships for Genesis."

- 4 -

21.     Pursuant to the Letter Agreement, MBA, and thereby Plaintiffs would receive a "finder's fee: (i) in cash equal to ten percent (10%) of the gross proceeds of the Financing; and (ii) in five (5) year cashless warrants to purchase the Company's common stock in an amount equal to 10% of the gross proceeds of the Financing at a strike price equal to the investment purchase price."

22.     Thus in total, Plaintiffs were to earn twenty percent (20%) of any financing from qualified investors.

23.     The finders fee would be due upon Lion Bio receiving any Financing from a Qualified Introduction.  A Qualified Introduction is defined, under the Letter Agreement, to mean "a Person introduced to the Company by Consultant or through another Person introduced to the Company by Consultant."

24.     At pertinent times, based on the intent of the parties, as evidenced through the assurances of Lion Bio's executives and as evidenced through the conduct of the parties, and as evidenced through subsequent writings, Plaintiffs were direct parties to the Letter Agreement.

25.     In the alternative, Plaintiffs were intended beneficiaries of the Letter Agreement, as similarly evidenced.

26.     The foregoing was confirmed in an email in which Lion Bio's then attorney confirmed that MBA and SC were to share in all proceeds, both cash and securities, in connection with the financing anticipated by the Letter Agreement.  Lion Bio also confirmed Raff to be a third party beneficiary of the Letter Agreement, with the three, each of MBA, SC, and Raff to be one-third beneficiaries.

27.     Further, and thereafter, Lion Bio's CEO's Anthony Cataldo and Defendant Singh, and Lion Bio's CFO acknowledged the terms of the Letter Agreement and regularly communicated

via phone, email, and text messages regarding Plaintiffs' efforts in introducing potential investors to Lion Bio, as well as the agreed upon compensation Plaintiffs would receive.

28.     Subsequently Beychok withdrew from participation in the financing of Lion Bio. However the continuing contractual relationship whereby Plaintiffs would be compensated for financing by qualified investors was confirmed by Lion Bio to Plaintiffs and to Plaintiffs' agents, representatives, and partners.[1]

29.     For example, Merrill McPeak, on behalf of Lion Bio acknowledged to Plaintiffs' to an agent and/or representative and/or partner that Plaintiffs will continue to be entitled to a finder's fee for the investors they introduced to Lion Bio.

**Plaintiffs Perform Pursuant to the Letter Agreement**

30.     Plaintiffs began to perform pursuant to the Letter Agreement by way of seeking out potential investors.

31.     To that extent, in or about August of 2012, Plaintiffs contacted New World Merchant Partners LLC ("New World"), a New York merchant banking firm for the purpose of assisting them in identifying potential investors for the Lion Bio financing.

32.     On August 28, 2012, (the "New World Agreement"), New World agreed to act as non-exclusive financial and strategic advisor to Genesis.   New World agreed to conduct due diligence of Genesis and to evaluate its growth and financial alternatives.

33.     It was understood and agreed between all the parties that any funds that were raised upon Plaintiffs' introductions, notwithstanding the involvement of New World, would still be attributed to Plaintiffs.

---

[1] Plaintiffs make no affirmative or negative allegation as to whether the Letter Agreement was terminated and a new agreement between the parties was formed, or whether the parties simply continued to perform under the Letter Agreement, as same is to be a conclusion of law.

34.     Before performing any services, New World required a $35,000 retainer due diligence fee. Lion Bio lacked the funds to pay this fee and requested that Raff make the payment for it.  Handelman and Cataldo, on behalf of Lion Bio, told Raff that this payment would be considered an investment in Lion Bio. Handelman promised Plaintiff Raff that upon making the payment he would receive (i) a promissory note in the company for $35,000; (ii) one-half (1/2) a common share for each dollar, *i.e.*, 17,500 shares; and (iii) the right to convert the note in Genesis's next financing.

35.     Agreeing to the above terms, Plaintiff Raff paid the $35,000 due diligence fee to New World ("New World Payment") on Genesis's behalf.

36.     On or about August 13, 2012, Handelman formally acknowledged Plaintiff Raff's payment of $35,000 and recognized his payment to New World as a direct investment in Genesis. In an email dated August 30, 2012, Handelman e-mailed to Plaintiff and attached the following documents to the e-mail in confirmation of the terms of the agreement: (i) an unsigned secured promissory note; (ii) an unsigned bridge note subscription agreement; and (iii) an unsigned bridge loan term sheet.

