UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                               :     Index No.:     1:20-CV-01391-ER

SOLOMON SHARBAT, SOLOMON    :
CAPITAL LLC, SOLOMON CAPITAL :
401k TRUST, SHELHAV RAFF     :
                               :
                               :
             Plaintiffs,   :
                               :     **AMENDED COMPLAINT**
   -against-               :
                               :
IOVANCE BIOTHERAPEUTICS, INC., :
f/k/a LION BIOTECHNOLOGIES INC. :
f/k/a GENESIS BIOPHARMA INC., and :
MANISH SINGH,               :
             Defendants.  :
------------------------------------------------------x

     Plaintiffs Solomon Sharbat ("Sharbat"), Solomon Capital LLC ("SC"), Solomon Capital

401k Trust ("The Trust"), and Shelhav Raff ("Raff") (collectively referred to herein as the

"Plaintiffs"), by and through their attorneys, Carmel, Milazzo & DiChiara LLP, alleges for their

Complaint against Defendants Iovance Biotherapeutics, Inc. f/k/a Lion Biotechnologies Inc. f/k/a

Genesis Biopharma Inc. ("Lion Bio") and Manish Singh ("Singh") (collectively, the "Defendants")

as follows:

<u>**Nature of the Action**</u>

     1.    This action arises from Defendants' willful failure and refusal to pay fees earned

by the Plaintiffs, pursuant to agreements between the parties, and in connection with successful

introductions made by Plaintiffs Sharbat, Raff, and/or SC for the benefit of Lion Bio.  Those

introductions resulted in the successful investments of tremendous sums of money into Defendant

Lion Bio, as contemplated by those agreements.  In fact, Lion Bio, then Genesis Biopharma Inc.,

was without sufficient capital and was in desperate need of investments and at times even direct

loans from Plaintiffs and others in order to keep the doors open.  The company is now worth tens of billions of dollars.  As a result of those successful introductions and investments, Plaintiffs were entitled to certain fees.  Moreover, Defendant Singh at all pertinent times acted with a fraudulent intention to deprive Plaintiffs of the benefit of their hard work and secretly kept for himself shares of Lion which should have been made available to Plaintiffs in connection with the foregoing, through warrant coverage, of an approximate value of sixteen and a half million dollars.  Finally, Plaintiffs are due fees and expenses forwarded by Plaintiffs for the benefit of Lion Bio in connection with a merger, which fees were never paid to Plaintiffs and which Plaintiffs are owed. Based upon the foregoing, Plaintiff asserts claims for, *inter alia*, breach of contract, fraud, unjust enrichment.

## The Parties

2.      Plaintiff Sharbat is an individual, and was at all pertinent times a resident of the Country of Israel.

3.      Plaintiff Raff is an Israeli citizen who contractually agreed to work with Genesis from 2012 to 2013.

4.      Plaintiff SC is a domestic limited liability company organized and existing pursuant to the laws of the State of New York with its place of business located at 67-34 Kessel Street, Forest Hills, New York.

5.      Plaintiff Solomon Capital 401k Trust is a qualified retirement trust organized under the laws of the State of New York.  Sharbat serves as the trustee of the trust.  The Trust's principal place of business is New York, New York.

6.      Upon information and belief, Defendant Lion Bio is a corporation organized under the laws of the State of Nevada and existing pursuant to the laws of the State of Delaware, with its principal place of business located at 112 West 34th Street, New York, New York.

7.      Upon information and belief, Iovance Biotherapeutics Inc. is the successor-in-interest to Lion Biotechnologies Inc.

8.      Upon information and belief Lion Biotechnologies Inc. is the successor-in-interest to Genesis Biopharma Inc.

9.      Upon information and belief, Defendant Singh is an individual, residing in the State of California.

## Jurisdiction and Venue

10.      This Court has personal jurisdiction over Defendants pursuant to CPLR 301 in that Defendants reside in New York and/or did so at the time of the alleged transactions and occurrences, and they continuously and systematically do business within the State of New York. Further, Defendants have availed themselves of the Courts of the State of New York.

11.      This Court has personal jurisdiction over Defendants pursuant to CPLR 302(a)(1) in that at all pertinent times they transacted business in New York and contracted for goods and services within the state of New York.  These are substantially, in fact directly, related to the claims asserted herein.

12.      This Court has personal jurisdiction over the Defendants pursuant to CPLR 302(a)(2) in that they committed many, if not all, of the tortious and unlawful acts hereinafter alleged within the state of New York.

