UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOLOMON SHARBAT, SOLOMON
CAPITAL LLC, SOLOMON CAPITAL
401k TRUST, and SHELHAV RAFF,

                              Plaintiffs,

            – against –

IOVANCE BIOTHERAPEUTICS, INC.,
f/k/a LION BIOTECHNOLOGIES, INC.,
f/k/a GENESIS BIOPHARMA, INC., and
MANISH SINGH,

                              Defendants.

**OPINION & ORDER**

20 Civ. 1391 (ER)

Ramos, D.J.:

        Solomon Sharbat, Solomon Capital LLC, Solomon Capital 401k Trust, and

Shelhav Raff bring this suit against Iovance Biotherapeutics ("Iovance") and Manish

Singh for breach of contract and related claims.  Pending before the Court are Iovance's

and Singh's motions for partial judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  For the reasons that follow, both motions are

GRANTED.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

        The Court assumes familiarity with its prior opinion denying Defendants' motion

to dismiss for lack of personal jurisdiction, Doc. 29, and includes here only the factual

background necessary for resolution of the instant motion.[1]

        Sharbat and Raff are in the business of consulting for corporate clients and assist-

ing them with fundraising, mergers, strategic alliances, and introductions to facilitate

---

[1] Unless otherwise indicated, citations to ¶ _ refer to the first amended complaint ("FAC"), Doc. 15.  For
purposes of deciding the instant motion, the facts in the FAC are presumed true and all reasonable infer-
ences are drawn in favor of Plaintiffs.

those ends.  ¶ 23.  Solomon Capital is a limited liability company, and Solomon Capital 401k Trust is a qualified retirement trust, of which Sharbat is a trustee.  ¶¶ 4–5.  Iovance is a biotechnology company and the successor in interest to Lion Biotechnologies, Inc. ("Lion Bio"), a biotechnology company that developed and marketed novel cancer immunotherapies and that eventually merged with Genesis Biopharma, Inc. ("Genesis").  ¶¶ 7–8, 24, 57.  Anthony Cataldo served as chief executive officer ("CEO") of Lion Bio until July 24, 2013, when Singh took over as CEO.  ¶¶ 24, 59; Doc. 23 at ¶ 7.

In approximately the summer of 2012, Sharbat and Raff were introduced to Cataldo and to Lion Bio's chief financial officer Michael Handelman through Mark Beychok, CEO of MBA Holdings, LLC ("MBA"), a California-based consulting firm. ¶¶ 25–26.  Handelman informed Sharbat and Raff that they could earn substantial fees by assisting Lion Bio in raising the $30 million it needed to develop its intellectual property and fund its start-up costs.  ¶ 28.  Handelman further informed Plaintiffs that they would work alongside MBA and would be entitled to similar fees.  ¶ 29.

According to the FAC, on June 15, 2012, Lion Bio and MBA entered into an agreement that MBA would act as a consultant for Lion Bio and act as a finder to source financing and strategic relationships for Genesis (the "Letter Agreement").[2]  ¶ 30.  Pursuant to the Letter Agreement, MBA would receive a finder's fee of 20% of the financing from a qualified investor, 10% in cash and 10% in warrants to purchase the company's common stock.  ¶ 31; *see also* Doc. 18-8 at 8–12.  The finder's fee would be due upon Lion Bio receiving any financing from a qualified introduction, defined as a person introduced to the company by MBA or through another person introduced to the company by MBA.  ¶ 36.  According to documents previously submitted by Iovance, MBA and Genesis entered into two other agreements in the summer of 2012, which go unmentioned in

---

[2] Confusingly, while the FAC alleges that the contract was between MBA and Lion Bio, the Letter Agreement itself is executed by and between MBA and Genesis.  *See* Doc. 18-8 at 8–12.

the FAC:  a confidentiality and non-disclosure agreement entered into on June 13, 2012, and a consulting agreement entered into on July 9, 2012.  *See* Doc. 18-8 at 13–22.

The Letter Agreement does not mention Plaintiffs or any other parties or beneficiaries to the agreement.  However, Plaintiffs allege that they had understandings with Lion Bio and with MBA that the terms of the Letter Agreement also applied to them, either as direct parties to the contract or as intended beneficiaries thereof.  ¶¶ 32–34, 37–40.  Plaintiffs allege that all parties agreed that Sharbat, Raff, and MBA would each be entitled to one-third of the finder's fee contingent on qualified introductions to investors, and that in the alternative to the one-third fee, Sharbat would be entitled to a $400,000 secured note payable on the demand.  ¶¶ 33–35.

Between approximately August 2012 and 2014, Plaintiffs made several qualified introductions and sought out strategic relationships for Lion Bio, resulting in over $70 million in financing for the company.  ¶¶ 52–56.  At some unspecified time, Beychok withdrew from the agreement and stopped seeking financing for Lion Bio.  ¶ 41.  Plaintiffs continued seeking financing from qualified investors and allege that phone, email, and text message communications from Lion Bio management and representatives, as well as the parties' course of conduct, further confirmed the existence of the contract and its terms.  ¶¶ 39–42.

Plaintiffs allege that, together with Highline Research Advisors LLC, they introduced Genesis to Lion Bio, leading to the eventual merger of the two companies.[3]  ¶ 57.