37.     On or about November 13, 2012, Handelman e-mailed Plaintiff Raff to confirm again that Plaintiff Raff tendered payment to New World on behalf of Genesis in the amount of $35,000.  Attached to the e-mail was an invoice from New World memorializing the due diligence payment of $35,000.  Therein, Handelman re-confirmed the terms of Plaintiff Raff's investment in Genesis' convertible note offering, which are as follows: (i) a "note in the Genesis company [of $35,000]"; (ii) "[one-half (1/2)] a common share for each dollar[, *i.e.*,] 17,500 shares"; and (iii) "the right to convert into the next financing of the company [(Genesis)] on the same terms."

- 7 -

38.     To date, Genesis has failed to deliver to Plaintiff Raff an executed secured promissory note and the promised common shares, and has otherwise refused to reimburse Plaintiff Raff for the $35,000 Plaintiff Raff laid out on behalf of the Company.

**Plaintiffs Make Qualified Introductions**

39.     Following the formation of the agreement(s), Plaintiffs identified several potential investors and strategic relationships for Lion Bio.

40.     Upon information and belief, in or about November of 2013, the qualified investors which Plaintiffs introduced to Lion Bio, and/or those who were introduced to Lion Bio by individuals or entities directly introduced to Lion Bio by Plaintiffs invested approximately $20,000,000 into Lion Bio and then those indirectly introduced to Lion Bio by Plaintiffs invested another approximate $3,300,000.

41.     In 2014, one of these investors invested another $17,000,000 into Lion Bio.

42.     In 2014 two more of these investors made reinvestments into Lion Bio in excess of $20,000,000.00.

43.     In 2012, one of the investors introduced to Lion Bio by Plaintiffs, Highline Research Advisors, LLC ("Highline") introduced Lion Bio to investors ready and willing to invest an additional $10,000,000.

44.     Finally, Plaintiffs, with the participation of Highline, introduced Genesis to Lion, which two companies eventually merged.  Lion received 1.3 million Genesis shares (after reverse stock split), then valued at $13.5 million dollars and now valued at $35,000,000.  Plaintiffs are therefore entitled to a commission of 86,000 shares or $24500,000 million, plus warrants, under the Letter Agreement in consideration of their introduction of Lion to Genesis.

**Manish Singh is Appointed Chief Executive and Perpetrates a Fraud and Converts Shares**

45.     As previously alleged, Plaintiffs introduced Defendant to Highline.  However, prior to injecting any funds, Highline required that Lion Bio, then Genesis, install an appropriate management team.  Highline suggested Singh be installed as CEO.

46.     Eventually Singh replaced Cataldo as CEO of Lion Bio.

47.     Thereafter, Singh gathered the qualified introductions made by Plaintiffs, to Anthony Cataldo and Lion Bio's previous management, and carried out the aforementioned financing hastily for the purpose of gaining the financial benefit for himself and cutting the Plaintiffs out.

48.     Once at the helm, Manish continued, like his predecessor, to update Plaintiffs about meetings held with investors.

49.     With respect to discussions concerning a company called Roth Capital, Singh sought to convince the Plaintiffs to take a course of action by which they would agree with Roth Capital that Roth Capital would pay Plaintiffs their fees, evidencing Plaintiffs' entitlement to such fees, but in an attempt to relieve Lion Bio of that responsibility.

50.     Plaintiffs had discussions with Singh regarding other of the qualified introductions made by Plaintiffs in which Singh acknowledged that fees were owed to Plaintiffs with respect to certain of them but disputed Plaintiffs' rights with respect to certain others.  While Plaintiffs dispute the validity of Singh's denials, the acknowledgements demonstrate that the parties understood there to be an agreement by which they were bound with respect to Plaintiffs' qualified introductions.

51.     However, as time went on, updates with respect to some prospective investors, which would have been qualified introductions, were hidden from Plaintiffs by Singh.

52.     Next, Singh began to attempt to limit the class of qualified introductions for which Plaintiffs would be entitled to fees, despite Lion Bio previously acknowledging same.  This was the case, for example, with financing raised through Highline and New World.  Plaintiffs fees in connection with same had previously been approved by Lion Bio.

53.     During the ensuing days, weeks, and months, Singh would misrepresent to the amounts expected to be raised from Plaintiffs' qualified introductions.