13.      In fact, the agreement(s) governing various aspects of this case, which were entered into during the transpiration of the events herein alleged, whether written, oral, or those to be

enforced as a matter of law as quasi contracts, were negotiated and/or entered into within the State of New York.

14.     Many, of the acts, events, and transactions alleged herein, which are substantially related to the claims asserted, occurred, and were performed, negotiated, and executed in the State of New York, and Defendants' actions in those regards were undertaken and effected by Defendants purposefully.

15.     For example, the due diligence for which, as described below, Raff laid out $35,000 was conducted in New York, by a New York Company, the agreement for which was negotiated and entered into in New York, and which had a New York forum selection clause.  Defendants were involved in this transaction and present in New York for jurisdictional purposes for same from start to finish.

16.     Defendant Singh, acting for and on the behalf of Lion Bio, conducted multiple meetings with investors introduced to Defendants by Raff, Sharbat, and/or SC, in New York.

17.     Lion Bio met with several investors introduced to it by Raff, Sharbat, and/or SC and Raff in New York.

18.     At least one of the third-parties with whom the parties transacted business with respect to these events has an office in New York and/or is a New York resident.

19.     This Court has jurisdiction over the Defendants pursuant to CPLR 302(a)(3) in that, to the extent Defendants assert they acted from California or Delaware, or any state other than New York, Defendants committed tortious acts without the state which caused injury to persons within the state and upon information and belief regularly do or solicit business in New York, engage in a persistent course of conduct, and derive substantial revenue from services rendered.

Moreover, upon information and belief, Defendants derive substantial revenue from interstate commerce and should have reasonably expected their acts to have consequences in New York.

20.    With respect to the foregoing, Lion Bio had purposefully availed itself of the privilege of conducting its activities in New York.

21.    Venue in the County of New York is proper under CPLR 503(a) as neither party resides in the State of New York and Plaintiffs thus designate the County of New York.

### Choice of Law

22.    Pursuant to the agreements between the parties, as described and defined below, the claims in this action are to be governed and the agreements construed under the laws of the State of California.

### Facts Common to All Claims

#### Background

23.    Plaintiffs Raff and Sharbat are in the business of, *inter alia*, assisting and consulting firms with respect to fundraising, mergers, and strategic alliances and introductions.

24.    Defendant Lion Bio is a late stage biotechnology company focused on the development and commercialization of novel cancer immunotherapies.  Defendant Singh was the Chief Executive Officer of Lion Bio subsequent to Anthony Cataldo, and the two held such positions at all times material times prior to the subject funds being raised.

25.    In or around the summer of 2012, Plaintiffs Raff and Sharbat were introduced to Mark Beychok ("Beychok"), chief executive officer and managing member of MBA Holdings, LLC ("MBA"), a California based consulting firm.

26.     Through MBA, Plaintiffs were introduced to the then CFO of Lion Bio, Michael Handelman, who also served on its board of directors, and Lion's then CEO Anthony Cataldo who also served on Lion's board of directors.

27.     At or around this time Lion Bio had certain international rights to employ a biomedical technology but required an immediate injection of capital to fund its endeavor, and in reality, to continue operating at all.

28.     Mr. Handelman discussed with Plaintiffs the development of Genesis, the potential role Plaintiffs would play in its growth, to wit, their assistance in helping Lion Bio raise $30,000,000 to expand and develop their intellectual property, and explained that the company needed the help of Plaintiffs because while it had promise, it lacked the capital continue its normal operations.  The thirty million was needed for start-up costs, and advancing the research and technology for their property.  Handelman further advised and acknowledged that Plaintiffs could earn substantial fees in connection with their assistance.

29.     Further, Handelman acknowledged that Plaintiffs Sharbat, Raff, and/or SC would work alongside of MBA and acknowledged their entitlement, given a qualified introduction, to the fees described below.

30.     On or about June 15, 2012, Lion Bio and MBA entered into an agreement (the "Letter Agreement") whereby MBA was to act as consultant to Lion Bio and "act as finder to seek financing and other strategic relationships for Genesis."

31.     Pursuant to the Letter Agreement, MBA, and thereby Plaintiffs would receive a "finder's fee:  (i) in cash equal to ten percent (10%) of the gross proceeds of the Financing; and (ii) in five (5) year cashless warrants to purchase the Company's common stock in an amount equal

to 10% of the gross proceeds of the Financing at a strike price equal to the investment purchase price."