---

[3] While Plaintiffs allege that they introduced Genesis and Lion Bio, leading to the merger of the two companies, on its face the FAC does not support this allegation.  The FAC is confusingly written and frequently alternates between references to Lion Bio and references to Genesis without explanation, seemingly referring to the two interchangeably.  For example, "Mr. Handelman discussed with Plaintiffs the development of *Genesis*, the potential role Plaintiffs would play in its growth, to wit, their assistance in helping *Lion Bio* raise $30,000,000 to expand and develop their intellectual property . . ."  ¶ 28 (emphasis added).  Later, Plaintiffs allege that in approximately August 2012, they contacted "New World Merchant Partners LLC ('New World')," a banking firm, to help them identify potential investors for the *Lion Bio* financing, and that New World then "agreed to act as non-exclusive financial and strategic advisor to *Genesis*" and conduct due diligence on Genesis' behalf.  ¶¶ 44–45 (emphasis added).  Raff further alleges that he paid New World a due diligence retainer fee of $35,000 as "an investment in Lion Bio," and that

As a result of the merger, Lion Bio received 1.3 million Genesis shares, now valued at $35 million, of which Plaintiffs allege they are entitled to a commission of 86,000 shares or $2.45 million,[4] pursuant to the terms of the Letter Agreement.  *Id.*

When Singh took over from Cataldo as CEO of Lion Bio, he continued the company's financing efforts, conducting several meetings with investors introduced by Plaintiffs.  ¶¶ 16, 59–61.  Singh continued to discuss the qualified introductions with Plaintiffs, but he disputed whether Lion Bio, rather than other entities, owed Plaintiffs their finder's fees for certain introductions.  ¶¶ 62–63.  Over time, Singh began to "hide" updates regarding prospective investors from Plaintiffs and to "omit material facts concerning the development of the investments by Highline and others" introduced to him by Plaintiffs.  ¶¶ 64, 67.  Furthermore, Singh sought to limit the class of qualified introductions for which Lion Bio would pay Plaintiffs' finder's fees, in a departure from the parties' prior dealings, and he misrepresented to Plaintiffs the amount the company expected to raise from the introductions.  ¶¶ 65–66.

In emails as of October 14, 2013, Singh told Plaintiffs "that it was still too early to determine the final value of the company and that the final valuation should be made the day before closing the deal," but that the expected price per share would be approximately $4–$5.  ¶ 69.  Plaintiffs communicated the expected price per share of approximately $4 to potential investors, some of whom expressed concern that the valuation was too high.  ¶ 68.  Sharbat and Raff explained to Singh that the high valuation made

---

Handelman promised him in return a promissory note in the amount of $35,000 along with 17,500 shares in the company.  ¶ 47.  In the next two paragraphs, Plaintiffs allege that Raff paid the diligence fee on *Genesis*' behalf and that Handelman "recognized his payment to New World as a direct investment in *Genesis*." ¶¶ 48–49 (emphasis added).  Finally, the FAC alleges that Plaintiffs introduced the company to Highline, which required that "Lion Bio, then Genesis," change its management before Highline would invest.  ¶ 58. The FAC does not specify the timing of the merger between Lion Bio and Genesis, although according to the company's July 24, 2013 form 8-K filed with the SEC and previously submitted by Iovance, Lion Bio and Genesis merged on July 24, 2013, with Lion Bio as the surviving company.  *See* ¶ 57; Doc. 18-27. Given that Plaintiffs refer to both Lion Bio and Genesis interchangeably as "Defendant" and allege communications with both entities going back to 2012, it is difficult to follow their allegation that they introduced the two.

[4] The FAC lists this amount as $24500,000 million.  ¶ 57.

fundraising impossible and prevented them from making qualified introductions, but Singh refused to reconsider his position on the expected valuation. *Id.* Approximately two weeks after Singh's October 14 emails, a deal at a price of $2 per share plus a free warrant at $2.50 was published. ¶ 70. Plaintiffs allege that Singh deliberately provided them with misleadingly high expected valuations in order to prevent them from making qualified introductions and earning their commissions, instead attracting investors himself. ¶ 71. Following the financing,[5] Singh received 608,000 shares of stock worth approximately $6 million. ¶ 72. Plaintiffs allege that these shares—today worth upwards of $16 million—should have been offered to them and are their property. *Id.*

Plaintiffs also allege that, in addition to the terms of the Letter Agreement, Lion Bio promised them an exclusive license to distribute its cancer treatment methods in Israel if they raised between $3–$5 million for the company. ¶ 74. The license is worth at least $30 million and as much as $50 million. *Id.*

Plaintiffs assert claims for breach of contract against Lion Bio for failure to pay them finder's fees and to issue the warrants they earned; for breach of contract for failure to issue 1.5 million unrestricted shares, half to MBA and half to them[6]; for breach of contract for failure to transfer the Israeli license; for unjust enrichment; and for indemnification. ¶¶ 76–107, 119–123. Plaintiffs assert claims for fraud and conversion against Singh. ¶¶ 108-118.

On September 27, 2019, Plaintiffs initiated this suit by filing their initial complaint in the Supreme Court of the State of New York, *Sharbat et al. v. Iovance Biotherapeutics, Inc. et al.*, Index No. 655668/2019. Doc. 1-1. On February 18, 2020, Iovance removed the case to this Court. Doc. 1. On May 1, 2020, Plaintiffs filed their first

---

[5] The FAC does not explain the date or circumstances of this financing. ¶ 72.

[6] This alleged provision of the contract appears for the first time under Plaintiffs' second cause of action and, as discussed further below, appears to refer to the separate consulting agreement between Genesis and MBA.

amended complaint ("FAC").  Doc. 15.  On May 22, 2020, Iovance moved to dismiss this action for lack of personal jurisdiction, Doc. 18, and on June 19, 2020, Singh also moved to dismiss.  Doc. 21.  On March 26, 2021, the Court denied both motions.  Doc. 29.  On April 30, 2021, Iovance and Singh answered.  Doc. 37.  As relevant to Plaintiffs' application to amend the FAC, on May 7, 2021, following its resolution of Defendants' motions to dismiss, the Court entered the parties' consent case management schedule.  Doc. 39. The schedule, to which all parties agreed, provides that "Per FRCP 15(a), the deadline [to file amended pleadings] has passed."  *Id.* ¶ 4.

Iovance and Singh now move for judgment on the pleadings as to Plaintiffs' second and third causes of action for breach of contract against Iovance and fifth and sixth causes of action for fraud and conversion against Singh.  Docs. 42, 44.  Plaintiffs do not oppose the motion to dismiss the conversion claim against Singh.  Plaintiffs also seek leave to file their proposed second amended complaint ("PSAC").[7]  Doc. 49.