54.     Further, Singh began to omit material facts concerning the development of the investment by Highline from Plaintiffs.

55.     Next, there came a time when Singh sent a correspondence to Plaintiffs, while Plaintiffs were working on bringing in investors, stating the conditions, before a reverse split, would be four cents per share with an additional one half option for each share.  Plaintiffs sent these conditions to various investors around the world.  These conditions caused some concern to some of the potential qualified introductions that Plaintiffs could have made, because of the high valuation.  Plaintiffs discussed with Singh that at such a high valuation, fund raising would be impossible and all of Plaintiffs' work would be worthless.  Plaintiffs asked Singh to reconsider his position concerning the value of the company, Singh refused to do so.

56.     However, in emails as of October 14, 2013, Singh stated that it was still too early to determine the value of the company and that the final valuation should only be made the day before closing the deal.  He further stated that the expected price per share would be in the range of $4-$5.

57.     Approximately two weeks later, a deal for shares at a price of $2 per share plus a free warrant at $2.50, was published.

58.     Upon information and belief, Singh provided Plaintiffs with incorrect and misleading information in an effort to make it impossible for them to attract investors, all while trying to attract investors of his own for his own personal gain.

59.     Finally, following the financing, Singh received 608,000 shares of stock which were valued at approximately six million dollars.  Upon information and belief, these were shares that should have been offered to Plaintiffs and were their rightful property.  Today those shares would have a value in excess of $16,000,000.00.

60.     Thereafter, Singh, knowing the fundraising stage had been completed, began purchasing company shares with his own money.

**Exclusive Israeli License Due Plaintiffs**

61.     In addition to the terms of the Letter Agreement, Lion Bio promised that if Plaintiffs raised $3-5 million for it, Plaintiffs would be granted an exclusive license to distribute Lion Bio's cancer treatment methods in Israel (the "License").  The License has a minimum value of $30 million and may be worth as much as $50 million.

62.     Lion Bio breached its promise to deliver the License to Plaintiffs.

## AS AND FOR A FIRST CAUSE OF ACTION – BREACH OF CONTRACT
### (Against Lion Bio)

63.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 86 as if set forth in full herein.

64.     At all pertinent times, a valid and enforceable contract existed between Plaintiffs and Lion Bio requiring Lion Bio to pay Plaintiffs a fee upon the completed financing by any qualified introduction, as that term is defined in the Letter Agreement.

65.     In the alternative, Plaintiffs were third-party beneficiaries to the Letter Agreement, and were understood and intended to be such by Lion Bio and MBA at all pertinent times.

66.     In the further alternative, an agreement was formed between Plaintiffs and Lion Bio through future writings, understandings, and agreements, and pursuant to the conduct of the parties.

67.     Pursuant to the agreement(s) between the parties, Plaintiffs were entitled to receive fees in connection with the financing by qualified investors.

68.     At all pertinent times Plaintiffs have been in compliance with all of their obligations under the agreement(s).

69.     Lion Bio's failure to pay the money and issue the warrants owed to Plaintiffs as fees for the financing made by the qualified introductions constitutes a breach of the agreement(s) made directly between Plaintiffs and Lion Bio.

70.     Lion Bio's failure to pay the money and issue the warrants it owes to Plaintiffs, which is more than $46,000,000, constitutes breach of its contract with MBA, of which Plaintiffs are intended third-party beneficiaries.

71.     Lion Bio knew and agreed that, pursuant to the Letter Agreement, Plaintiffs would receive payment for its services.

72.     Upon information and belief, Lion Bio contemplated Plaintiffs' involvement during the execution of the contract.

73.     On numerous occasions, Lion Bio repeatedly acknowledged that Plaintiffs were facilitating qualified introductions and acting as a finder for Lion Bio pursuant to the Letter Agreement.  Lion Bio's understanding concerning Plaintiffs' role is confirmed in communications between the parties.

74.     Lion Bio knew that its breach of contract with MBA would result in injury to Plaintiffs, in that Plaintiffs would not receive compensation for the services that it rendered.

75.     Despite demands by both Plaintiffs, Lion has not fulfilled its contractual obligations.

76.     As a result, Plaintiffs have been damaged in an amount to be determined at trial, but which in no instance is less than $60,000,000.

## AS AND FOR A SECOND CAUSE OF ACTION – BREACH OF CONTRACT
### (Failure to Deliver 1.5 Million Free-Trading Shares)

77.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 110 as if set forth in full herein.