32.     This was pursuant to an agreement and understanding among all of the parties and MBA, in addition to an agreement and understanding as between MBA on one hand and Sharbat, Raff, and/or SC on the other hand.

33.     Thus, in total, Plaintiffs Sharbat, Raff, SC, and/or the Trust were to earn twenty percent (20%) of any financing from qualified investors.

34.     The Letter Agreement provided, and it was acknowledged by all parties, that Solomon Sharbat would be entitled to 33% of the fee, MBA to 33% of the fee, and Raff to 33% of the fee.

35.     However, Mr. Cataldo stated to Sharbat that he may, instead of entitlement to 1/3 of the fee earned, be entitled to and insist upon entitlement to $400,00 into the secured note.  This fee, upon Sharbat's election, would be payable on demand, and was not a contingent success fee.

36.     The finder's fee, or contingent success fee, would be due upon Lion Bio receiving any Financing from a Qualified Introduction.  A Qualified Introduction is defined, under the Letter Agreement, to mean "a Person introduced to the Company by Consultant or through another Person introduced to the Company by Consultant."

37.     At pertinent times, based on the intent of the parties, as evidenced through the assurances of Lion Bio's executives and as evidenced through the conduct of the parties, and as evidenced through subsequent writings, Plaintiff Sharbat, Raff, and/or SC were direct parties to the Letter Agreement.

38.     In the alternative, Plaintiff Sharbat, Raff, and/or SC were intended beneficiaries of the Letter Agreement, as similarly evidenced.

39.     The foregoing was confirmed in an email in which Lion Bio's then attorney confirmed that MBA and SC were to share in all proceeds, both cash and securities, in connection with the financing anticipated by the Letter Agreement.  Lion Bio also confirmed Raff to be an intended and/or third-party beneficiary of the Letter Agreement, with the three, each of MBA, SC, and Raff to be one-third beneficiaries.

40.     Further, and thereafter, Lion Bio's CEO's Anthony Cataldo and Defendant Singh, and Lion Bio's CFO acknowledged the terms of the Letter Agreement and regularly communicated via phone, email, and text messages regarding Sharbat, Raff, and/or SC's efforts in introducing potential investors to Lion Bio, as well as the agreed upon compensation they would receive.

41.     Subsequently Beychok withdrew from participation in the financing of Lion Bio. However, the continuing contractual relationship whereby Plaintiffs Sharbat, Raff, and/or SC would be compensated for financing by qualified investors was confirmed by Lion Bio to them and to their agents, representatives, and partners.[1]

42.     For example, Merrill McPeak, on behalf of Lion Bio acknowledged to Sharbat and Raff to an agent and/or representative and/or partner that Sharbat, Raff, and/or SC will continue to be entitled to a finder's fee for the investors they introduced to Lion Bio.

**Plaintiffs Perform Pursuant to the Letter Agreement**

43.     Sharbat, Raff, and/or SC began to perform pursuant to the Letter Agreement by way of seeking out potential investors.

---

[1] Plaintiffs make no affirmative or negative allegation as to whether the Letter Agreement was terminated and a new agreement between the parties was formed, or whether the parties simply continued to perform under the Letter Agreement, as same is to be a conclusion of law.

44.     To that extent, in or about August of 2012, Sharbat, Raff, and/or SC contacted New World Merchant Partners LLC ("New World"), a New York merchant banking firm for the purpose of assisting them in identifying potential investors for the Lion Bio financing.

45.     On August 28, 2012, (the "New World Agreement"), New World agreed to act as non-exclusive financial and strategic advisor to Genesis.  New World agreed to conduct due diligence of Genesis and to evaluate its growth and financial alternatives.

46.     It was understood and agreed between all the parties that any funds that were raised upon Sharbat, Raff, and/or SC's introductions, notwithstanding the involvement of New World, would still be attributed to them.

47.     Before performing any services, New World required a $35,000 retainer due diligence fee.  Lion Bio lacked the funds to pay this fee and requested that Raff make the payment for it.  Handelman and Cataldo, on behalf of Lion Bio, told Raff that this payment would be considered an investment in Lion Bio. Handelman promised Plaintiff Raff that upon making the payment he would receive (i) a promissory note in the company for $35,000; (ii) one-half (1/2) a common share for each dollar, *i.e.*, 17,500 shares; and (iii) the right to convert the note in Genesis's next financing.