## II.    LEGAL STANDARD

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c). Under Rule 12(c), courts apply the same standard as on a motion to dismiss for failure to state a claim under Rule 12(b)(6).  *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001) (calling the standards "identical"); *see also Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 93 (2d Cir. 2019) ("The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings.").  Judgment on the pleadings is appropriate only if, drawing all reasonable inferences in favor of the non-moving party, it is apparent from the

---

[7] Iovance points out that the proposed complaint would in fact be Plaintiffs' fourth version of the complaint (third amended complaint), as they have already filed an original complaint and an amended complaint in the state court proceedings before the matter was removed to this Court.  Doc. 50 at 2 n.1.  Nevertheless, for ease of reference, the Court will refer to the proposed amended complaint as the PSAC.

pleadings that no set of facts can be proven that would entitle the plaintiff to relief.  *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).  In considering a Rule 12(c) motion, courts should assume all the well pleaded factual allegations in the non-moving party's pleadings to be true.  *Brown v. De Fillipis*, 717 F. Supp. 172, 178 (S.D.N.Y. 1989). When deciding a motion for judgment on the pleadings, a court may only consider "the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings."  *See Prentice v. Apfel*, 11 F. Supp. 2d 420, 424 (S.D.N.Y. 1998) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

## III.   DISCUSSION

As a threshold matter, the Court must consider which substantive state law to apply to Plaintiffs' contract and tort claims.  Plaintiffs' FAC alleges that California law governs all their claims, as the parties' agreements provide that California law should  apply.[8]  ¶ 22.  Defendants argue that there is no conflict between New York and California substantive law for breach of contract, and Plaintiffs—who cite both New York and California law in their opposition—appear to agree.  *See* Doc. 43 at 6; Doc. 49-3 at 7–8. Generally, where, as here, "jurisdiction is predicated on diversity of citizenship, a federal court must apply the choice-of-law rules of the forum state."  *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015).  However, under New York law, the Court need engage in a choice-of-law analysis "only where there is an actual conflict of law between the two jurisdictions."  *Medtronic, Inc. v. Walland*, No. 21 Civ. 2908 (ER), 2021 WL 4131657, at *4 (S.D.N.Y. Sept. 10, 2021) (citing *Liang v. Progressive Cas. Ins. Co.*, 99 N.Y.S.3d

---

[8] While the FAC does not specify, the Court assumes that Plaintiffs refer to the Letter Agreement, Doc. 18-8 at 8–12, and the consulting agreement, Doc. 18-8 at 17–22, both of which include provisions that California law governs.

449, 451 (2d Dep't 2019)).  Here, there is "no real conflict between the laws of California and New York for breach of contract[.]"  *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007) (citing *Bridgeway Corp. v. Citibank, N.A.,* 132 F.Supp.2d 297, 305 (S.D.N.Y. 2001) and *Reichert v. General Ins. Co.,* 442 P.2d 377, 381 (1968)).  Accordingly, the Court need not engage in a choice-of-law analysis as to Plaintiffs' second and third claims for breach of contract.

Any contractual choice-of-law provision does not reach tort claims.  *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 334–35 (2d Cir. 2005) (citing *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 427 N.Y.S.2d 10, 12–13 (1st Dep't 1980), as the "leading New York case" on this issue)).  For tort claims, courts in New York apply the "interests test," which looks at the "law of the jurisdiction having the greatest interest in the litigation."  *Cotiviti, Inc. v. Deagle*, 501 F. Supp. 3d 243, 256 (S.D.N.Y. 2020) (quoting *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir. 2006)).  "The states' interests are defined primarily by the parties' domiciles and the locus of the tort."  *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018) (internal quotation marks omitted).   Here, Iovance is a Nevada corporation with its principal place of business in New York, and Singh resides in California.  ¶¶ 6, 9.  While the FAC does not specify, presumably Singh's statements and communications to Plaintiffs giving rise to the purported fraud claim were made in California, where he lived, and received by Plaintiffs at their domiciles in either Israel or New York.[9]  ¶¶ 59–73.  Thus, the interests test favors New York law.  However, Singh argues that the elements of common law fraud are similar under either New York or California law.  Doc. 45 at 8–9 (citing *First Hill Partners, LLC v. BlueCrest Cap. Mgmt. Ltd.*, 52 F. Supp. 3d 625, 633 (S.D.N.Y. 2014) and *Avedisian v. Mercedes-Benz USA, LLC*, No. CV 12-00936 (DMG), 2013 WL 2285237, at *8 (C.D. Cal. May 22, 2013) (elements of

---

[9] As discussed in the Court's prior opinion, Sharbat and Raff are Israeli citizens, and Solomon 401k Trust and Solomon Capital LLC have their principal places of business in New York.  *See* Doc. 29 at 1.

common law fraud)).   Again, Plaintiffs appear to agree:  although the FAC maintains that California law applies to all their causes of action, Plaintiffs cite only New York law in their opposition.  *See* Doc. 49–3 at 11–20.  The Court concludes that there is no conflict of laws as to Plaintiffs' fraud claim.

### A.  Second Cause of Action:  Breach of Contract

Plaintiffs' second cause of action claims breach of contract by Lion Bio for failure to issue 1.5 million unrestricted shares, half to MBA and half to them.   ¶ 93.   Iovance argues that the Court should enter judgment in its favor because Plaintiffs have failed, under either New York or California law, to state a claim for breach of contract.

In order to state a claim for breach of contract, "a plaintiff must allege four elements:  (1) the existence of a contract, (2) performance of the contract by the plaintiff, (3) breach by the defendant, and (4) damages suffered as a result of the breach."  *Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020) (citing *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).   A complaint fails to plead the first element—the existence of a contract—"if it does not provide factual allegations regarding . . . the formation of the contract, the date it took place, and the contract's major terms.  Conclusory allegations that a contract existed or that it was breached do not suffice."  *Id.* at 347–48 (internal quotation marks and citations omitted); *see also Valley Lane Indus. Co. v. Victoria's Secret Direct Brand*, 455 F. App'x. 102, 104 (2d Cir. 2012) (summary order).  The requirements are the same under California law:  a "plaintiff must allege (1) the existence of a contract; (2) plaintiff's performance; (3) defendant's breach of the contract; and (4) damages flowing from the breach."  *A.B. Concrete Coating Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 491 F. Supp. 3d 727, 735 (E.D. Cal. 2020) (citing *CDF Firefighters v. Maldonado*, 70 Cal. Rptr. 3d 667, 679 (2008)).  As such, plaintiffs are required to "plead the specific terms of the contract or the contract's legal effect," and the

complaint must, at minimum, "identify the specific provision of the contract allegedly breached by the defendant." *Id.* (internal quotation marks and citations omitted).