78.     At all pertinent times, a valid and enforceable contract existed between Lion Bio and Plaintiffs.

79.     Plaintiffs at all pertinent times were in compliance with the contract.

80.     Lion Bio breached this agreement by failing to issue 1.5 million unrestricted shares, half to MBA and half to Solomon, as an intended third party beneficiary who assisted in the provision of the consulting services.

81.     As a result of the violation of the agreement to deliver registered, unrestricted shares, Solomon and MBA were damaged in the amount to be determined at trial but in no event less than $1,000,000.

## AS AND FOR A THIRD CAUSE OF ACTION – BREACH OF CONTRACT
### (Failure to Transfer Genesis Technology Israeli License)

82.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 116 as if set forth in full herein.

- 13 -

83.     A valid and enforceable contract existed between Plaintiffs and Lion Bio.  In consideration of Plaintiffs' efforts on behalf of Lion Bio, it promised to grant the License to Plaintiffs.

84.     At all pertinent times, Plaintiff was in compliance with its obligations under the contract.

85.     Genesis breached its promise to deliver the License to Plaintiffs.

86.     As a result, Plaintiffs have been damaged in an amount to be determined at trial but in no event less than $50 million.

## AS AND FOR A FOURTH CAUSE OF ACTION – UNJUST ENRICHMENT

87.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 120 as if set forth in full herein.

88.     Lion Bio engaged Plaintiffs to assist them in meeting potential investors and to secure financing.  Plaintiffs did so at the request and behest of Lion Bio and with Lion Bio's knowledge and understanding that Plaintiffs would be compensated for their work by receiving a fee or a portion of that fee that would be due and owing to MBA.

89.     Plaintiffs performed services for Lion Bio at its request and provided additional monies to help Lion Bio secure investments.

90.     Lion Bio received a benefit as a result of Plaintiffs' substantial endeavors and services performed.

91.     Lion Bio has not compensated Plaintiffs for their substantial endeavors and services performed and, to the contrary, has interfered with Plaintiffs' being compensated in the manner contemplated by the parties.

92.     Plaintiffs have been damaged as a result of Lion Bio's failure to pay the agreed-upon compensation and expenses paid on behalf of Lion Bio.

93.     Plaintiffs have performed services for Lion Bio at the request of Lion Bio, and Lion Bio knowingly accepted the benefits of those services with knowledge that Plaintiffs expected to be paid for their work.  The services performed by Plaintiffs, for which Lion Bio has failed and refused to pay, are reasonably worth millions of dollars, and the benefit of those services to Lion Bio was worth millions of dollars.  Lion Bio has not paid those monies, though Plaintiffs have demanded payment.  Lion Bio may not retain the benefits of those services in equity and good conscience without paying to Plaintiffs an amount to be determined at trial.

94.     By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but which in no instance is less than $6.3 million.

## AS AND FOR A FIFTH CAUSE OF ACTION – FRAUD
### (Against Manish Singh)

95.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 128 as if set forth in full herein.

96.     In connection with all of the foregoing, Manish Singh made material misrepresentations and omissions concerning the qualified introduction parties brought in by Plaintiffs and concerning the value of the shares.

97.     Upon information and belief, Singh purposefully misrepresented the price per share as to be too high so that Plaintiffs would be unable to secure any further qualified introductions and would be unable to earn fees from the financing.  Singh did this while omitting to inform Plaintiffs of what was going on with other of their qualified introductions.

98.     Upon information and belief, Singh engaged in this pattern of conduct in order to keep fees for himself, to deprive Plaintiffs of their fees, and to gain for himself fees, a bonus, and/or other valuable consideration.

99.     Plaintiffs justifiably relied on his representations as truthful and complete as they had no reason to believe he was acting untruthfully, they thought they were on the same team.

100.     This reliance was to their detriment, as a result of pitching an artificially high price, Plaintiffs were unable to secure potential investments from other connections they had, and as a result were unable to earn fees on same.  Further, the reliance regarding omissions was to their detriment as they were unaware of what was happening with their qualified introductions.

101.     As a result of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but which in no instance is less than $12 million.

## AS AND FOR A SIXTH CAUSE OF ACTION – CONVERSION

102.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 135 as if set forth in full herein.