48.     Agreeing to the above terms, Plaintiff Raff paid the $35,000 due diligence fee to New World ("New World Payment") on Genesis's behalf.

49.     On or about August 13, 2012, Handelman formally acknowledged Plaintiff Raff's payment of $35,000 and recognized his payment to New World as a direct investment in Genesis. In an email dated August 30, 2012, Handelman e-mailed to Plaintiff and attached the following documents to the e-mail in confirmation of the terms of the agreement: (i) an unsigned secured

promissory note; (ii) an unsigned bridge note subscription agreement; and (iii) an unsigned bridge loan term sheet.

50.     On or about November 13, 2012, Handelman e-mailed Plaintiff Raff to confirm again that Plaintiff Raff tendered payment to New World on behalf of Genesis in the amount of $35,000.  Attached to the e-mail was an invoice from New World memorializing the due diligence payment of $35,000.  Therein, Handelman re-confirmed the terms of Plaintiff Raff's investment in Genesis' convertible note offering, which are as follows: (i) a "note in the Genesis company [of $35,000]"; (ii) "[one-half (1/2)] a common share for each dollar[, *i.e.*,] 17,500 shares"; and (iii) "the right to convert into the next financing of the company [(Genesis)] on the same terms."

51.     To date, Lion Bio has failed to deliver to Plaintiff Raff an executed secured promissory note and the promised common shares, despite representing to the Bank of Israel Raff's entitlement to such shares, and has otherwise refused to reimburse Plaintiff Raff for the $35,000 Plaintiff Raff laid out on behalf of the Company.

**<u>Sharbat, Raff, and/or SC Make Qualified Introductions</u>**

52.     Following the formation of the agreement(s), Plaintiffs Sharbat, Raff, and/or SC identified several potential investors and strategic relationships for Lion Bio.

53.     Upon information and belief, in or about November of 2013, the qualified investors which Sharbat, Raff, and/or SC introduced to Lion Bio, and/or those who were introduced to Lion Bio by individuals or entities directly introduced to Lion Bio by them invested approximately $20,000,000 into Lion Bio and then those indirectly introduced to Lion Bio by them invested another approximate $3,300,000.

54.     In 2014, one of these investors invested another $17,000,000 into Lion Bio.

55.     In 2014 two more of these investors made reinvestments into Lion Bio in excess of $20,000,000.00.

56.     In 2012, one of the investors introduced to Lion Bio by Sharbat, Raff, and/or SC Highline Research Advisors, LLC ("Highline") introduced Lion Bio to investors ready and willing to invest an additional $10,000,000.

57.     Finally, Sharbat, Raff, and/or SC, with the participation of Highline, introduced Genesis to Lion, which two companies eventually merged.  Lion received 1.3 million Genesis shares (after reverse stock split), then valued at $13.5 million dollars and now valued at $35,000,000.  Sharbat, Raff, and/or SC are therefore entitled to a commission of 86,000 shares or $24500,000 million, plus warrants, under the Letter Agreement in consideration of their introduction of Lion to Genesis.

**Manish Singh is Appointed Chief Executive, Perpetrates a Fraud and Converts Shares**

58.     As previously alleged, Sharbat, Raff, and/or SC introduced Defendant to Highline. However, prior to injecting any funds, Highline required that Lion Bio, then Genesis, install an appropriate management team.  Highline suggested Singh be installed as CEO.

59.     Eventually Singh replaced Cataldo as CEO of Lion Bio.

60.     Thereafter, Singh gathered the qualified introductions made by Sharbat, Raff, and/or SC, to Anthony Cataldo and Lion Bio's previous management, and carried out the aforementioned financing hastily for the purpose of gaining the financial benefit for himself and cutting the Plaintiffs out.

61.     Once at the helm, Manish continued, like his predecessor, to update Plaintiffs about meetings held with investors, which meetings occurred in the State of New York.

62.     With respect to discussions concerning a company called Roth Capital, Singh sought to convince the Sharbat, Raff, and/or SC to take a course of action by which they would agree with Roth Capital that Roth Capital would pay them their fees, evidencing their entitlement to such fees, but in an attempt to relieve Lion Bio of that responsibility.

63.     Sharbat, Raff, and/or SC had discussions with Singh regarding other of the qualified introductions made by them in which Singh acknowledged that fees were owed to them with respect to certain of them but disputed their rights with respect to certain others.  While Plaintiffs dispute the validity of Singh's denials, the acknowledgements demonstrate that the parties understood there to be an agreement by which they were bound with respect to Sharbat, Raff, and/or SC's qualified introductions.