Iovance argues that Plaintiffs have not met these requirements because the FAC does not include the elements required to establish the existence of such a contract between the parties, including facts about the formation of the contract, its terms, when the parties entered into the contract, or what performance was owed thereunder.  Doc. 43 at 6–8.  Plaintiffs respond that there is no heightened pleading requirement for contract claims, and that they need only allege enough facts to state a claim for relief that is plausible on the face of the complaint—that is, they need only allege the contract's "major terms."  Doc. 49-3 at 7–8 (citing *Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, No. 16 Civ. 1099 (NSR), 2017 WL 1383773, at *7 (S.D.N.Y. Apr. 12, 2017)).  Plaintiffs seek to distinguish *Ebomwonyi* and *A.B. Concrete* on the grounds that, in the former case, plaintiffs had alleged only vague terms speaking only of a "promise to pay," and in the second, had not even alleged the performance required by each party to the contract at issue.  Doc. 49-3 at 7–8.  However, as Iovance points out, Plaintiffs' brief cites the relevant legal standards but makes no effort to apply them; instead, they seek leave to amend to add additional facts in support of the second and third claims for breach of contract.  *See id.* at 10.  As such, Plaintiffs appear to have waived any opposition.

Nevertheless, the Court will consider Iovance's motion on the merits.  The Court agrees with Iovance that Plaintiffs have not sufficiently alleged the existence of a contract with terms including that Plaintiffs would receive 1.5 million shares.  The contract at issue, incorporated by reference in the FAC, is the June 15, 2012 Letter Agreement.  ¶¶ 30–31.  By its terms, the Letter Agreement memorializes an agreement between MBA

and Genesis.  *See* Docs. 18-8 at 8–12.[10]  The Letter Agreement makes no mention of Plaintiffs and does not include any clauses concerning assignment of the Agreement, nor any third-party beneficiaries.  *See* Docs. 18-8, 18-9.  However, in their FAC, Plaintiffs allege that the Letter Agreement applied to them either as direct parties or as beneficiaries, and further allege the existence of emails and other communications between Lion Bio leadership and themselves acknowledging that Plaintiffs were entitled to compensation for qualified introductions, pursuant to the terms of the Letter Agreement.  ¶¶ 31, 37–42.  The FAC further alleges performance by Plaintiffs, including the qualified introductions to investors who ultimately invested millions in the company.  ¶¶ 43–57.  Still, even reading the FAC in the light most favorable to Plaintiffs and assuming that they were parties to or beneficiaries of the Letter Agreement, nowhere do Plaintiffs allege that the contract between the parties included any terms that Lion Bio would issue half of 1.5 million unrestricted shares to them; this bald assertion appears for the first time under Plaintiffs' second cause of action.  ¶ 93.  Nor does the Letter Agreement itself include any such terms.  *See* Doc. 18-8 at 8–12.

To be sure, Iovance's prior submissions include another document—distinct from the Letter Agreement—purporting to be a consulting agreement between Genesis and MBA Holdings.[11]  *See* Doc. 18-8 at 17–22.  The consulting agreement is dated July 9, 2012 and signed by Handelman on behalf of Genesis and by Beychok on behalf of MBA.  The consulting agreement states that Genesis is involved with a major institutional hospital in Israel performing clinical tests on patients with metastatic melanoma and has

---

[10] Document 18-8 consists of MBA's August 2015 complaint against Lion Bio filed in California state court and supporting documents.  Annexed to the complaint are a confidentiality agreement between MBA and Genesis, dated June 13, 2012; the Letter Agreement between MBA and Genesis, dated June 15, 2012; and a consulting agreement between MBA and Genesis, dated July 9, 2012.  Document 18-9 is another copy of the Letter Agreement.  These documents were submitted as exhibits in connection with Iovance's earlier motion to dismiss for lack of personal jurisdiction.  Doc. 18.  Plaintiffs have not submitted any contract between themselves and Lion Bio/Genesis.

[11] The Court may consider the consulting agreement as it was submitted by Iovance, the moving party, albeit in connection with a prior motion, and is in Plaintiffs' possession.  *Prentice*, 11 F. Supp. 2d at 424.

asked MBA to develop their relationship with the hospital and to assist in developing the company's network of scientific relationships in Israel. Doc. 18-8 at 17. That agreement provides that, as compensation, Genesis shall pay MBA in the form of stock by issuing 1.5 million shares of unrestricted, fully vested common stock following the filing of the company's registration statement with the SEC. *Id.* at 18. Notably, the consulting agreement also includes a non-assignment clause stating that it is entered into "in reliance upon and in consideration of the *singular personal skills and qualifications of Consultant* [Beychok]," and that any assignment or transfer would require prior written consent of the other party. *Id.* at 19 (emphasis added). As Iovance points out in reply, there is no reference in the consulting agreement of any other parties to or beneficiaries of the agreement, and no mention of Plaintiffs. Doc. 50 at 7–9. The consulting agreement includes an integration clause and a provision that any amendments to the agreement must be made in writing. *Id.* Furthermore, the FAC makes no mention of the July 9, 2012 consulting agreement at all, which is a separate document from the June 15, 2012 Letter Agreement.