103.     Plaintiffs had a right of possession to specific and identifiable warrants and/or shares in Lion Bio in connection with the financing gained from their qualified introductions.

104.     Defendant Singh has taken those shares and/or warrants for himself, and by that has exercised an unauthorized dominion over same to the exclusion of Plaintiffs' rights to same.

105.     By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but which in no instance is less than $6.3 million.

## AS AND FOR AN SEVENTH CAUSE OF ACTION – INDEMNIFICATION

106.    Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 139 as if set forth in full herein.

107.    Lion Bio promised to indemnify MBA under the Letter Agreement for any litigation costs arising out of the Letter Agreement.

108.    Plaintiffs are entitled to indemnification as third party beneficiaries of the Letter Agreement.

109.    Plaintiffs have and will continue to incur litigation costs in connection with this litigation, which arises out of the Letter Agreement.

110.    Plaintiffs are entitled to the reimbursement of legal fees and costs in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs prays for judgment of this Court:

(1)     On the First Cause of Action, finding Defendant to have breached the agreement(s), and awarding Plaintiffs damages in an amount to be determined at trial but presently believed to be in excess of $60 million;

(2)     On the Second Cause of Action, finding Defendant breached its promise to deliver 1.5 million free-trading, registered shares and awarding damages in an amount no less than $1 million;

(3)     On the Third Cause of Action, finding that Lion Bio breached its agreement to award Plaintiffs an exclusive Israeli license to Lion Bio's technology and awarding damages in an amount no less than $50 million;

(4)     On the Fourth Cause of Action, finding that Plaintiffs are entitled to the reasonable value of the monies, work, and services expended or performed for or on behalf of

Defendant as described above, in an amount to be determined at trial, but no less than $6.3 million;

(5)   On the Fifth Cause of Action, finding that Singh committed a fraud against Plaintiffs and awarding damages in an amount to be determined at trial;

(6)   On the Sixth Cause of Action, finding that Singh converted the Plaintiff's property and awarding damages in an amount no less than $6.3 million; and

(7)   On the Seventh Cause of Action, awarding Plaintiffs reasonable attorneys' fees and costs; and

(8)   Such other and further relief as the Court deems just and proper.

Dated: New York, New York
        January 14, 2019

                              CARMEL, MILAZZO & DiCHIARA, LLP

                              By: ___/s/_____
                                      Michael D. Nacht, Esq.
                              55 West 39th Street, 18th Floor
                              New York, New York 10018
                              (212) 658-0458

                              *Attorneys for Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF

-----------------------------------------------------------------x

*Solomon Sharbat, Solomon Capital LLC, Solomon Capital 401k Trust, Shelhav Raff*

Plaintiff/Petitioner,

- against -

Index No. 655 668/2019

*Irene Biotherapeutics, Inc., f/k/a Lion Biotechnologies Inc., f/k/a Genesis Biopharma Inc., and Manish Singh*

Defendant/Respondent.

-----------------------------------------------------------------x

### NOTICE OF ELECTRONIC FILING
### (Consensual Case)
### (Uniform Rule § 202.5-b)

**You have received this Notice because:**

> 1) The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

> 2) You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney.  (Attorneys: see "Information for Attorneys" pg. 2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you must have access to a computer and a scanner or other device to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:

    - serving and filing your documents electronically

    - free access to view and print your e-filed documents

    - limiting your number of trips to the courthouse

    - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**

- visit: www.nycourts.gov/efile-unrepresented or
- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

**Information for Attorneys**

An attorney representing a party who is served with this notice must either consent or decline consent to electronic filing and service through NYSCEF for this case.

Attorneys registered with NYSCEF may record their consent electronically in the manner provided at the NYSCEF site. Attorneys not registered with NYSCEF but intending to participate in e-filing must first create a NYSCEF account and obtain a user ID and password prior to recording their consent by going to www.nycourts.gov/efile

Attorneys declining to consent must file with the court and serve on all parties of record a declination of consent.

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: _1/17/2020_

_Michael D. Nacht, Esq._
Name

_Carmel, Milzzro & D, Chiara, LLP_
Firm Name

_55 West 39th Street, 18th Floor_

_New York, New York 10018_
Address

_(646) 868-3880_
Phone

_MNacht@ CMDLLP.com_
E-Mail

To: _Iovance Bio therapeutics, Inc._
_and Manish Singh_

_112 West 39th Street_

_New York, New York 10120_

6/6/18