64.     However, as time went on, updates with respect to some prospective investors, which would have been qualified introductions, were hidden from Plaintiffs by Singh.

65.     Next, Singh began to attempt to limit the class of qualified introductions for which Sharbat, Raff, and/or SC would be entitled to fees, despite Lion Bio previously acknowledging same.  This was the case, for example, with financing raised through Highline, New World, and Perceptive Life Bio Science Fund.  Sharbat, Raff, and/or SC's fees in connection with same had previously been approved by Lion Bio.

66.     During the ensuing days, weeks, and months, Singh would misrepresent to the amounts expected to be raised from Sharbat, Raff, and/or SC/s qualified introductions.

67.     Further, Singh began to omit material facts concerning the development of the investments by Highline and others introduced Sharbat, Raff, and/or SC.

68.     Next, there came a time when Singh sent a correspondence to Sharbat, Raff, and/or SC, while they were working on bringing in investors, stating the conditions, before a reverse split,

would be four cents per share with an additional one-half option for each share.  Sharbat, Raff, and/or SC sent these conditions to various investors around the world.  These conditions caused some concern to some of the potential qualified introductions that Sharbat or Raff could have made, because of the high valuation.  Sharbat and Raff discussed with Singh that at such a high valuation, fund raising would be impossible and all of their work would be worthless.  They asked Singh to reconsider his position concerning the value of the company, Singh refused to do so.

69.     However, in emails as of October 14, 2013, Singh stated that it was still too early to determine the value of the company and that the final valuation should only be made the day before closing the deal.  He further stated that the expected price per share would be in the range of $4-$5.

70.     Approximately two weeks later, a deal for shares at a price of $2 per share plus a free warrant at $2.50, was published.

71.     Upon information and belief, Singh provided Sharbat and Raff with incorrect and misleading information in an effort to make it impossible for them to attract investors, all while trying to attract investors of his own for his own personal gain.

72.     Finally, following the financing, Singh received 608,000 shares of stock which were valued at approximately six million dollars.  Upon information and belief, these were shares that should have been offered to Sharbat, Raff, and/or SC and were their rightful property.  Today those shares would have a value in excess of $16,000,000.00.

73.     Thereafter, Singh, knowing the fundraising stage had been completed, began purchasing company shares with his own money.

**Exclusive Israeli License Due Plaintiffs**

74.     In addition to the terms of the Letter Agreement, Lion Bio promised that if Sharbat, Raff, and/or SC raised $3-5 million for it, they would be granted an exclusive license to distribute Lion Bio's cancer treatment methods in Israel (the "License").  The License has a minimum value of $30 million and may be worth as much as $50 million.

75.     Lion Bio breached its promise to deliver the License to Sharbat, Raff, and/or SC.

## AS AND FOR A FIRST CAUSE OF ACTION – BREACH OF CONTRACT
### (Against Lion Bio)

76.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 86 as if set forth in full herein.

77.     At all pertinent times, a valid and enforceable contract existed between Sharbat, Raff, and/or SC and Lion Bio requiring Lion Bio to pay them a fee upon the completed financing by any qualified introduction, as that term is defined in the Letter Agreement.

78.     In the alternative, Sharbat, Raff, and/or SC were intended and/or third-party beneficiaries to the Letter Agreement, and were understood and intended to be such by Lion Bio and MBA at all pertinent times.

79.     In the further alternative, an agreement was formed between Sharbat, Raff, and/or SC and Lion Bio through future writings, understandings, and agreements, and pursuant to the conduct of the parties.

80.     Pursuant to the agreement(s) between the parties, Sharbat, Raff, and/or SC were entitled to receive fees in connection with the financing by qualified investors.

81.     At all pertinent times Sharbat, Raff, and/or SC have been in compliance with all of their obligations under the agreement(s).

82.     Lion Bio's failure to pay the money and issue the warrants owed to Sharbat, Raff, and/or SC as fees for the financing made by the qualified introductions constitutes a breach of the agreement(s) made directly between Sharbat, Raff, and/or SC and Lion Bio.

83.     Lion Bio's failure to pay the money and issue the warrants it owes to Sharbat, Raff, and/or SC, which is more than $46,000,000, constitutes breach of its contract with MBA (or with MBA and Sharbat, Raff, and/or SC), or in the alternative, of which Sharbat, Raff, and/or SC are intended third-party beneficiaries.