In sum, the record before the Court indicates that *a* contract existed—the consulting agreement between Genesis and MBA—that included terms of compensation for 1.5 million shares of Genesis stock. Moreover, that agreement prohibits assignment without the express written consent of Genesis. The Court cannot conclude from the foregoing that the consulting agreement included Plaintiffs as either parties or beneficiaries, when Plaintiffs have not alleged as much. Nor does the FAC allege any contract the terms of which included that Plaintiffs would be compensated with half of 1.5 million shares. The FAC therefore does not include "'factual allegations regarding . . . the formation of the contract, the date it took place, and the contract's major terms.'" *Ebomwonyi*, 473 F. Supp. 3d at 347 (quoting *Emerald Town Car*, 2017 WL 1383773, at *7); *see also A.B. Concrete Coating, Inc.*, 491 F. Supp. 3d at 735. Therefore, under either New York or California law, Plaintiffs have failed to plead the existence of a contract.

Even construing the allegations liberally, Plaintiffs have not met the pleading standard. *See Emerald Town Car*, 2017 WL 1383773, at *8.

Accordingly, the Court grants Iovance's motion for judgment on the pleadings and dismisses Plaintiffs' second cause of action.

### B.  Third Cause of Action:  Breach of Contract

Plaintiffs' third cause of action claims breach of contract for Lion Bio's failure to grant to them the license for Genesis' cancer therapeutics in Israel, resulting in damages of no less than $50 million.[12]  ¶¶ 98–99.  Iovance moves for judgment on the pleadings on the grounds that Plaintiffs have failed to allege the existence of such a contract.  Doc. 43 at 8–9.

Plaintiffs' third cause of action suffers from the same deficiencies as their second. The FAC makes no reference whatsoever to the formation of any contract providing that Plaintiffs would be compensated for their fundraising efforts with the grant of an exclusive license to distribute Genesis' therapeutics in Israel.  The FAC provides in conclusory fashion only that, "In addition to the terms of the Letter Agreement, Lion Bio promised that if Sharbat, Raff, and/or [Solomon Capital] raised $3–5 million for it, they would be granted an exclusive license to distribute Lion Bio's cancer treatment methods in Israel," and alleges that the Israeli license "has a minimum value of $30 million and may be worth as much as $50 million."  ¶ 74.  The FAC goes on to allege, without more, that the parties had an enforceable contract, that Plaintiffs were in compliance with that contract, and that "Lion Bio breached its promise to deliver the License to Sharbat, Raff, and/or [Solomon Capital]."  ¶¶ 75, 96–98.  Iovance argues that Plaintiffs have not provided facts sufficient to support a "reasonable inference that there was a definite promise, supported by consideration, that would establish a binding and enforceable contract."  Doc. 43 at 9 (quoting *A.B. Concrete*, 491 F. Supp. 3d at 735).  Moreover,

---

[12] Paragraphs 95–99 of the FAC refer to Lion Bio and Genesis interchangeably.

Iovance argues that, "given the subject matter of the alleged contract—an intellectual property licensing agreement worth over $50 million," it is "not plausible that after negotiating such a complex and valuable contract with a sophisticated biotechnology company, Plaintiffs would only be able to plead two short sentences of facts about the agreement."  Doc. 43 at 9.  The Court agrees.

The FAC is insufficient to establish the existence of a contract pursuant to which Plaintiffs would be granted a license to distribute Genesis cancer therapeutics in Israel. The FAC refers to terms apart from those in the Letter Agreement.  ¶ 74.  Thus, it appears to refer to a separate purported agreement between the parties that if Plaintiffs raised $3– 5 million, they would be granted the exclusive Israeli license.  However, Plaintiffs never allege where and how that contract was formed, or how the performance due under the contract to raise $3–5 million was distinct from Plaintiffs' qualified introductions and fundraising efforts, if in fact it was distinct.  The only performance that Plaintiffs have alleged is their qualified introductions and fundraising from investors.

In their opposition, Plaintiffs urge that the Court should not read the FAC "restrictively," and that it should consider the allegations in reference to each other.  Doc. 49-3 at 9.  Plaintiffs argue that the allegations in the FAC are "sufficient to glean" that a contract existed between the parties pursuant to which Iovance would grant the Israeli license to Plaintiffs in exchange for Plaintiffs' raising between $3–5 million, and that Plaintiffs complied with their obligations to raise that amount.  *Id.* at 8–9.  However, Plaintiffs fail to address the central problem that the FAC does not allege the formation of such a contract, and the allegations as to its existence are entirely conclusory.  *See Ebomwonyi*, 473 F. Supp. 3d at 347; *A.B. Concrete Coating, Inc.*, 491 F. Supp. 3d at 735.

The Court dismisses Plaintiffs' third cause of action.

### C.  Fifth Cause of Action:  Fraud

Plaintiffs' fifth cause of action asserts a claim of fraud against former Lion Bio CEO Singh.  They allege that he made material omissions and misrepresentations concerning the qualified introductions that Plaintiffs made and the expected value of the shares.  ¶ 109.  Specifically, Plaintiffs assert that Singh failed to inform them of the status of their qualified introductions and that he misrepresented the expected price per share of company stock as higher than it ultimately was, thus undermining Plaintiffs' efforts to secure further qualified introductions and preventing them from earning fees for securing financing.  ¶ 110.  Plaintiffs allege that Singh therefore misrepresented and/or omitted relevant information in order to deprive them of their finder's fees, that they relied to their detriment on Singh's misrepresentations in that they were unable to secure potential investments, and that they have suffered damages in an amount no less than $12 million in cash and stock.  ¶¶ 111–14.  Singh argues that the fraud claim must be dismissed for four reasons:  (1) Plaintiffs' fraud by omission theory fails because Singh had no duty to disclose material information; (2) Plaintiffs have not alleged reliance on Singh's alleged omissions; (3) Plaintiffs' fraudulent misrepresentation theory fails because the alleged fraudulent statement is one of future expectation; and (4) Plaintiffs' fraud claim fails because they have not alleged an actual pecuniary loss.  Doc. 45 at 9–14.  The Court need only address the first and third arguments in any detail, as they are dispositive.