84.     Lion Bio knew and agreed that, pursuant to the Letter Agreement, Sharbat, Raff, and/or SC would receive payment for their services.

85.      Upon information and belief, Lion Bio contemplated Sharbat, Raff, and/or SC's involvement during the execution of the contract.

86.     On numerous occasions, Lion Bio repeatedly acknowledged that Sharbat, Raff, and/or SC were facilitating qualified introductions and acting as a finder for Lion Bio pursuant to the Letter Agreement.   Lion Bio's understanding concerning their role is confirmed in communications between the parties.

87.     Lion Bio knew that its breach of contract with MBA would result in injury to Sharbat, Raff, and/or SC, in that they would not receive compensation for the services that they rendered.

88.     Despite demands by Sharbat, Raff, and/or SC, Lion has not fulfilled its contractual obligations.

89.     As a result, Sharbat, Raff, and/or SC have been damaged in an amount to be determined at trial, but which in no instance is less than $60,000,000 in cash and stock.

## AS AND FOR A SECOND CAUSE OF ACTION – BREACH OF CONTRACT
### (Failure to Deliver 1.5 Million Free-Trading Shares)

90.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 110 as if set forth in full herein.

91.     At all pertinent times, a valid and enforceable contract existed between Lion Bio and Sharbat, Raff, and/or SC.

92.     Sharbat, Raff, and/or SC at all pertinent times were in compliance with their obligations under the contract.

93.     Lion Bio breached this agreement by failing to issue 1.5 million unrestricted shares, half to MBA and half to Sharbat, Raff, and/or SC, as an intended third-party beneficiary who assisted in the provision of the consulting services, as was one of its obligations thereunder.

94.     As a result of the violation of the agreement to deliver registered, unrestricted shares, Sharbat, Raff, and/or SC were damaged in the amount to be determined at trial but in no event less than $1,000,000 in cash and stock.

## AS AND FOR A THIRD CAUSE OF ACTION – BREACH OF CONTRACT
### (Failure to Transfer Genesis Technology Israeli License)

95.     Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 116 as if set forth in full herein.

96.     A valid and enforceable contract existed between Sharbat, Raff, and/or SC and Lion Bio.  In consideration of their efforts on behalf of Lion Bio, it promised to grant the License to them.

97.     At all pertinent times, Sharbat, Raff, and/or SC were in compliance with their obligations under the contract.

98.     Genesis breached its promise and agreement to deliver the License to Sharbat, Raff, and/or SC.

99.     As a result, Sharbat, Raff, and/or SC have been damaged in an amount to be determined at trial but in no event less than $50 million.

### AS AND FOR A FOURTH CAUSE OF ACTION – UNJUST ENRICHMENT

100.    Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 120 as if set forth in full herein.

101.    Lion Bio engaged Sharbat, Raff, and/or SC to assist them in meeting potential investors and to secure financing.  Sharbat, Raff, and/or SC did so at the request and behest of Lion Bio and with Lion Bio's knowledge and understanding that Sharbat, Raff, and/or SC would be compensated for their work by receiving a fee or a portion of that fee that would be due and owing to MBA.

102.    Sharbat, Raff, and/or SC performed services for Lion Bio at its request and provided additional monies to help Lion Bio secure investments.

103.    Lion Bio received a benefit as a result of Sharbat, Raff, and/or SC's substantial endeavors and services performed.

104.    Lion Bio has not compensated Sharbat, Raff, or SC for their substantial endeavors and services performed and, to the contrary, has interfered with their being compensated in the manner contemplated by the parties.

105.    Sharbat, Raff, and/or SC have been damaged as a result of Lion Bio's failure to pay the agreed-upon compensation and expenses paid on behalf of Lion Bio.

106.    Sharbat, Raff, and/or SC have performed services for Lion Bio at the request of Lion Bio, and Lion Bio knowingly accepted the benefits of those services with knowledge that

they expected to be paid for their work. The services performed by Sharbat, Raff, and/or SC, for which Lion Bio has failed and refused to pay, are reasonably worth millions of dollars, and the benefit of those services to Lion Bio was worth millions of dollars. Lion Bio has not paid those monies, though they have demanded payment. Lion Bio may not retain the benefits of those services in equity and good conscience without paying to Sharbat, Raff, and/or SC an amount to be determined at trial.