"Both New York and California require similar elements for a common law fraud claim." *First Hill Partners, LLC*, 52 F. Supp. 3d at 633 (S.D.N.Y. 2014) (citing *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) and *Avedisian*, 2013 WL 2285237, at *8).  In order to state a claim for fraud under New York law, a plaintiff must demonstrate: "(1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Bailey v. New York L. Sch.*, No. 16 Civ. 4283 (ER), 2017 WL 6611582, at *10 (S.D.N.Y. Dec. 27,

2017), *aff'd*, No. 19-3473, 2021 WL 5500078 (2d Cir. Nov. 24, 2021) (quoting *Wynn*, 273 F.3d at 156).  Similarly, under California law, a plaintiff must allege:  "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009) (quoting *Engalla v. Permanente Med. Group, Inc.,* 938 P.2d 903, 917 (1997)); *see also Swafford v. Int'l Bus. Machines Corp.*, 408 F. Supp. 3d 1131, 1141–42 (N.D. Cal. 2019).

In addition to these required elements, the plaintiff must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  "In other words, the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent,'" or in the case of fraudulent omissions, "the complaint must specify '(1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud.'"  *Bailey*, 2017 WL 6611582, at *10 (quoting *Hirsch v. Columbia Univ., Coll. of Physicians & Surgeons*, 293 F. Supp. 2d 372, 381 (S.D.N.Y. 2003) and *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.,* 244 F.R.D. 204, 213 (S.D.N.Y. 2007)); *see also Kearns*, 567 F.3d at 1126 (affirming dismissal of plaintiff's fraud claim where plaintiff failed to articulate the who, what, when, where, and how of the misconduct alleged.).  Rule 9(b) is intended to provide defendants with adequate notice of a plaintiff's claim against them and a fair opportunity to defend against it, and to protect defendants' reputations from improvident fraud charges.  *Id.* at 1125; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

*1. Fraudulent Omission*

As a threshold matter, Plaintiffs' fraud by omission claim fails because the claim that Singh omitted "to inform [Plaintiffs] of what was going on with other of their qualified introductions" does not meet the requirements under Rule 9(b) to state a claim for fraud with particularity.  ¶ 110.  The FAC provides scant detail, namely that "updates with respect to some prospective investors, which would have been qualified introductions, were hidden from Plaintiffs by Singh," and that Singh began to omit material facts concerning the development of the investments by Highline and others introduced by Plaintiffs, and as a result, Plaintiffs were unaware of what was happening with their qualified introductions.  ¶¶ 64, 67, 113.  These allegations fail to articulate the who, what, when, where, and how that Rule 9(b) requires.  Even in the case of fraudulent omission, where the plaintiff cannot specify time and place because the relevant act did not occur, "the complaint must still allege:  (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff; and (4) what the defendant obtained through the fraud."  *Watts v. Jackson Hewitt Tax Serv. Inc.*, 579 F. Supp. 2d 334, 350 (E.D.N.Y. 2008) (quoting *Manhattan Motorcars,* 244 F.R.D. at 213 n.58 (S.D.N.Y. 2007)).  Plaintiffs have not met these requirements.  Their allegations are almost completely unmoored in time and place and provide no specifics or context as to what the "updates" that Singh allegedly hid from them might have been.  In their opposition, Plaintiffs write that Singh "hid what was happening with those introductions, and lied to prevent Plaintiffs from attracting new investors."  Doc. 49-3 at 11.  However, Plaintiffs never explain *what* they allege Singh to have been hiding, or even what information they needed and did not have. Plaintiffs' vague allegations are insufficient to state a claim for fraudulent omission.

Furthermore, Plaintiffs' fraud by omission theory fails for the independent reason that, as Singh points out, they allege neither a duty to disclose on Singh's part nor reliance.  Doc. 45 at 9–11.  In order to state a claim for fraud by omission (or

nondisclosure), plaintiffs must allege a duty by defendant to disclose the material information. *First Hill Partners*, 52 F. Supp. 3d at 637; *see also Goldstein v. Gen. Motors LLC*, 517 F. Supp. 3d 1076, 1092 (S.D. Cal. Feb. 3, 2021). A duty to disclose arises only when "(1) the parties are in a fiduciary relationship; (2) under the special facts doctrine, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge; or (3) where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure." *First Hill Partners*, 52 F. Supp. 3d at 637 (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005); *see also Lewis v. Google LLC*, 461 F. Supp. 3d 938, 960 (N.D. Cal. 2020) (explaining similar requirements under California law).

Plaintiffs contend that they *were* in a fiduciary relationship with Singh, as they were in a "relationship of trust," and "Plaintiffs trusted and relied upon Singh to be truthful and honest with respect to the price of the offering and the progression of Plaintiffs' qualified introductions." Doc. 49-3 at 12. Plaintiffs further argue that the fact that they were engaged in an arm's length business transaction with Lion Bio does not necessarily preclude a finding that Plaintiffs were in a fiduciary relationship with Singh, which is a fact-based determination. *Id.* at 12–14. What Plaintiffs' arguments boil down to is that the Court cannot rule out a fiduciary relationship between the parties or special knowledge on Singh's part because these are factual questions that the Court cannot decide at this juncture. Doc. 49-3 at 11–15. That argument fails. While the Court agrees that whether or not a fiduciary duty exists "depends on the facts of a particular relationship," *Ho Myung Moolsan Co. v. Manitou Min. Water, Inc.*, 665 F. Supp. 2d 239, 258 (S.D.N.Y. 2009), Plaintiffs have never alleged such a duty or indeed anything in their dealings with Lion Bio and Singh other than an arm's length business transaction. Their belated claim in opposition that Plaintiffs had a relationship of trust with Singh because they trusted him is tautological.

Plaintiffs' argument that the Court cannot rule out the special facts doctrine is likewise unavailing.  Plaintiffs argue that "[i]t certainly cannot be said that as a matter of law . . . that Singh did not have superior knowledge by way of being CEO."  Doc. 49-3 at 15.  While it is true that, as CEO, Singh presumably had knowledge of the company's inner workings that Plaintiffs did not, Plaintiffs' FAC never alleges what superior knowledge Singh may have had, beyond the vague allegations that he withheld "updates" about the "status" of investors, nor that they were acting on the basis of mistaken knowledge.  *First Hill Partners*, 52 F. Supp. 3d at 637.  Furthermore, the Court agrees with Singh that Plaintiffs have not alleged the other elements of the special facts doctrine: they do not allege that information about the status of the qualified introductions was not available to them, nor that Singh knew that Plaintiffs lacked such knowledge.  Doc. 51 at 4 (citing *Naughright v. Weiss*, 826 F. Supp. 2d 676, 690 (S.D.N.Y. 2011) and *Trahan v. Lazar*, 457 F. Supp. 3d 323, 353 (S.D.N.Y. 2020)).