107.    By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but which in no instance is less than $6.3 million in cash and stock.

## AS AND FOR A FIFTH CAUSE OF ACTION – FRAUD
### (Against Manish Singh)

108.    Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 128 as if set forth in full herein.

109.    In connection with all of the foregoing, Manish Singh made material misrepresentations and omissions concerning the qualified introduction parties brought in by Sharbat, Raff, and/or SC and concerning the value of the shares.

110.    Upon information and belief, Singh purposefully misrepresented the price per share as to be too high so that Sharbat, Raff, and/or SC would be unable to secure any further qualified introductions and would be unable to earn fees from the financing. Singh did this while omitting to inform Sharbat, Raff, and/or SC of what was going on with other of their qualified introductions.

111.    Upon information and belief, Singh engaged in this pattern of conduct in order to keep fees for himself, to deprive Sharbat, Raff, and/or SC of their fees, and to gain for himself fees, a bonus, and/or other valuable consideration.

112.    Sharbat, Raff, and/or SC justifiably relied on his representations as truthful and complete as they had no reason to believe he was acting untruthfully, they thought they were on the same team.

113.    This reliance was to their detriment, as a result of pitching an artificially high price, Sharbat, Raff, and/or SC were unable to secure potential investments from other connections they had, and as a result were unable to earn fees on same.   Further, the reliance regarding omissions was to their detriment as they were unaware of what was happening with their qualified introductions.

114.    As a result of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but which in no instance is less than $12 million in cash and stock.

### AS AND FOR A SIXTH CAUSE OF ACTION – CONVERSION

115.    Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 135 as if set forth in full herein.

116.    Sharbat, Raff, and/or SC had a right of possession to specific and identifiable warrants and/or shares in Lion Bio in connection with the financing gained from their qualified introductions.

117.    Defendant Singh has taken those shares and/or warrants for himself, and by that has exercised an unauthorized dominion over same to the exclusion of Sharbat, Raff, and/or SC rights to same.

118.    By reason of the foregoing, Plaintiffs have suffered damages in an amount to be determined at trial, but which in no instance is less than $6.3 million in cash and stock.

## AS AND FOR AN SEVENTH CAUSE OF ACTION – INDEMNIFICATION

119.    Plaintiffs repeat and reallege the allegations set forth above in paragraphs 1 through 139 as if set forth in full herein.

120.    Lion Bio promised and agreed to indemnify MBA under the Letter Agreement for any litigation and other costs arising out of the Letter Agreement.

121.    Sharbat, Raff, and/or SC are entitled to indemnification as third-party beneficiaries of the Letter Agreement.

122.    Sharbat, Raff, and/or SC have and will continue to incur litigation costs in connection with this litigation, which arises out of the Letter Agreement.

123.    Sharbat, Raff, and/or SC are entitled to the reimbursement of legal fees and costs in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs prays for judgment of this Court:

(1)    On the First Cause of Action, finding Defendant to have breached the agreement(s), and awarding Plaintiffs damages in an amount to be determined at trial but presently believed to be in excess of $60 million;

(2)    On the Second Cause of Action, finding Defendant breached its promise to deliver 1.5 million free-trading, registered shares and awarding damages in an amount no less than $1 million;

(3)    On the Third Cause of Action, finding that Lion Bio breached its agreement to award Plaintiffs an exclusive Israeli license to Lion Bio's technology and awarding damages in an amount no less than $50 million;

(4)    On the Fourth Cause of Action, finding that Plaintiffs are entitled to the reasonable value of the monies, work, and services expended or performed for or on behalf of

Defendant as described above, in an amount to be determined at trial, but no less than $6.3 million;

(5)     On the Fifth Cause of Action, finding that Singh committed a fraud against Plaintiffs and awarding damages in an amount to be determined at trial;

(6)     On the Sixth Cause of Action, finding that Singh converted the Plaintiff's property and awarding damages in an amount no less than $6.3 million; and

(7)     On the Seventh Cause of Action, awarding Plaintiffs reasonable attorneys' fees and costs; and

(8)     Such other and further relief as the Court deems just and proper.


Dated: New York, New York
        May 1, 2020

                                        CARMEL, MILAZZO & FEIL, LLP

                                        By:____/s/_____
                                              Claudio Simpkins, Esq.
                                        55 West 39th Street, 18th Floor
                                        New York, New York 10018
                                        (212) 658-0458

                                        *Attorneys for Plaintiffs*