Although the above defects are dispositive, Plaintiffs have also failed to plead the required element of reliance, as the FAC nowhere alleges that Plaintiffs were "induced to act or refrain from acting to [their] detriment because of the alleged omission[s]."  *Dumas v. Wyeth*, 283 F. Supp. 2d 948, 952 (S.D.N.Y. 2003); *Goldstein*, 517 F. Supp. 3d at 1092)).

### 2. Fraudulent Misrepresentation

Plaintiffs' fraud claim based on the theory of fraudulent misrepresentation asserts that, in October 2013, Singh misrepresented to them that the company's future price per share would be $4–5, higher than the $2 it ultimately turned out to be.  They allege that the higher share price dissuaded investors, thereby depriving Plaintiffs of the ability to make qualified introductions and earn commissions.  ¶¶ 68–71, 110, 113.  Plaintiffs' claim for fraudulent misrepresentation hinges on their allegation that Singh deliberately misstated the future valuation of the company.  However, the FAC on its face undercuts this claim, as Plaintiffs allege that "Singh stated that it was still too early to determine the

value of the company and that the final valuation should only be made the day before closing the deal."  Doc. 45 at 12 (quoting ¶ 69).

"[A]ny alleged misrepresentation must be made with respect to an existing fact, as opposed to a representation concerning future conduct," and "statements . . . concerning future expectations[] are insulated from liability."  *Hennebery v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 544 (S.D.N.Y. 2007) (citations omitted); *see also GemCap Lending, LLC v. Quarles & Brady, LLP*, 269 F. Supp. 3d 1007, 1038 (C.D. Cal. 2017).  As is well settled under New York law, "opinions of value or future expectations" and "forward-looking statements of opinion" cannot support a claim for fraud.  *Nourieli v. Lemonis*, No. 20 Civ. 8233 (JPO), 2021 WL 3475624, at *7 (S.D.N.Y. Aug. 6, 2021) (internal quotation marks and citations omitted).  In opposition, Plaintiffs argue that a statement about a future event can form the basis of a claim for fraud where the speaker has a fraudulent present intent.  Doc. 49-3 at 16.  Plaintiffs rely in part on *Century Pac., Inc. v. Hilton Hotels Corp.*, in which the court stated that "a claim based upon statements of future intention . . . requires proof of a present intent to deceive," and a "present expression of the intent to perform a future act is actionable as fraud only if actually made with a preconceived and undisclosed intention of not performing it."  528 F. Supp. 2d 206, 222 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (internal quotation marks and citations omitted).  However, *Century Pac.* and the other cases Plaintiffs rely on concern fraudulent misrepresentations about a defendant's intent to perform.  Here, as Singh points out, the valuation of the shares was not a function of Singh's performance or failure to perform, but a function of the financial markets.  Doc. 51 at 5; *Dooner v. Keefe, Bruyette & Woods, Inc.*, 157 F. Supp. 2d 265, 277–78 (S.D.N.Y. 2001) (dismissing plaintiff's fraud claim where the complaint "only describes characterizations by the defendants about the future prospects of [an initial public offering].")  The FAC does not allege that Singh controlled the valuation of the company's share price or even that he

had access to information about the company's expected valuation that he deliberately withheld.

Plaintiffs separately assert, without more, that Singh misrepresented the amounts expected to be raised from their qualified introductions.  ¶¶ 66, 109.  This assertion does not meet any of the requirements of Rule 9(b), as discussed above, nor do Plaintiffs claim that they relied on Singh's alleged misrepresentation or that they were injured thereby. *See Wynn*, 273 F.3d at 156.  Accordingly, they have not stated a claim for fraudulent misrepresentation on this basis.

Plaintiffs have not met the requirements to plead a claim for fraud against Singh, and their fraud claim is dismissed.

### D.  Sixth Cause of Action:  Conversion

Plaintiffs do not oppose Singh's motion for judgment on the pleadings as to the conversion claim against him.  Doc. 49-3 at 20.  Failure to oppose may be construed as waiver.  *See BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021).

The Court dismisses Plaintiffs' conversion claim.

## IV.   LEAVE TO AMEND

In their opposition, Plaintiffs request leave to amend and include their PSAC.  *See* Doc. 49-1, Doc. 49-3 at 21.  Plaintiffs also argue that the Court should not countenance Iovance's and Singh's motions for judgment on the pleadings because, by moving for judgment on the pleadings under Rule 12(c), rather than bringing a motion to dismiss under Rule 12(b)(6) at the same time as their 12(b)(2) motion to dismiss for lack of personal jurisdiction, Defendants engaged in "gamesmanship" by delaying the case and "lock[ing] them into their allegations" in the operative complaint, depriving them of the opportunity to amend as a matter of course 21 days after service of a 12(b) motion.  Doc. 49-3 at 2, 20–21 (citing Fed. R. Civ. P. 15(a)(1)(B)).  Plaintiffs filed their FAC after

receiving notice of Defendants' Rule 12(b)(2) motion, but the FAC only provided further allegations as to jurisdictional matters, rather than the substance of Plaintiffs' claims.  *Id.* at 21.  Therefore, Plaintiffs argue that they should have a further opportunity to amend their complaint in the interests of justice.  In their memorandum of law, Plaintiffs indicated that they would file a letter-motion seeking leave to amend.  *Id.*  However, to date they have not done so.  Defendants oppose Plaintiffs' application to file the PSAC as procedurally barred and as futile.  *See* Docs. 50, 51.

Plaintiffs' objection about "gamesmanship" is without merit.  *See Aviles v. S&P Glob., Inc.*, No. 17 Civ. 2987 (JPO), 2020 WL 1689405, at *3 (S.D.N.Y. Apr. 6, 2020) (stating that litigants are permitted to bring successive motions, first under Rule 12(b)(6) and then under Rule 12(c)).  For the reasons set forth below, the Court denies Plaintiffs' application to file the PSAC.

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, a "court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15.  "Generally, '[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'"  *Holmes v. Grubman,* 568 F.3d 329, 334 (2d Cir. 2009) (quoting *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007)).  However, the Second Circuit has held that where a scheduling order governs amendments to the complaint, the "lenient standard under Rule 15(a)" must be "balanced against" Rule 16(b)'s requirement of a showing of good cause.  *Holmes,* 568 F.3d at 334–35; *see also Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003).  Courts have noted the "obvious tension" between the standards set forth in Rules 15(a) and 16(b).  *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 175 (S.D.N.Y. 2014) (collecting cases).  That is, Rule 15(a) allows for amending "freely" while Rule 16(b) states that the Court should not grant leave to amend without a showing of "good cause."  *Id.*  Here, the parties' scheduling order, entered on May 7, 2021, provided that the deadline for amended pleadings had already passed and

that discovery should be completed by November 5, 2021. *See* Doc. 39. However, the Court subsequently granted an extension of the discovery deadline to January 4, 2022. Doc. 54. Accordingly, the Court will review Plaintiffs' request in view of Rule 15(a) as well as Rule 16(b).

A finding of "good cause" under Rule 16 generally depends on the diligence of the moving party. *Perez v. MVNBC Corp.*, No. 15 Civ. 6127 (ER), 2016 WL 6996179, at *3 (S.D.N.Y. Nov. 29, 2016) (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000)). However, the Second Circuit has also instructed that diligence is not "the only consideration," and courts may exercise their discretion and consider other relevant factors, including whether amendment of the pleadings will prejudice defendants. *Id.* (quoting *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 245 (2d Cir. 2007)).

While Plaintiffs have not submitted a formal motion to amend, nothing in their application or in the PSAC supports a finding of good cause under Rule 16. The PSAC purports to add further detail as to Plaintiffs' second and third causes of action for breach of contract and their claim for fraud against Singh. *See* Doc. 49-1 ¶¶ 90–108, 117–129. For their second cause of action, Plaintiffs allege that they were parties or beneficiaries to the consulting agreement between Genesis and MBA, that thanks to their efforts Iovance developed a relationship with the Chaim Sheba Medical Center at Tel Hashomer in Israel and with Israeli researcher Professor Jacob Schachter, and that they are therefore owed half of the 1.5 million unrestricted shares under the agreement. *Id.* ¶¶ 92–101. For their third cause of action, they allege that in approximately September or October 2012, then-CEO Cataldo agreed that if they raised $3–5 million through their qualified introductions, they would be granted a license to distribute Iovance's cancer treatment technology in Is-rael. *Id.* ¶ 104. The PSAC also purports to add two new claims against Singh, for tor-tious interference with contract and tortious interference with prospective business rela-tions. *See id.* ¶¶ 130–145. Plaintiffs' submissions do not show diligence or explain why

they could not have included these allegations earlier.  Courts often find good cause where a party acts diligently to amend after learning new facts in discovery.  *See, e.g.*, *Perez,* 2016 WL 6996179, at *4 (S.D.N.Y. Nov. 29, 2016) (finding that plaintiffs, who had sued the wrong corporate entity in the first place, had shown diligence in moving to amend shortly after discovering the actual identity of defendant employer); *Enzymotec Ltd. v. NBTY, Inc.*, 754 F. Supp. 2d 527, 537 (E.D.N.Y. 2010) (noting that delayed discovery and settlement negotiations deferred plaintiff's ability to discover facts and holding that plaintiff acted diligently by seeking leave to file an amended complaint only two months after acquiring the information).  That is manifestly not the case here, where the terms of the alleged agreements were set in approximately 2012, Plaintiffs' dealings with Singh took place between 2013 and 2014, and the consulting agreement has been available to Plaintiffs for years.

Plaintiffs' application to file new tort claims against Singh fails for the independent reason that these claims are time-barred and therefore futile under Rule 15.  Under California law, the statute of limitations for tortious interference with contract is two years, which typically accrues "at the date of the wrongful act."  *DC Comics v. Pac. Pictures Corp.*, 938 F. Supp. 2d 941, 948 (C.D. Cal. 2013).  The statute of limitations for tortious interference with prospective business relations is also two years.  *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, No. 17-cv-02824-JST, 2019 WL 281370, at *7 (N.D. Cal. Jan. 22, 2019).  The relevant statutes of limitation under New York law are three years.  *See Weizmann Inst. of Sci. v. Neschis*, 229 F. Supp. 2d 234, 252 (S.D.N.Y. 2002) (statute of limitations for tortious interference with contract claim is three years, and limitations period begins to run on the date the injury is sustained (citations omitted)); *Brown Media Corp. v. K & L Gates, LLP*, 586 B.R. 508, 526 (E.D.N.Y. 2018) (same for claims for tortious interference with prospective business relations (citations omitted)).  The PSAC alleges misrepresentations by Singh in October 2013, ¶ 69, but Plaintiffs did not bring suit until September 2019—nearly six years later.  Accordingly, Plaintiffs' proposed

additional tort claims are time-barred, and amendment would be futile.  *See Kleeberg v. Eber*, 331 F.R.D. 302, 314 (S.D.N.Y. 2019) (noting "good reason" to deny a request for leave to amend where the proposed amendment is futile because it is time-barred).

## V.    CONCLUSION

For the reasons set forth above, Iovance's and Singh's motions for judgment on the pleadings are GRANTED.  The Court dismisses Plaintiffs' second and third causes of action for breach of contract and fifth and sixth causes of action for fraud and conversion. Plaintiffs' first cause of action against Iovance for breach of contract survives, along with their claims for unjust enrichment and indemnification.

The Clerk of Court is respectfully directed to terminate Singh as a defendant and to terminate the motions, Docs. 42 and 44.

It is SO ORDERED.

Dated: January 5, 2022
New York, New York

_____
Edgardo Ramos, U.S.D.J.