UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SOLOMON SHARBAT, SOLOMON CAPITAL LLC,
SOLOMON CAPITAL 401(K) TRUST, and
SHELHAV RAFF,

                                        Plaintiffs,

                    – against –

IOVANCE BIOTHERAPEUTICS, INC. *formerly
known as* Lion Biotechnologies, Inc., *formerly known as*
Genesis Biopharma, Inc.,

                                        Defendant.

**OPINION AND ORDER**
20-cv-1391 (ER)

Ramos, D.J.:

        Solomon Sharbat, Solomon Capital LLC, Solomon Capital 401k Trust, and Shelhav Raff

bring this suit against Iovance Biotherapeutics for breach of contract and related claims for

unjust enrichment and indemnification.  Pending before the Court is Iovance's motion for

sanctions against Plaintiff for violating rules 11(b)(1), (2), and (3) of the Federal Rules of Civil

Procedure.  For the reasons set forth below, the motion is GRANTED in part.

I.      **BACKGROUND[1]**

        a.  **The Parties**

        Solomon Sharbat and Shelhav Raff are in the business of helping corporate clients with

fundraising, mergers, and strategic alliances, and making introductions to facilitate those ends.  ¶

23.  Solomon Capital is a limited liability company, and Solomon Capital 401k trust is a

---

[1] Unless otherwise indicated, citations to ¶ _ refer to the first amended complaint, Doc. 15.  The Court assumes familiarity with its prior May 22, 2020 and January 5, 2022 opinions, *see* Docs. 29, 92; it includes here only the factual background necessary to resolve the instant motions.

qualified retirement trust, for which Sharbat is the trustee.  ¶¶ 4–5.  It is not disputed that Solomon Capital and Solomon Capital 401k Trust are owned and controlled by Sharbat; they have no employees and conduct no business activities other than holding assets on Sharbat's behalf.  *See* Doc. 127-1 ¶¶ 3, 4, 10, 11.[2]

Iovance is a publicly traded biotechnology company focused on the development of cancer therapies.[3]  ¶¶ 7–8, 24, 57.  As relevant to the instant motion, Anthony Cataldo served as chief executive officer of Iovance until July 24, 2013, when Manish Singh took over as CEO.  ¶¶ 24, 59; Doc. 23 at ¶ 7.

### b. The MBA-Iovance Agreements

According to the first amended complaint ("FAC"), in the summer of 2012, Sharbat and Raff were introduced to Cataldo and to Iovance's chief financial officer, Michael Handelman, through Mark Beychok, CEO of non-party MBA Holdings, LLC ("MBA").  MBA is a California single member limited liability company, whose principal is Beychok, a California resident.  *See* Doc. 127-1 ¶ 2.  The FAC alleges that Handelman informed Sharbat, Raff, and Beychok that

---

[2] Iovance asks the Court to take judicial notice of the following filings from other cases:  (1) the verified complaint filed on February 21, 2019, in *Schwarz v. Solomon Capital LLC, et al.*, Supreme Court of the State of New York, County of New York, Index No. 651091/2019, Doc. 127-1; (2) the complaint filed on August 17, 2015 in the matter of *MBA Holdings, LLC v. Lion Biotechnologies, Inc.*, Superior Court of California, County of Los Angeles, LASC Case No. BC501513, Doc. 127-2; and (3) the notice of dismissal entered on December 11, 2015, in the California lawsuit, Doc. 127-3.  *See* 127 at 2.  District courts may "take judicial notice of documents filed in other courts, . . . not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 276 n.3 (2d Cir. 2021) (noting that a court "may take judicial notice of the existence of affidavits filed in another court").  Accordingly, the Court takes notice of these documents.

[3] In 2012, when the events at issue in this action occurred, the company was named Genesis Biopharma, Inc.  On September 25, 2013, the company amended and restated its articles of incorporation, which changed the company's name to Lion Biotechnologies, Inc.  On June 27, 2017, the company changed its name again to Iovance Biotherapeutics, Inc.  Doc. 124 at 9 n.4.  For the sake of simplicity, the Court here refers to the company as Iovance, regardless of its actual name at the time.

they could earn substantial fees by helping Iovance raise $30 million to develop its intellectual property and fund start-up costs.  ¶¶ 28–29.

On June 13, 2012, MBA entered into a confidentiality, non-disclosure and non-circumvention agreement with Iovance (the "Confidentiality Agreement").  Doc. 18-8 at 13–16. The Confidentiality Agreement provides that "MBA and [Iovance] desire[d] to enter into discussions regarding the possibility of establishing a mutually beneficial relationship" and that certain information exchanged in exploring that possibility was to remain confidential.  *Id.* Plaintiffs are neither party to, nor referenced in, the Confidentiality Agreement.  *Id.*

Two days later, on June 15, 2012, MBA entered into a six-page agreement with Iovance (the "Finder's Fee Agreement"), whereby MBA agreed to act as a finder to source financing and strategic relationships for Iovance.  ¶¶ 37, 38, 77, 78, 79; Doc. 111-4.  Pursuant to the Finder's Fee Agreement

> [i]f [Iovance] receiv[ed] any [f]inancing from a Qualified Introduction[4] at any time, [Iovance would] pay to [MBA] at the closing of the [f]inancing a finder's fee:  ( i) in cash equal to ten percent . . . of the gross proceeds of the [f]inancing; and (ii) in five . . . years, cashless warrants to purchase [Iovance's] common stock in an amount equal to 10% of the gross proceeds of the [f]inancing at a strike price equal to the investment purchase price.

Doc. 111-4 at 2.  The Finder's Fee Agreement further includes an integration clause, which states that

> [t]his [a]greement contains the sole and entire agreement and understanding of the parties with respect to the entire subject matter of this [a]greement, and any and all prior discussions, negotiations, commitments and understandings, related to the subject matter of this [a]greement are hereby merged herein.

---

[4] The Finder's Fee Agreement defines "Qualified Introduction" to mean an entity introduced to Iovance by MBA, or an entity introduced to Iovance by another entity who was introduced by MBA to Iovance.  Doc. 111-4 at 3.

Doc. 111-4 at 5.  The Finder's Fee Agreement also provides that the "[a]greement may be amended only by a written agreement executed by all of the parties to this [a]greement."  *Id.* at 6.  Lastly, the Finder's Fee Agreement indicates that it "shall be construed in accordance with the laws of the State of California."  *Id.*

The FAC describes the Finder's Fee Agreement as "an agreement and understanding among all of the parties and MBA, in addition to an agreement and understanding as between MBA on one hand and Sharbat, Raff, and/or [Solomon Capital] on the other hand."  ¶ 32.  Only two entities, however, are parties to the Finder's Fee Agreement:  Iovance and MBA.  *Id.* at 6.  The Finder's Fee Agreement makes no reference to any of the Plaintiffs.  *Id.*

Nonetheless, the FAC alleges that Plaintiffs had an understanding with Iovance and MBA that the terms of the Finder's Fee Agreement also applied to them, either as direct parties to the contract or as "intended beneficiaries" thereof.  ¶¶ 32–34, 37–40.  Specifically, the FAC purports that "[t]he . . . [Finder's Fee Agreement] provided, and it was acknowledged by all parties," that Sharbat, MBA, and Raff would each be entitled to one-third of the finder's fee, or that, in the alternative, Sharbat would be entitled to a $400,000 secured note payable on the demand.  ¶¶ 34–35.  This language, however, does not appear anywhere in the Finder's Fee Agreement.  Doc. 111-4.

In addition to the Confidentiality Agreement and Finder's Fee Agreement, MBA entered into another contract with Iovance:  a July 9, 2012 consulting agreement (the "Consulting Agreement") (together with the Confidentiality Agreement and Finder's Fee Agreement, the "MBA Contracts").  *See* Doc. 18-8 at 17–22.[5]

---

[5] Document 18-8 is MBA's August 17, 2015 complaint against Iovance in the matter of *MBA Holdings, LLC v. Lion Biotechnologies, Inc.*, Superior Court of California, County of Los Angeles, LASC Case No. BC501513; annexed to the complaint is the Confidentiality Agreement and the Consulting Agreement.

The Consulting Agreement is signed by Handelman on behalf of Iovance and by Beychok on behalf of MBA. *Id.* at 18-8 at 17–22. It specifies that in exchange for MBA's help with developing scientific relationships in Israel, Iovance would give MBA 1.5 million shares of unrestricted, fully vested common stock after the company filed a registration statement with the Securities and Exchange Commission. *Id.* at 18. Notably, the Consulting Agreement contains a non-assignment clause, reflecting that Iovance entered into the contact "in reliance upon and in consideration of the singular personal skills and qualifications of [Beychock]," and that any assignment or transfer would require prior written consent of Iovance. *Id.* at 19. Like the Finder's Fee Agreement, the Consulting Agreement also includes an integration clause, a California choice-of-law provision, and provides that any amendments to the contract must be made in writing. *Id.* Plaintiffs are not party to, or otherwise referenced in, the Consulting Agreement. *Id.*

### c.  Plaintiffs' Fundraising Efforts

From the time the MBA Contracts were executed until 2014, Plaintiffs purport to have made several qualified introductions to Iovance, resulting in over $70 million in financing for the company. ¶¶ 52–56. As proof, Plaintiffs have produced approximately thirty emails, the earliest of which is dated July 10, 2012, approximately one month after the execution of the Finder's Fee Agreement. *See* Doc. 111-7 at 20. Specifically, an email from Sharbat to Beychok, with the subject line "List for [Iovance]," contains the name of a "[prospective] biotech fund." *Id.* at 17. Attached to the email is a spreadsheet containing a list of contacts. *Id.* at 18–19. Similarly, a July 12, 2012 email from Sharbat to Beychok contains a list of names, along with the note: "Will be in the office in 1 hour will add to the list." *Id.* at 20.

Some of the emails are directly between Sharbat and Cataldo, with Beychok copied.  For example, in an email dated July 31, 2012, Sharbat told Cataldo that he and Beychok had dinner with a representative of a potential investor and that Cataldo would be able to meet with the investor.  *See id.* at 4.  Sharbat further explained that he and Beychok would split the prospective finder's fee with the investor's representative.  *Id.*  In response, Cataldo thanked Sharbat for his efforts.  *Id.*  None of the emails produced by Plaintiffs, however, indicate that Iovance understood Sharbat to be party to, or the intended beneficiary of, any of the MBA Contracts.[6]

### d.  Emails Concerning Plaintiffs' Status Under the MBA Contracts

According to the FAC, the fact that Plaintiffs were either "direct parties to" or "intended beneficiaries of" the MBA Contracts was

> confirmed in an email in which [Iovance]'s then attorney confirmed that MBA and [Solomon Capital] were to share in all proceeds, both cash and securities, in connection with the financing anticipated by the [Finder's Fee] Agreement. [Iovance] also confirmed Raff to be an intended and/or third-party beneficiary of the [Finder's Fee] Agreement, with the three, each of MBA, [Solomon Capital], and Raff to be one-third beneficiaries.

¶ 39.  The email to which the FAC refers is an August 19, 2012 message from Iovance's Israeli counsel, Sarit Molcho, to Beychok.  According to Sharbat, Molcho's email was in response to his request for her to "draft a contract between [Sharbat Capitial], Sharbat, and MBA to reflect [their] partnership in the benefits of the MBA Contracts."  Doc. 132-9, Sharbat Declaration in Opposition to Motion for Sanctions, ¶ 9.  Molcho's August 19, 2012 email to Beychok provides:

> As I understand the agreement between MBA and [Solomon Capital] is to share all proceeds (cash and securities) received by any of MBA or [Solomon Capital] (net after deductions of payments to other 3rd parties) in connection with the Financing (a loan or the sale of debt or equity securities) of [Iovance] equally without reference to the origin, or the entity that made the initial introduction, of such Financing.  Such agreement will not apply in the event that MBA and [Solomon Capital] has a specific agreement under which they share the fees (such

---

[6]  The most recent of these fundraising-related emails is dated October 26, 2012.

> as the agreement with Shelhav in which they share the fees in three equal parts).
> Please confirm that this is the understanding and I will draft an agreement later.

Doc. 132-3.  Sharbat claims that "[Solomon Capital] and MBA reviewed drafts of a formal

contract confirming their partnership in the proceeds due under the MBA Contracts but did not

agree on a definitive formal contract."  Doc. 132-9 ¶ 10.  He maintains that "[his] and MBA['s]

oral partnership was nevertheless effective and binding on both [Solomon Capital] and MBA."

*Id.*

In a separate email dated August 29, 2012, Beychok wrote to Sharbat, stating that he,

through MBA, and Sharbat, through Solomon Capital, "are 50/50 partners on the [Iovance] deal

that we are both working on."[7]  *See* Doc. 132-2.  Like Sharbat, Beychok also asserted that

although he and Sharbat "never executed a formal contract," their "intent . . . was that their

partnership was valid as an oral agreement . . . and did not require execution of a formal contract

to be effective and binding on the parties."  *See* Doc. 132-1, Beychok Declaration in Opposition

to Iovance's Motion for Sanctions, ¶ 12.

Another email thread submitted by Iovance—dated April 28, 2013, eight months later—

shows another conversation between Sharbat and Molcho.  Doc. 133-3.  In this exchange,

Sharbat wrote:  "[T]he fact that [Iovance] hired you to be the[ir] Israeli corp[orate l]awyer can

make it easier for me to go to [Iovance] to get paid directly - since you have the email from

[Beychok]?"  *Id.*  Molcho responded:

> I do not think so.  The email from [Beychok] confirms your internal agreement
> but it has nothing to do with [Iovance].  If [Iovance] pays you directly it is fine
> but [u]nless you have an agreement with [Iovance] you can not make them pay
> "your share" directly to you.  However, this is Israeli law.  You should consult
> California lawyer.  The above does not refer to amounts that are covered by direct

---

[7] In contrast to the FAC, which pled an equal, three-way split between Sharbat, Raff, and Beychok, neither of these emails include or make any reference to Raff; the emails reflect only an even split between Sharbat and Beychok. *See* Docs. 132-2; 132-1.

obligation given by [Iovance] to you.  Obviously these amounts are collectible from [Iovance].

*Id.*

### e. MBA's 2015 Lawsuit Against Iovance

According to the declarations of Sharbat and Beychok, at some point after becoming CEO of Iovance on July 24, 2013, ¶ 59, Singh reneged on his duty to compensate MBA and Solomon Capital, pursuant to the MBA Contracts.  Docs. 132 ¶ 34; 132-9 ¶ 32.  At that time, Sharbat and Beychok assert that they stopped performing services for Iovance.[8]  *Id.*

On August 18, 2015, MBA sued Iovance in the Superior Court of the State of California, County of Los Angeles, Case No. BC501513, alleging, in part, that on November 6, 2013, Iovance breached the [Finder's Fee] Agreement by "[f]ailing to tender to [MBA] all monies, warrants and other consideration owed to [it] under the [Finder's Fee Agreement]."  *See* Doc. 127-2 at 4.

On August 28, 2015, Iovance's counsel wrote to MBA's counsel, explaining "the lawsuit is based on an apparent misunderstanding of the key facts and is without merit."  Doc. 126-2. Thereafter, MBA's counsel requested, and Iovance's counsel provided, documents pertaining to the dispute.  Doc. 126-3.  On December 11, 2015, MBA dismissed its complaint without prejudice.  Beychok's declaration provides that "[i]n [his] opinion, [MBA's] withdrawal had nothing to do with the merits of the case and everything to do with Defendants' counsel's threats and attempted intimidation, now repeated against current counsel" in the motion for sanctions now pending before the Court.  Doc. 132-1 ¶ 38.

---

[8] In contrast, in the FAC, Plaintiffs purport that they "*continued* to perform under the [Finder's Fee] Agreement," after "Beychok withdrew from participation."  ¶ 41, n. 1 (emphasis added).  There is no evidence in the record of efforts on the part of Sharbat of such continued performance.

### f.   The Instant Action

According to Beychok, in spring 2019, he received a phone call from Raff, advising him that Sharbat intended to bring the instant action to recover the finder's fees due pursuant to the Finder's Fee Agreement and asking him to participate in the action.  Doc. 132 ¶ 42.  Beychok claims that at that time, he could not participate in any business activities because he was undergoing to treatment for throat cancer.  *Id.* ¶¶ 39, 42–43.  He, however, purportedly told Raff to "[g]o get those SOB's and protect our interests."  *Id.* ¶ 43.

On September 27, 2019, Plaintiffs initiated this suit by filing an initial complaint in the Supreme Court of the State of New York, *Sharbat et al. v. Iovance Biotherapeutics, Inc. et al.*, Index No. 655668/2019.  Doc. 1-1.  On February 18, 2020, Iovance removed the case to this Court.  Doc. 1.  On May 1, 2020, Plaintiffs filed their first amended complaint to enforce their alleged rights as "direct parties" to, or "intended beneficiaries" of, the Fact Finder's Agreement, and for issuance of half of the 1.5 million unrestricted shares owed to them (ostensibly pursuant to the Consulting Agreement).[9]  Doc. 18.

On May 22, 2020, Iovance moved to dismiss this action for lack of personal jurisdiction, Doc. 18, and on June 19, 2020, former-Defendant Singh also moved to dismiss Plaintiffs 'claims against him.  Doc. 21.  On March 26, 2021, the Court denied both motions.  Doc. 29.

A scheduling order entered on May 7, 2021 provided that, pursuant to Federal Rule of Civil Procedure 15(a), the deadline for amending pleadings had passed and that discovery was to be completed by November 5, 2021.  Doc. 39.  On May 26, 2021, Iovance moved for judgment on the pleadings as to Plaintiffs 'second and third causes of action for breach of contract.  Docs.

---

[9] As the Court noted in its January 2022 Order, the FAC is actually Plaintiffs' third version of the complaint, as they had already filed an amended complaint in the state court proceedings before the matter was removed to this Court. *See* January 2022 Order at 6 n. 6.

42, 44.  On June 25, 2021, Plaintiffs also requested leave to file a second amended complaint.

Doc. 49.  On September 3, 2021, the Court granted an extension to the discovery deadline until

January 4, 2022.  Doc. 54.

On December 15, 2021, the Court held a discovery conference at the request of counsel

for Iovance, TroyGould PC.  At that conference, TroyGould requested an order requiring

Plaintiffs to appear for their depositions as noticed.  Doc. 87 at 2:18–19.  The Court ultimately

instructed then-counsel for Plaintiffs, Simon Schwarz of the Law Offices of Simon Schwarz, to

have Plaintiffs appear for their depositions.  *Id.* at 9:17–21, 10:18–19.

At a case management held on January 5, 2022, the Court made clear that "[d]iscovery

[was] closed."  *See* Doc. 94 at 26:13; *see also id.* at 2: 11–14 ("This matter is on for case

management conference . . . .  [A] case management conference means all discovery is

completed, and we just talk about next steps.").  Although discovery had closed, Schwarz,

counsel for Plaintiffs, requested leave from the Court to file a motion to compel discovery.  *Id.* at

24:20–25.  The Court granted Schwarz leave to do so, though cautioned him that the Court

would be "disinclined" to grant his motion "based on everything that [it] kn[ew] about th[e]

case."  *Id.* at 28:14–17; *see also id.* at 29:21–25 (TroyGould had done nothing to obstruct

Plaintiffs' ability to engage in discovery.  "The Court entered a scheduling order.  It was

extended at [Plaintiffs'] request.  [Counsel for Plaintiffs] knew that . . . yesterday was the end of

discovery.").  Schwarz further requested leave to file a motion to amend the complaint to add

two parties and additional facts.  *Id.* at 29:2–9.  Again, the Court granted Schwarz leave to do so

but warned that "based on everything that [it] kn[ew], . . . [it did not understand] why [Schwartz]

would spend [his] client's money doing that[.]"  *Id.* at 29:10–13.  Lastly, the Court granted

Iovance leave to file a motion for summary judgment.  *See id.* at 28:3–6.

Later that same day, the Court issued an Opinion and Order dismissing Plaintiffs' second and third causes of action against Iovance, leaving only Plaintiffs' first cause of action for breach of the Fact Finder's Agreement, along with related claims for unjust enrichment and indemnification.  Doc. 92, the "January 2022 Order."[10]  With respect to Plaintiffs' breach of contract action regarding the 1.5 million unrestricted shares of stock, the Court found that Plaintiffs had failed to state a claim, reasoning that while:

> the record before the Court indicates that *a* contract, [*i.e.*, the Consulting Agreement,] existed that included terms of compensation for 1.5 million shares of [Iovance] stock, that agreement prohibits assignment without the express written consent of [Iovance].  The Court cannot conclude from the foregoing that the [C]onsulting [A]greement included Plaintiffs as either parties or beneficiaries, when Plaintiffs have not alleged as much.  Nor does the FAC allege any contract the terms of which included that Plaintiffs would be compensated with half of 1.5 million shares.

January 2022 Order at 12.  The Court denied Plaintiffs' request for leave to file a second amended complaint, reasoning that Plaintiffs did not exercise diligence or adequately explain why they could not have included the new allegations earlier.  *See id.* at 23–24 (emphasizing that the MBA Contracts had been available to Plaintiffs for years).

On January 19, 2022, Plaintiffs filed a motion to compel Iovance to produce documents and appear at depositions.  Doc. 97.  Defendant's opposition to the motion was originally due on January 26, 2022.  Doc. 99.  On January 25, 2022, however, Sharbat informed the Court and Iovance's counsel via email that Plaintiffs' counsel, Schwarz, had suffered a serious health incident and requested that all deadlines be adjourned for sixty days.  The Court granted Sharbat's request.  Doc. 100.  On February 8, 2022, Sharbat informed the Court and Iovance's counsel via email that Schwarz had passed away, and requested until the scheduled April 7, 2022

---

[10] The Court also dismissed all of Plaintiffs' claims against Defendant Singh.  January 2022 Order.

case management conference to retain new counsel.  On March 25, 2022, Iovance filed its
opposition to the motion to compel.  *See* Docs. 102–06.

### g.  The Assignment

On March 28, 2022, Sharbat, Solomon Capital, and Solomon Capital 410k Trust
(collectively, the "Sharbat Parties")—but not Raff—entered into an assignment agreement (the
"Assignment") with MBA and newly-formed MBA Sharbat Holdings Inc., a Wyoming
Corporation ("MBA Sharbat").  Doc. 111-6.  The Assignment provides that

> *MBA owns all right, title and interest in and to the benefits of* [the MBA Contracts
> and that] in consideration of the services of the Sharbat Parties in assisting MBA
> in the performance of MBA's obligations under and pursuant to the MBA
> Contracts, MBA agreed that it would pay [the] Sharbat Parties shares of the
> compensation due to MBA pursuant to the MBA Contracts.

*Id.* at 2 (emphasis added).  Additionally, the Assignment indicates that the Sharbat Parties
brought the instant action against Iovance "to recover the sums due pursuant to the MBA
Contracts" and that, in a separate confidential letter,[11] the "Sharbat Parties and MBA . . . agreed
to share all recoveries from prosecution of [the instant action]."  *Id.*  "For that purpose," the
Assignment states that MBA and the Sharbat Parties formed MBA Sharbat, a corporation "whose
shares of capital stock are owned by MBA and [the] Sharbat Parties."  *Id.*

The Assignment then provides that MBA and the Sharbat Parties agreed to "each sell,
grant, convey and assign unto [MBA Sharbat], irrevocably and in perpetuity, . . . [their] right,
title and interest in and to (a) the benefits but not the burdens or obligations under the MBA
contracts and (b) the [instant action]" (together, the "Assigned Rights").  *Id.*  The Assignment
further provides that it "is made in consideration of the issuance of 100% of the capital stock of
[MBA Sharbat] to [MBA and the Sharbat Parties] and the assumption by [MBA Sharbat] of all

---

[11] The confidential letter is not part of the record before the Court.

costs and fees to be incurred in connection with the prosecution of the [instant action]."[12]  *Id.*
The Assignment also contains a California choice-of-law provision.  *Id.* at 3.

### h.  Plaintiffs' Motion to Amend and Iovance's Motion for Sanctions

In a March 29, 2022 short order, the Court directed the Plaintiffs to advise the Court at
the upcoming case management conference whether they wished to re-file their motion to
compel Iovance to produce documents and appear at depositions, or whether they would
withdraw it.  Doc. 107.

On April 1, 2022, the Roth Law Firm, filed a notice of appearance on behalf of Plaintiffs,
Doc. 108, along with a letter, which provided the firm "also represent[s] new proposed Plaintiff
MBA Sharbat," Doc. 112.  This was the first time that the Court had been informed about the
creation of MBA Sharbat.  That same day, Plaintiffs filed a motion for leave to amend the FAC
on behalf of non-party MBA Sharbat.  Doc. 111.

The case caption of the proposed second amended complaint (the "PSCA ") eliminates
the four named Plaintiffs, naming MBA Sharbat as the sole plaintiff in this action.  Doc. 111-2.
Raff is not mentioned in the motion.  *See generally id.*  The PSAC alleges that "MBA engaged
Solomon Sharbat . . . to assist in the performance of MBA's obligations under, and to receive
shares of the compensation due to MBA pursuant to, the MBA Contracts."  Doc. 111-2 ¶ 3.  It
brings two causes of action:  (1) for breach of the Finder's Fee Agreement for failure to pay fees
for qualified introductions, and for breach of the Consulting Agreement for "failure to issue
1,500,000 freely tradeable shares of common stock of Iovance as the S-8 Shares;" and (2) for

---

[12] According to its Articles of Incorporation, MBA Sharbat was not formed until April 7, 2022, ten days *after* the
Assignment Agreement was executed.  *See* Doc. 126-8.

declaratory judgment that MBA Sharbat, as assignee, is entitled to Finders Fees and the issuance of the S-8 Shares.  *Id.* ¶¶ 23, 27.

On April 5, 2022, counsel for Iovance wrote to the Court, objecting to MBA Sharbat Holding's motion to amend as untimely, highlighting the purported admissions of the Assignment, and requesting permission to discuss these matters at the upcoming case management conference.  *See* Doc. 113.  The following day, Plaintiffs' counsel responded, claiming that Plaintiffs have not admitted that they do not have rights under the MBA Contracts and that the motion to amend is timely.  *See* Doc. 116.

At the April 15, 2022 case management conference, the Court asked counsel for Plaintiffs for more information about MBA Sharbat.  Doc. 121 at 3:23–25.  In response, Iovance's counsel said:

> What happened was the individual, who's [] MBA, [which is] the entity that signed the [Finder's Fee Assignment], Mark Beychok was ill with cancer, and he therefore was not participating [in the instant action.]  Once we got ahold of him and [learned that he is remission and able to proceed with the case, we] . . . realized that the entity that actually signed the contract is certainly -- . . . we thought the simplest thing to do would be to create an entity which is an assignee of the current plaintiffs combined with Mr. Beychok's company.  So it just simplifies it.

*Id.* at 4:1 10.  The Court then asked whether these facts were known to Plaintiffs and their former counsel.  *Id.* at 4:12–14.  Roth responded:  "I believe so, your Honor."  *Id.* at 4:15.  The Court granted Roth leave to file a motion to amend, but warned him to "be very careful" in doing so. *Id.* at 11:12–13.  Counsel for Iovance then indicated that he would "like to file a Rule 11 motion" and that the Court "should dismiss [Plaintiffs'] case immediately."  *Id.* at 12:1–4.  The Court granted Iovance leave to file its motion and indicated that it would "not . . . resolv[e Plaintiffs'] motion [to amend] before [resolving] the Rule 11 motion[.]"  *Id.* at 12:16–21, 13:6–8.

Consistent with Rule 11(b)(2)'s notice requirement, on April 25, 2022, Iovance served Plaintiffs' counsel a copy of the now-pending motion for sanctions.  Doc. 132-17.  On May 13, 2022, Plaintiffs' counsel responded to Iovance, explaining why the motion is without merit and asking Iovance to withdraw it.  Doc. 132-18.  Counsel for Iovance responded by letter dated May 16, 2022, declining to do so.  Doc. 132-19.

On May 16, 2022, Iovance filed its Rule 11 motion, asking the Court to:  (1) strike MBA Sharbat's motion for leave to amend; (2) dismiss the FAC; and (3) order Plaintiffs and their counsel to pay $620,426 for attorneys' fees and $135,305 for expenses that Iovance has incurred defending against Plaintiffs' allegations.  Doc. 124 at 8.  For the reasons set forth below, Iovance's motion is GRANTED in part.

## II.    STANDARD

Federal Rule of Civil Procedure 11 authorizes the Court to impose terminating and monetary sanctions when a party advocates for a factually or legally frivolous filing.  Fed. R. Civ. P. 11(b); *see also Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) (stating that "sanctions under Rule 11 are discretionary, not mandatory").  "The standard for imposing Rule 11 sanctions, however, is purposefully high, so as not to stifle legal creativity and zealous advocacy."  *City of Perry, Iowa v. Procter & Gamble Co.*, No. 15 Civ. 8051 (JMF), 2017 WL 2656250, at *2 (S.D.N.Y. June 20, 2017).  Rule 11 sanctions should be granted with caution, applied only when "a particular allegation is utterly lacking in support."  *In re Highgate Equities, Ltd.*, 279 F.3d 148, 154 (2d Cir. 2002) (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (S.D.N.Y. 1996)); *Kiobel v. Milson*, 592 F.3d 78, 81 (2d Cir. 2010); (*see also Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003) ("When reviewing Rule 11 sanctions . . . we . . . need to ensure that any [sanctions] decision is made with restraint.")

(internal quotation marks omitted)).  A court must review the facts "objectively," *see Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003), and, "[w]hen divining the point at which an argument turns from merely losing to losing *and* sanctionable, . . . resolve all doubts in favor of the signer" of the pleading.  *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993) (internal quotation marks omitted) (emphasis in the original).

## III.    DISCUSSION[13]

### a.  Sanctions for the FAC

Iovance argues that the Plaintiffs have violated Rules 11(b)(1), (2), and (3) by filing— and continuing to litigate—a frivolous breach of contract claim, even after "admitting" that they have no rights in the Finder's Fee Agreement.  *See* Doc. 124 at 16.   Accordingly, before the Court are three central questions:  (1) whether the Assignment indeed concedes that Plaintiffs never had any rights under the Finder's Fee Agreement; (2) if so, whether Plaintiffs can establish standing under any alternate theory; and (3) if not, whether the filing of the FAC is sanctionable.

#### i.  The Assignment Concedes that the Sharbat Parties Lack Rights under the Finder's Fee Agreement

The clear and unambiguous terms of the Assignment show that Plaintiffs did not have rights under the Finder's Fee Agreement.  While the Assignment states a business arrangement

---

[13] As a preliminary matter, in its January 2022 Order, the Court dismissed Plaintiffs' breach of contract claim with respect to the Consulting Agreement, albeit not with respect to the Finder's Fee Agreement.  *See* January 2022 Order at 12–13.  The proposed SAC attempts to reintroduce this same claim.  *See* Doc. 111-2 ¶ 23 (alleging breach of the Consulting Agreement for "failure to issue 1,500,000 freely tradeable shares of common stock of Iovance as the S-8 Shares"); Doc. 111-1, Plaintiffs' Opposition, at 6 (conceding that "[t]he claims for damages in the SAC for breach of contract are the same as in the FAC[.]").  As discussed in greater detail herein, Plaintiffs offer no legal or factual explanation for why the Court should allow them to relitigate this already dismissed claim.  Plaintiffs further fail to address the fact that the Consulting Agreement contains a clause that requires the consent of *both* Iovance and MBA to assign rights in the agreement.  Doc 18-8 at 19.  Accordingly, to the extent that Plaintiffs request the Court to reconsider its dismissal of their claim that Iovance breached the Consulting Agreement, that request is denied. This Opinion, therefore, concerns itself only with the surviving breach of contract claim, concerning the Finder's Fee Agreement.

between the Sharbat Parties and MBA, and one between MBA and Iovance, it does not reference any agreement between the Sharbat Parties and Iovance.  Doc. 111-6 at 2.  Rather, the Finder's Fee Agreement expressly provides that MBA alone owns *all* right, title, and interest in, and the benefits of, the Finder's Fee Agreement.  *Id.*  It then explains that in consideration for helping MBA perform its obligations under the Finder's Fee Agreement, MBA would pay the Sharbat Parties a share of the compensation that MBA might receive from Iovance.  *Id.*  This purported side deal between MBA and the Sharbat Parties lies squarely outside of the four corners of Finder's Fee Agreement.  *See id.* at 5 (providing that "[the Finder's Fee Agreement] contains the sole and entire agreement and understanding of the parties").

Plaintiffs, however, argue that the Sharbat Parties can establish standing via alternate theories, consistent with the language of the Assignment.

### ii. Alternate Theories of Standing

Plaintiffs offer four reasons for why the Sharbat Parties have standing to bring the breach of contract claim:  (1) that Iovance understood the Sharbat Parties to have an interest in the Finder's Fee Agreement; (2) that Solomon Capital and MBA were partners in raising capital for Iovance and that, by contracting with MBA, Iovance effectively contracted with the Sharbat Parties; (3) that the Sharbat Parties are third-party beneficiaries under the Finder's Fee Agreement; and (4) that Beychok's authorization of this action is sufficient.  *See* Doc. 132 at 13–15.  Each fails.

First, Plaintiffs argue that the August 19, 2012 email from Iovance's Israeli counsel, Molcho, to Beychok demonstrates Iovance's understanding that the Sharbat Parties had an interest in the Finder's Fee Agreement.  *See* 132-3.  By virtue of this email, Plaintiffs suggest,

without pointing to any legal authority, that they have standing to sue Iovance for breach of the contract.  Plaintiffs, however, mischaracterize Molcho's message.

According to Sharbat's declaration, Molcho sent her email in response to Sharbat's request for her to "draft a contract between [Solomon Capital], Sharbat, and MBA to reflect [their] partnership in the benefits of the MBA Contracts."[14]  Doc. 132-9 ¶ 9.  Molcho responded by confirming Iovance's awareness that the Sharbat Parties would be helping MBA in exchange for half of MBA's proceeds earned pursuant to the Finder's Fee Agreement.  Doc. 132-3.  She did *not* state that Iovance understood that the Sharbat Parties had any rights under the Finder's Fee Agreement.  *Id.*  And the fact that Iovance was aware that Beychok separately agreed to share his fees with Sharbat does not give Plaintiffs standing to sue under the Finder's Fee Agreement.

The April 28, 2013 email from Molcho to Sharbat corroborates this interpretation of the August 19, 2012 email.  There, in response to Sharbat's request for Iovance to pay him directly, Molcho explained:  "Unless you have an agreement with [Iovance], you can not make [Iovance] pay 'your share' directly to you."  *See* Doc. 133-3.  She further explained that Sharbat's email correspondence with Beychok (presumably the August 29, 2012 email) "confirm[ed]" only his "internal agreement [with MBA,] but . . . has nothing to do with [Iovance]."  *Id.*  Molcho thereby affirmatively disavowed the notion that Iovance understood Sharbat to be party, or otherwise a beneficiary of, the Finder's Fee Agreement.[15]

---

[14] According to Sharbat's declaration, Cataldo gave Sharbat approval to engage Molcho as counsel to prepare a separate contract outlining the terms of the relationship between an Israel-based cancer expert and Iovance, which Beychok and Sharbat helped broker.  *See* Doc. 132-9 ¶ 8.  Sharbat's declaration does not, however, state that he received any such permission from Iovance to contact Molcho to prepare a partnership agreement between Solomon Capital and MBA.  *Id.* ¶ 8.

[15] The Court further notes that the August 29, 2012 email produced by Plaintiffs, from Beychok to Sharbat, similarly reflects only Sharbat's and Beychok's understandings that they would share proceeds from the "[Iovance] deal" equally, as "partners."  *See* Doc. 132-2.  The fact that Beychok enlisted Sharbat's assistance is entirely consistent

In any event, the August 19, 2012 email was sent *after* MBA and Iovance executed the Finder's Fee Agreement on June 15, 2012.  *See* Doc. 111-4.  As noted, the Finder's Fee Agreement provides that amendments to the contract must be made in writing and with the consent of Iovance.  *Id.* at 19.  To grant Plaintiffs rights in the contract therefore required a jointly executed amendment.  The August 19, 2012 email plainly does not constitute an amendment.  For these reasons, the Court is not swayed by Plaintiffs' first argument.

In support of their second theory to establish standing, Plaintiffs rely on § 16301 of the California Corporations Code, which provides in relevant part:

> Each partner is an agent of the partnership for the purpose of its business.  An act of a partner, including the execution of an instrument in the partnership name, for apparently carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership[.]

CA Corp. Code § 16301(1).[16]  Citing this statute, Plaintiffs assert that "any partner of a partnership has the right to bring an action in their own name on behalf of the partnership on 'ordinary matters.'"  Doc. 132 at 14; *see, e.g., Elias Real Estate, LLC v. Tseng*, 156 Cal. App. 4th 425, 431–32 (2007) ("[I]nsofar as a partner limits his conduct to matters apparently within the partnership business, he can bind the other partners without obtaining their written consent.") (internal quotation marks omitted).  Without any more explanation, Plaintiffs conclude that the Sharbat Parties have the right to sue Iovance for breach of the Finder's Fee Agreement.

This argument fails.  First, the plain language of § 16301(1) states that it applies to the "execution of an instrument in the *partnership name*."  CA Corp. Code § 16301(1) (emphasis

---

with the statement in the Assignment Agreement that MBA alone owns all rights under the Finder's Fee Agreement. The other emails produced by Plaintiffs—including the direct exchanges between Sharbat and Iovance personnel about fundraising—offer no more indication that Iovance believed the Sharbat Parties to have an interest in the Finder's Fee Agreement.  *See generally* Doc. 111-7.

[16] As noted in the Court's January 2022 Order, California state law governs the Plaintiffs' breach of contract claim. *See* January 2022 Order at 7–8.

added).  Beychok did not sign the Finder's Fee Agreement on behalf of a partnership between

MBA and Solomon Capital.  He signed exclusively on behalf of MBA.  *See* Doc. 111-6 at 5.

Plaintiffs do not point to any cases where a court has applied this statute to permit one partner to

sue to enforce a contract that was entered into prior to the time that partnership was formed, or

by another partner in his own name, and on behalf of an entity distinct from the partnership.

California courts *have* held that:  "It is the rule that 'prima facie' a contract, when signed by an

individual, is presumed to be the paper of the individual partner whose name is signed to it, and

the burden of proof is upon the holder to show affirmatively that the signature was intended for

the signature of the firm."  *Refinite Sales Co. v. Fred R. Bright Co.*, 119 Cal.App.2d 56, 62

(1953).  But as Plaintiffs do not address this burden, and, as discussed, the record before the

Court at this post-discovery stage[17] contains no evidence that Beychok intended to sign the

Finder's Fee Agreement on behalf of his alleged, not-yet formed partnership with Solomon

Capital at the time of execution.

What's more—assuming, *arguendo*, that MBA and the Solomon Capital entered into a

partnership to source funding for Iovance—the record before the Court is devoid of evidence that

any such partnership formed before MBA entered into the Finder's Fee Agreement with

Iovance.[18]  Rather, the record shows that the opposite is true:  that the partnership formed

---

[17] Plaintiffs mistakenly contend in their opposition to Iovance's motion that "discovery is far from complete."  Doc. 132 at 21; *see also id.* at 23 n.5 ("The SAC is an attempt to simplify this action and new counsel intends on moving forward expeditiously with discovery so that this matter can be resolved in short order.").  As noted, during the January 5, 2022 conference, the Court stated in no uncertain terms that discovery had closed.  *See* Doc. 94 at 26:13; *see also* Doc. 54. (extending the discovery deadline from November 4, 2021 to January 4, 2022).

[18] Only Sharbat's own declaration suggests the possibility that he entered into a partnership with Beychok prior to MBA's execution of the MBA Contracts:  "Prior to the execution of the MBA Contracts, through an introduction from [] Beychok[,] . . . Cataldo . . . asked me to help save [Iovance] from foreclosure . . . by raising much needed capital.  I agreed and even before the execution of the MBA Contracts[,] I commenced services for [Solomon Capital] by introducing investors to Cataldo . . . and Handelman . . . .  From [the] inception of [Solomon Capital's] services for the account of [Iovance], MBA and [Solomon Capital] agreed that [Solomon Capital] or its designees would be at least equal partners in all aspects of the MBA Contracts."  Doc. 132-9 ¶¶ 3–4.

*afterwards*.  For example, the earliest email produced by Plaintiffs showing the possibility of a partnership is dated July 10, 2012, approximately one month after the execution of the June 15, 2012 Finder's Fee Agreement.  *See* Doc. 111-7 at 20.  Even more recent are the August 19 and 29, 2012 emails.  Docs. 132-2; 132-3.  Beychok's own declaration states that "upon entering into the MBA Contracts," the latest of which is dated July 9, 2012, "[he] engaged [Sharbat] to assist MBA in performance of its obligations."  Docs. 132 ¶ 5; 18-8 at 17–22.  Simply put, there can be no "ordinary course [of] partnership business," to bind a contracting partner's partner if *no partnership yet exists*.  CA Corp. Code § 16301(1).  For these reasons, Plaintiffs' partnership-theory to show standing is without basis.

Third, Plaintiffs conclusively assert that the Sharbat Parties have standing as third-party beneficiaries of the MBA Contracts.  This argument is unsupported.  For the Sharbat Parties to be third-party beneficiaries, Iovance and MBA "must have [had] a motivating purpose to benefit [Plaintiffs] . . . , and not simply knowledge that a benefit to [Plaintiffs] . . . may follow from the contract[.]"  *See Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 830 (2019).  Plaintiffs set forth no evidence to support the idea that Iovance and MBA entered into the Finder's Fee Agreement with any such motivating purpose.

Lastly, Plaintiffs contend that they have standing because in spring 2019, Beychok allegedly gave Raff permission to bring this action after Raff informed him that Raff and Sharbat intended to sue Iovance.  *See* Doc. 132 ¶¶ 39, 42–43 ("Go get those SOB's and protect our interests.").  This argument is similarly baseless.  Under the plain terms of the Finder's Fee Agreement, Beychok could not unilaterally "authorize" a non-party to sue Iovance for breach of Finder's Fee Agreement.  Doc. 132 at 14.

For the reasons set forth, Plaintiffs have failed to articulate a viable basis to show standing for their breach of contract claim.

### iii. Sanctions are Appropriate

Iovance argues that Plaintiffs' initial filing and continued refusal to withdraw the FAC violate Rules 11(b)(1), (2), and (3), which provide:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:  (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and] (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b).  The rule "imposes an 'affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed.'"  *Galin v. Hamada*, 283 F. Supp. 3d 189, 201 (S.D.N.Y. 2017) (quoting *Gutierrez v. Fox*, 141 F.3d 425, 427 (2d Cir. 1998)); *see also Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 477–78 (S.D.N.Y. 2013) ("A pleading, motion or other paper violates Rule 11 . . . where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification or reversal of existing law.") (quoting *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (internal citations and quotations omitted)).

A court may impose sanctions for filing a complaint when "it should have been patently obvious to any attorney who had familiarized himself [or herself] with the law" that the action had no chance of success.  *Four Keys Leasing & Maint. Corp. v. Simithis*, 849 F.2d 770, 773 (2d

Cir. 1988); *see also Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (noting it must be "patently clear that a claim ha[d] absolutely no chance of success").  In *Alberts v. Wall St. Clearing Corp.*, for example, a court imposed Rule 11 sanctions against plaintiff's counsel, who filed the action without first discerning that plaintiff did not have standing because the cause of action was an asset of a bankruptcy estate belonging to the plaintiff's trustee.   No. 89 Civ. 0002 (JMW), 1989 WL 88585, at *1–3 (S.D.N.Y. July 13, 1989).  The court reasoned that "a reasonably competent attorney, acting under the circumstances presented, would have discovered that [the plaintiff] could not bring a claim in his name."  *Id.* at *2.

Moreover, "a litigant's obligations with respect to the contents of papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit."  Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment, subdivisions (b) & (c).  Accordingly, courts may impose sanctions "once discovery [is] closed, [if the plaintiff] kn[ows]—by that point [or] earlier—that [his] allegations on the central . . . issue in the case [are] 'utterly lacking in support,'" but nonetheless refuses to withdraw the frivolous allegation or claim.  *See Galin,* 283 F. Supp. 3d at 202–203 (citing *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 307 (2d Cir. 2014)); *see also Bunnell v. Haghighi*, 183 F. Supp. 3d 364, 372 (E.D.N.Y. 2016)).

In *Galin*, for example, the plaintiff refused to withdraw his complaint after failing to produce any admissible evidence apart from conclusory statements to prove that a dispositive provision of the Uniform Commercial Code did not apply to his claim.  *Id.* at 203.  The court imposed sanctions, reasoning that the plaintiff's "decision not to [withdraw his complaint after discovery had closed]—despite [the defendant's] explicit requests—took [his] actions outside of

the ambit of 'zealous advocacy' and into the realm of Rule 11 sanctions." *Id.*; *see also Carlton Grp., Ltd. v. Tobin*, No. 02 Civ. 5065 (SAS), 2003 WL 21782650, at *6 (S.D.N.Y. July 31, 2003) ("Rule 11 sanctions are appropriate where an attorney or party declines to withdraw a claim upon an express request by his or her adversary after learning that [the claim] was groundless." (internal quotation marks omitted)).

Iovance argues that Plaintiffs have always known that there never existed a contractual relationship between Plaintiffs.  Accordingly, Iovance asserts that the Court should impose sanctions, both for Iovance's initial filling of a frivolous claim, and for Iovance's refusal to withdraw the claim at Iovance's request on May 13, 2022.  *See* Docs. 132-18; 132-19

For the reasons already set forth the Court agrees that Plaintiffs have failed to substantiate the FAC's allegation that they were "direct parties to the [Finder's Fee Agreement]" or its "intended beneficiaries."  ¶¶ 37–38.  The record before the Court shows that Plaintiffs were *neither.*  The Finder's Fee Agreements omits of any reference to Plaintiffs; and the emails produced by Plaintiffs show no more than a downstream business relationship between MBA and the Sharbat Parties.  Prior to bringing a breach of contract action, reasonable inquiry into the plain language of the Finder's Fee Agreement, along with the handful of readily attainable emails on which Plaintiffs here rely, would have revealed to "a reasonably competent attorney, acting under [like] circumstances," that Plaintiffs plainly do not have standing to bring the breach of contract action.  *Alberts,* 1989 WL 88585, at *1–3.  Plaintiffs' suing Iovance for breach of the Finder's Fee agreement is therefore sanctionable.[19]

What's more, Plaintiffs acknowledge by way of the Assignment that "MBA owns all right, title and interest in and to the benefits of" the Finder's Fee Agreement and that their role

---

[19] The Court notes that the entirety of the FAC is not sanctionable, as other of Plaintiffs' claims, *i.e.*, the unjust enrichment and indemnification claims, have not been litigated.

was limited to "assisting MBA in the performance of *MBA's* obligations under and pursuant to [it]." Doc. 111-4 at 2. Critically, in their memorandum in opposition, they claim that they understood these facts to be true since the time that they filed the FAC. *See* Doc. 132 at 8 (The Assignment "merely confirms the rights of the parties from inception." "The PSAC is no more than a simplification of the FAC."). Nonetheless, Plaintiffs have persisted with litigation, now raising new theories to show standing (*i.e.*, standing via: Iovance's approval, partnership with MBA, beneficiary-status, and Beychok's authorization) that, as noted, are legally baseless.

For the foregoing reasons, and with the awareness courts must exercise utmost restraint in imposing Rule 11 sanctions, the Court finds that both Plaintiffs' initial filing of the FAC and refusal to withdraw its claim that Iovance breached the Finder's Fee Agreement warrant sanctions. Having so concluded, the Court must decide what sanctions are appropriate. Prior to doing so, however, the Court must first consider the other sanctionable offenses allegedly perpetrated by MBA Sharbat's motion for leave to amend, which we have not yet adjudicated.

### b. Sanctions for the Motion for Leave to Amend

Iovance argues that MBA Sharbat's motion for leave to amend is sanctionable because: (1) it derives from an illegal scheme that violates New York's anti-champerty law; (2) it is barred by California's statute of limitations; and (3) seeks reconsideration of an already dismissed claim without advancing any new legal or factual arguments; (4) it is futile and untimely; and (5) it is brought under the name of a non-party, who cannot move pursuant to Federal Rule of Civil Procedure 15.

### i. Reliance on a Champertous Assignment

Iovance argues that Plaintiffs are subject to sanctions under Rules 11(b)(1) and (2) for violating New York's anti-champerty statute, N.Y. Jud. L. § 489, by executing the Assignment

so that MBA Sharbat could step in as the sole plaintiff in this action.[20]  Section 489 provides that

no corporation may "directly or indirectly, itself or by or through its officers" take assignment of

"any claim or demand, with the intent and for the purpose of bringing an action or proceeding

thereon."  N.Y. Jud. L. § 489.  An assignment is champertous when the "intent to sue on that

claim" was the "primary purpose for, if not the sole motivation behind, entering into the

transaction."  *Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 167 (N.Y. 2016) (quoting

*Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 731 N.E.2d 581, 587 (N.Y. 2000)).  "'The

purpose behind [the plaintiffs'] acquisition of rights' is the critical issue in assessing whether

such acquisition is champertous." *Id.* (quoting *Tr. for Certificate Holders of Merrill Lynch

Mortg. Inv'rs, Inc. v. Loving Funding Corp.*, 13 N.Y.3d 190, 198–99 (2009)).  Accordingly,

when a "lawsuit is not merely an incidental or secondary purpose of an assignment, but its very

essence," the assignment is champertous.  *Phoenix Light SF Limited v. U.S. Bank National

Association*, No. 14 Civ. 10116 (VSB), 2020 WL 1285783, at *11 (S.D.N.Y. Mar. 18, 2020)

(internal quotation marks omitted); *see, e.g.*, *Aretakis v. Caesars Ent.,* No. 16 Civ. 8751 (KPF),

2018 WL 1069450, at *10 (S.D.N.Y. Feb. 23, 2018) (granting a motion to dismiss a contract

claim on champerty grounds, reasoning that "[t]he assignor's purpose—to allow [the p]laintiff to

prosecute this case to obtain a money judgment—is clear from the face of the document by

which he attempted to assign his rights to [p]laintiff[.]'")  (internal quotation marks omitted).  "A

champertous assignment is void, 'effectively den[ying] the [p]laintiff standing to assert a

claim.'"  *Trustpilot Damages LLC v. Trustpilot, Inc.*, No. 21 Civ. 432 (JSR), 2021, WL 2667029,

---

[20] Although the Assignment contains a California choice-of-law provision, the parties exclusively rely upon on New York law in their moving papers on the question of champerty; Plaintiffs do not argue that California law should apply or that any conflict exists between New York's and California's champerty jurisprudence.

at *4 (S.D.N.Y. June 29, 2021) (quoting *Gowen v. Helly Nahmad Gallery, Inc.*, 77 N.Y.S.3d 605, 631 (N.Y. Sup. Ct. 2018), *aff'd*, 95 N.Y.S.3d 62 (1st Dep't 2019)).

Section 489, however, draws a distinction "between 'acquiring a thing in action in order to obtain costs,' which constitutes champerty, 'and acquiring it in order to protect an independent right of the assignee,' which does not." *Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 591 F.3d 116, 121 (2d Cir. 2010) (quoting *Loving Funding*, 13 N.Y.3d at 199). Accordingly, "[c]ourts have noted that an assignment of rights is not champertous . . . 'if its purpose is to collect damages, by means of a lawsuit, for losses on a debt instrument in which [the plaintiff] holds a preexisting proprietary interest.'" *Phoenix Light SF Limited*, 2020 WL 1285783, at *11 (quoting *Loving Funding Corp.*, 13 N.Y.3d at 195). Moreover, in evaluating the question of an assignment's purpose, courts have explained that when a substantial relationship exists between the assignor and assignee (*e.g.,* when the assignor owns the assignee in part or in whole) "there is less reason to be wary that the assignment is designed simply to foment litigation." *American Fun & Toy Creators, Inc. v. Gemmy Industries, Inc.*, No. 96 Civ. 799 (AGS) (JCF) 1997 WL 482518, at *4 (S.D.N.Y. Aug. 21, 1997); *see also Trustpilot*, 2021, WL 2667029, at *5.

Here, on March 28, 2022, MBA and the Sharbat Parties assigned to MBA Sharbat all rights under the MBA Contracts. Doc. 111-6 at 2. MBA and the Sharbat Parties own all capital stock in MBA Sharbat and, according to its articles of incorporation, formed MBA Sharbat on April 7, 2022, ten days *after* the Assignment was executed. *See* Doc. 126-8. Relevant here, the Assignment provides that the "Sharbat Parties and MBA have agreed to share all recoveries from prosecution of the [instant action] derived or arising from the benefits of the MBA Contracts in a separate confidential letter *and for that purpose have formed Assignee*[.]" *Id.* (emphasis

added).  Plaintiffs' motion for leave to amend attempts to bring the breach of contract claim exclusively on behalf of MBA Sharbat, pursuant to its newly acquired rights.  Doc. 111.

Like in *Aretakis,* the purpose of the Assignment is "clear from the face of the document[:]"  to give MBA Sharbat standing to litigate the breach of contract claim against Iovance.  2018 WL 1069450, at *10.  Because bringing the instant lawsuit is the "very essence" of the Assignment, it is champertous.  *Phoenix Light SF Limited*, 2020 WL 1285783, at *11.  And contrary to Plaintiffs' contentions, no exception applies.

Plaintiffs are correct that *Love Funding* stands for the proposition that when an assignee has "a preexisting proprietary interest" in the assigned claims—and the assignment is made for the purpose of enabling the assignee to protect its independent rights—§ 489 does not apply.  F.3d at 116 (2d Cir. 2010).  But unlike in *Love Funding,* where plaintiff had a pre-existing proprietary interest in an underlying loan*,* MBA Sharbat has no such interest in the Finder's Fee Agreement since it was not formed until ten years after the execution of the Finder's Fee Agreement.  *Id.*

*BSC Associates, LLC v. Leidos, Inc.* is illustrative of this point.  91 F. Supp. 3d 319, 328 (N.D.N.Y. 2015).  There, the court rejected the theory that an entity formed *after* a claim arose could have a pre-existing interest entitling it to exemption from § 489.  *See id.* at 91 F. Supp. 3d at 325–29.  The court ultimately dismissed the case on champerty grounds because, as here, the plaintiff "was formed solely to 'retain' [a] cause of action" and clearly did not have a proprietary interest in the contract underlying the action that predate[d] the transfer of claims to Plaintiff."  *Id* at 328*.*  Also of relevance, the court explained that the plaintiff had identified no legal mechanism that would permit the court to disregard the plaintiff's form as a distinct legal entity in order to find that it had a preexisting interest in the subcontract, even though the entities

that previously owned the subcontract were owned and managed by the plaintiff's current owners and managers.  *Id.*  Like the plaintiff in *BSC Associates,* MBA Sharbat was not formed until after MBA and Iovance executed the Finder's Fee Agreement.  And like in *BSC Associates,* the fact that assignors and assignee, here, are owned and managed in part by the same individuals does not enable MBA Sharbat—a distinct and newly created entity—to share in MBA's *pre-existing* interest in the Finder's Fee Agreement.[21]

Lastly, Plaintiffs' claim that for the champerty statute to apply, Iovance must offer "evidence . . . to show that the [MBA Sharbat] took the Assignment solely to 'stir up' a controversy in order to recover legal fees" is incorrect.  *See* Doc. 132 at 16 (citing *Love Funding,* 13 N.Y.3d at 201).  As the New York Court of Appeals explained in *Justinian Capital*:

> The reference in *Love Funding* to litigation being stirred up in an effort to secure costs harks back to earlier cases, from before 1907, when the prohibition of champerty was limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs, *which, at the time, included attorneys' fees.*  Thus, the reference to champerty as a vehicle to obtain costs has no application to a company [that] is not a law firm and would not obtain attorneys' fees by virtue of bringing the lawsuit.

28 N.Y.3d at n. 3 (internal quotation marks omitted).  Like the plaintiff in *Justinian*, MBA Sharbat is not a law firm and would not obtain attorneys' fees simply by acting as the plaintiff in this action.  Accordingly, this argument is without merit.

---

[21] Plaintiffs' related argument, *i.e.*, that they are exempt from New York's anti-champerty law because the assignors, MBA and the Sharbat Parties, and the assignee, MBA Sharbat, are substantially related entities, is not persuasive.  In the first instance, there is no evidence in the record that the Sharbat Parties and MBA are substantially related entities.  The fact that just-formed MBA Sharbat is owned by Sharbat or Beychok is in no way dispositive.  While courts have noted that it is less likely that the purpose of an assignment is to "foment litigation" when the assignee and assignor are substantially related, *see American Fun & Toy Creators*, No. 96 Civ. 799 (AGS) (JCF), 1997 WL 482518, at *4, there is no question that the impetus for the Assignment was to enable MBA Sharbat to sue Iovance for breach of the Finder's Fee Agreement.

For the reasons set forth above, the Court finds that the Assignment violates New York's anti-champerty statute.  The Assignment is, accordingly, void, and MBA Sharbat cannot recover on the claims assigned to it for lack of standing.   *See Trustpilot Inc.*, 2021, WL 2667029, at *4.

### ii.  Statute of Limitations

Iovance next argues that MBA Sharbat's motion for leave to amend is legally frivolous because the claims in the PSAC have been time barred since before this action was filed.  *See* Doc. 124 at 25.  Although the Court has already found that MBA Sharbat cannot file the PSAC because the Assignment is champertous, the Court nonetheless agrees with Iovance that, in any event, MBA Sharbat would be time barred from bringing it since MBA—the sole counterparty to Iovance in the Finder's Fee Agreement with any rights to assign—would be time barred from bringing it.  As explained below, MBA Sharbat, as the assignee, is entitled to stand in no better position than MBA and is likewise barred.

In the PSAC, MBA Sharbat purports to sue Iovance as an assignee of MBA.  *See* Doc. 111-2 ¶¶ 1, 4, 21, 28.  Both California and New York law are clear that "[a]n assignee stands in the shoes of the assignor, taking his rights and remedies, subject to any defenses which the obligor has against the assignor prior to notice of the assignment."  *Casiopea Bovet, LLC v. Chiang*, 12 Cal. App. 5th 656, 663 (2017) (internal citations and quotation marks omitted); *see also Cirone v. Tower Ins. Co. of New York*, 908 N.Y.S.2d 178, 179 (N.Y. App. Div. 2010) ("As . . . assignees, plaintiffs are now suing upon a claim which is subject to the same defenses [defendant] could have asserted against [the assignor].").  "The assignee's rights are no greater than those of the assignor."  *Id.* at 663 (internal citations and quotation marks omitted); *accord Madison Liquidity Invs. 119, LLC v. Griffith*, 869 N.Y.S.2d 496, 499 (N.Y. App. Div. 2008)

("[A]n assignee never stands in any better position than his assignor." (Internal quotation marks omitted)).[22]

Under New York's borrowing statute, "[w]hen a cause of action accrues outside New York and the plaintiff is a nonresident, [New York's Civil Practice Law & Rules ("C.P.L.R.") § 202] 'borrows' the statute of limitations of the jurisdiction where the claim arose, if shorter than New York's, to measure the lawsuit's timeliness."[23]  *Norex Petroleum Ltd. v. Blavatnik*, 23 N.Y.3d 665, 668 (2014).  "For purposes of [] § 202, a cause of action on a contract accrues where a plaintiff sustains its alleged injury; when an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Ormeno v. Relentless Consulting, Inc.*, No. 21 Civ 1643 (LJL), 2022 WL 103482, at *4 (S.D.N.Y. Jan. 11, 2022) (internal quotation marks omitted).

*Portfolio Recovery* is illustrative of the interplay between New York's borrowing statute and its assignment jurisprudence.  14 N.Y. 3d 410, 416 (2010).  There, a plaintiff licensed to do business in New York[24] sued a defendant for breach of contract.  *Id.*  Plaintiff acquired the right to sue under the contract from an entity based and incorporated in Delaware.  *Id.*  The court determined that plaintiff's cause of action accrued in Delaware because the assignor felt the injury of the defendant's purported breach there.  *Id.*  New York has a six-year statute of

---

[22] Under New York law, the Court need engage in a choice-of-law analysis "only where there is an actual conflict of law between the two jurisdictions." *Medtronic, Inc. v. Walland*, No. 21 Civ. 2908 (ER), 2021 WL 4131657, at *4 (S.D.N.Y. Sept. 10, 2021) (citing *Liang v. Progressive Cas. Ins. Co.*, 99 N.Y.S.3d 449, 451 (2d Dep't 2019)).  Here, as shown, California and New York law agree that an assignee's rights are no greater than those of the assignor. Accordingly, there is no conflict.

[23]  In full, New York's borrowing statute provides that "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."  C.P.L.R. § 202.

[24] Neither the Court of Appeal's opinion nor the lower appellate court's opinion's state whether the plaintiff was a resident of New York.

limitations for breach of contract claims, compared to Delaware's three-year statute of limitations. *Id.* In deciding which state's statute of limitations to apply to the plaintiff-assignee's claim, the court explained that because an assignee is not entitled to stand in a better position than that of the assignor, pursuant to § 202, Delaware's shorter three-year statute of limitations governed. *Id.*

Similarly, in *Windsearch, Inc. v. Delafrange*, a court applied Delaware's statute of limitations to a *New York*-based plaintiff's debt recovery action. 90 A.D.3d 1223, 1224 (N.Y. App. Div. 2011). Like in *Portfolio Recovery*, a Delaware-based entity assigned the plaintiff the right to sue, and the court determined that the cause of action accrued in Delaware. *Id.* Applying § 202, the court held that because an assignee "is not entitled to stand in a better position than that of its assignor," the three-year statute of limitations applied. *Id.* (internal quotation marks omitted)

According to the PSAC, MBA Sharbat is a resident of New York. Doc. 111-2 ¶ 13. MBA is a California entity, with its office located in California. *See* Docs. 127-1 ¶ 2; 111-6 at 2s. Any cause of action that MBA had in connection with the Finder's Fee Agreement accrued in California. *See Ormeno*, 2022 WL 103482, at *4 (explaining that the plaintiff was "a resident of California," where "[t]he [c]omplaint allege[d] that [he was] an individual doing business in the State of California" and was "a San Francisco-based entertainment company") (internal quotation marks omitted). California has a four-year statute of limitations for an action based on a breach of contract. Cal. Civ. Proc. Code § 337(a). New York's is six years. C.P.L.R. § 213(2). As demonstrated above, when a New York resident is assigned the rights under a contract that a non-resident accrued out-of-state, a court applies the shorter of the two state's statutes of limitations, so as to prevent an assignee from obtaining any advantage unavailable to

the assignor.  *See Portfolio Recovery*, 14 N.Y. 3d at 16; *Windsearch*, 90 A.D.3d at 1224.

Accordingly, California's four-year statute of limitations applies to MBA's claim and, by

consequence, MBA Sharbat's proposed action.

In its complaint against Iovance in the 2015 California state court action, MBA alleged

that Iovance breached the Finder's Fee Agreement on or about November 6, 2013.  *See* Doc.

127-1.  Therefore, the last day that MBA or MBA Sharbat could sue for breach of the Finder's

Fee Agreement was November 6, 2017.[25]  MBA Sharbat's proposed action is thus untimely.

Plaintiffs incorrectly assert that various tolling doctrines can save MBA claims and

thereby preserve MBA Sharbat's claims.  First, equitable tolling cannot fix MBA's delay

because, even if applicable, the statute of limitations would only be tolled by the five months

when MBA's lawsuit against Iovance was pending in California state court.  *Lantzy v. Centex

Homes*, 31 Cal. 4th 363, 370 (2003) (equitable tolling applies for the "length of time during

which the tolling event previously occurred").  Second, Beychok's December 2018 cancer

diagnosis is irrelevant because it occurred more than a year after the statute of limitations

expired.  *See Reyes v. Sotelo*, No. C 11-2747 YGR (PR), 2013 WL 3477062, at *4 (N.D. Cal.

July 10, 2013) ("[O]nce [a] cause of action has accrued and the statute has begun to run, no later

disability can suspend it."); *see also Lindsay v. Ahuja*,

Third, the doctrine of continuous violation applies only to "a series of small harms, any

one of which may not be actionable on its own[,]" not "a series of discrete, independently

actionable alleged wrongs."  *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1197 (2013).  The

---

[25] The instant action, however, was timely filed.  Unlike MBA, Plaintiffs are New York residents and allege to have been injured by Iovance's purported breach of the Finder's Fee Agreement in New York in November 2013. Section 202 provides that "where the cause of action accrued in favor of a resident of [New York] the time limited by the laws of [New York] shall apply."  C.P.L.R. § 202.  New York has adopted a six-year statute of limitations for breach of contract claims.  C.P.L.R. § 213(2).  The instant action was filed in state court on September 27, 2019, approximately one month before the statute of limitations was set to expire.  *See* Doc. 1.

doctrine of continuous accrual is also inapplicable because "California courts have largely confined [it] . . . to a limited category of cases, including installment contracts, leases with periodic rental payments, and other types of periodic contracts that involve no fixed or total payment amount." *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 136–37 (N.D. Cal. 2020). Beychok declares that Iovance repudiated its contracts with MBA in 2013, that MBA "ceased to perform services[,]" and that he hired counsel in 2015 to sue "for breach and repudiation of the MBA Contracts."[26]  Doc. 132-1 ¶¶ 29, 34, 35.

### iii. Re-pleading of an Already Dismissed Claim

Iovance argues that MBA Sharbat's motion for leave to amend is a futile motion to reconsider the holding of the January 2022 Order.  The January 2022 Order dismissed Plaintiffs' breach of contract claim with respect to the Consulting Agreement (*i.e.*, the second cause of action of the FAC).  *See* January 2022 Order at 12–13; *see also* ¶¶ 90–94.  In so doing, the Court held that while the record before the Court indicated that *a* contract existed that included terms of compensation for 1.5 million shares of Iovance stock, it could not conclude that the Consulting Agreement included Plaintiffs as either parties or beneficiaries." *Id.* at 12.  The Court further noted that that the Consulting Agreement includes a non-assignment clause, which provides that Iovance and MBA entered into the agreement "in reliance upon and in consideration of the

---

[26] Plaintiffs separately argue that "MBA did not assign the [instant action] to MBA [] Sharbat in the Assignment[;]" rather "Solomon Capital, a New York resident, assigned the [instant action] to MBA Sharbat [], a New York resident.  Therefore, unless Defendant[] can show that [Solomon Capital's] claims were barred by any limitation period of any state on assignment to MBA/Sharbat, then Defendants have no claim under the "borrowing" statute at all."  Doc. 132 at 25.  This argument, however, is meritless.  Even assuming that MBA Sharbat now has the right to sue under the Finder's Fee Agreement, such right derived *not* from Solomon Capital, but rather, from MBA alone.  While the language of the Assignment suggests that Solomon Capital had rights under the Finder's Fee Agreement via its partnership with MBA, this Court has already concluded that Solomon Capital had no such rights and otherwise lacked standing to sue Iovance for breaching the Finder's Fee Agreement.  Solomon Capital cannot assign the right to bring a claim that it had no right to bring in the first place.  Only MBA, a non-resident, held any claim to sue Iovance for breach of the Finder's Fee Agreement.  Accordingly, the New York borrowing statute applies.

singular personal skills and qualifications of [Beychok]," and that any assignment or transfer would require prior written consent Iovance.  *Id.* (quoting *id.* 18-8 at 19 (emphasis added)).  Now pending before the Court, the PSAC attached to MBA Sharbat's April 1, 2022 motion to amend attempts to reintroduce the claim that Iovance breached the Consulting Agreement.  *See* Doc. 111-2 ¶ 23 (alleging breach of the Consulting Agreement for "failure to sue 1,500,000 freely tradeable shares of common stock of Iovance as the S-8 Shares").  This amounts to an untimely and unmeritorious motion for reconsideration.[27]

"A motion for reconsideration or re-argument shall be granted only if the court has overlooked controlling decisions or factual matters that were put before it on the underlying motion and which, had they been considered, might have reasonably altered the result before the court."  *Wiener v. AXA Equitable Life Ins. Co.*, No. 16 Civ. 4019 (ER), 2022 WL 950979, at *4 (S.D.N.Y. Mar. 29, 2022) (internal quotation marks omitted).  "Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."  *Id.* (internal quotation marks omitted).  "Where the movant fails to show that any controlling authority or facts have actually been overlooked, and merely offers substantially the same arguments he offered on the original motion or attempts to advance new facts, the motion for reconsideration must be denied."  *Id.* (internal quotation marks omitted).  Moreover, Local Rule 6.3 for the Southern and Eastern District Courts of New York provides that "a notice of motion for reconsideration . . . of a court order determining a

---

[27] MBA Sharbat asserts that it "accepts the [January 2022] Order, and actually deletes the Causes of Action stricken by the Court," in the PSAC.  *See* Doc. 132 at 23.  MBA Sharbat simply does not acknowledge that the January 2022 Order dismissed Plaintiffs' breach of contract claim with respect to the Consulting Agreement or that the PSAC brings that same claim again.

motion shall be served within fourteen (14) days after the entry of the Court's determination of the original motion[.]"  Local Rule 6.3.

Setting aside the fact that MBA Sharbat provided the Court no indication of its intent to revive an already dismissed claim until filing the PSAC, its request is more than two months late under the Local Rules of this Court.  Local Rule 6.3.  Furthermore, MBA Sharbat makes no attempt whatsoever to show that the Court committed any legal or factual error in dismissing Plaintiffs' claim in the January 2022 Order.  It, for example, fails to mention, let alone address, the Consulting Agreement's non-assignment clause.  *See* Doc 18-8 at 19.  Having made no effort to meet its already hefty burden, Plaintiffs' request is without basis.

### iv. The Motion to Amend is Frivolous[28]

Iovance further argues that MBA Sharbat's motion to amend is unsupportable and untimely.  The Court's January 2022 Order denied Plaintiffs leave to file an amended complaint, reasoning that although a court "court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15, "nothing in [Plaintiffs'] application . . . support[ed] a finding of good cause under Rule 16."  January 2022 Order at 23; *see also id.* at 23 (explaining that while courts often find good cause where a party acts diligently to amend after learning new facts in discovery, that was manifestly not the case here, where the terms of the alleged agreements were set in approximately 2012.)  *Id.* at 24 (citing *Perez,* 2016 WL 6996179, at *4 (S.D.N.Y. Nov. 29, 2016).[29]

---

[28] Iovance also argues that the motion to amend is also untimely, but that is not so.  Although it is true that the Court's May 7, 2021 scheduling order provided that the deadline for "[j]oinder of additional parties" and filing "amended pleadings" had already passed, *see* Doc. 39 at 1, the Court nonetheless granted Roth leave to file a motion to amend at the January 5, 2022 status conference, *see* Doc. 94 at 29:2–13, and again during the April 15, 2022 case management conference, *see* Doc. 121 at 11:12–13.

[29] The Court also noted that "courts may exercise their discretion and consider other relevant factors, including whether amendment of the pleadings will prejudice defendants."  January 2022 Order at 23.

In their April 1, 2022 motion, Plaintiffs, through MBA Sharbat, again ask the Court for leave to amend the FAC.  As before, no good cause exists; nothing has changed in the three months between the January 2022 Order and April 1, 2022 to support such a finding.  The only "new" allegation by MBA Sharbat is MBA's prior inability to participate in this action due to Beychok's illness.[30]  But—setting aside the fact that the statute of limitations on MBA's claims expired in 2017—Plaintiffs' knowledge of Beychok's sickness is not new.  *See* Doc. 121 at 3:23–4:15 (the Court asking, "[b]ut all of these facts were known to your clients and their former counsel before you came on several weeks ago?" and Roth : I believe so, your Honor."); *see also* Doc. 132 ¶ 42.  But this long-known fact is irrelevant to the allegations.  Accordingly, the Court finds that MBA Sharbat has not acted diligently, there is no good cause on which to grant this second request, and that doing so would unnecessarily prejudice to Iovance by further drawing out this dispute.

### v.  Non-Party Status

As a final point, the Court notes that the motion for leave to amend is without merit because Federal Rule of Civil Procedure 15 permits only *a party* to amend its pleading.  MBA Sharbat is not a party to this lawsuit and thus has no pleading to amend.  *See Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 262 F.R.D. 348, 351 (S.D.N.Y. 2009) ("While there may be some rationale for looking to Rule 15(b)(1) or Rule 17(a)(3) in the present circumstances, applying either of these Rules to what is clearly a request of a non-party to intervene in an ongoing lawsuit seems illogical and unnecessarily complicated in light of the well-established procedure for intervention pursuant to Rule 24."); *see also MasterCard Int'l Inc.*

---

[30] Plaintiffs also suggest that the Assignment is new insofar as it "confirms the partnership between MBA and [Solomon Capital] from inception."  Doc. 132 at 13.  But confirming a longstanding fact does not somehow make the long-known information *new*.

*v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 382 (2d Cir. 2006) ("We attribute the absence of prior case law on this issue to the fact that Visa, as a non-party to the underlying action, should not have been allowed to file a motion to dismiss in the district court.").[31]

### vi. Sanctions

As explained below, and in light of the foregoing offenses, the Court finds that the motion for leave to amend is deserving of sanctions for violating Rules 11(b)(1), (2), and (3).

There is basis for imposing sanctions where, like here, counsel executes an illegal assignment in an effort to maintain an otherwise frivolous action. *See Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt Ag*, No. 04 Civ. 3600 (SWK), 2005 WL 2001888, at *5 (S.D.N.Y. Aug. 19, 2005) (imposing sanctions under Rule 11 and 28 U.S.C. § 1927, in part because the attorney was "proceeding in direct violation of New York's Champerty Statute"). Reasonable inquiry into New York's champerty jurisprudence would have made clear to any attorney acting in good faith that the Assignment is not simply a "simplification" or "streamlin[ing]" of the instant dispute. *See* Doc. 132 at 8, 21, 23. Rather, it is a transparent attempt to enable MBA—the sole party with any standing to sue Iovance for breach of the Finder's Fee Agreement—to circumvent the unambiguous amendment procedure set forth in the Finder's Fee Agreement and unilaterally convey a portion of its rights in the agreement to the Sharbat Parties, through MBA Sharbat, for the purpose of carrying out this litigation. In other words, this maneuver is a clear attempt to give Plaintiffs viable grounds on which to rest their breach of contract claim and MBA a second shot at reviving its expired claims.

---

[31] MBA Sharbat argues that it is entitled to move to amend the FAC pursuant to Rule 24. However, MBA Sharbat has not filed a Rule 24 motion. Additionally, it has not attempted to meet—or even discuss—the standards imposed by Rule 24.

Furthermore, there are grounds for imposing sanctions where, as here, an attorney fails to consider a statute of limitations prior to filing a pleading.  *See Levy v. Aaron Faber, Inc.*, 148 F.R.D. 114, 122–23 (S.D.N.Y. 1993) (imposing Rule 11 sanctions where, "had plaintiff's counsel conducted a reasonable inquiry into the law before filing the amended complaint, he would have had ample reason to conclude that many of plaintiff's claims . . . were barred by the relevant statutes of limitations").  Similarly, courts have imposed sanctions where, as here, a party attempts to reintroduce a pleading without any legal or factual grounds to do so.  *See Adams v. New York State Educ. Dep't*, No. 08 Civ.5996 (VM) (AJP), 2010 WL 4970011, at *9 (S.D.N.Y. Dec. 8, 2010) ("Presenting again a pleading, written motion or other paper that was adjudicated deficient, without substantially addressing legal deficiencies previously adjudicated, violates the duty to conduct a reasonable inquiry into law.") (quotation marks omitted)).

Lastly, seeking leave to amend but failing to address a key reason for the Court's denial of a previous request, is also sanctionable.  *See Adams*, 2010 WL 4970011, at *9; *Polar Int'l Brokerage Corp. v. Reeve*, 196 F.R.D. 13, 17 (S.D.N.Y. 2000) (imposing Rule 11 sanctions where, "[d]espite th[e] Court's warning and clear legal precedent . . . , plaintiffs included identically flawed allegations in their amended complaint"); *see also Corsini v. Bloomberg*, 26 F. Supp. 3d 230, 247 (S.D.N.Y. 2014) ("[A] party who re-files an action that is materially identical to an action previously dismissed by a court as being without legal merit is engaging in duplicative litigation that can result in the imposition of monetary sanctions under Rule 11."); *Lipin v. Hunt*, 573 F. Supp. 2d 836, 844 (S.D.N.Y. 2008) (finding that a plaintiff's pursuit of "claims similar or identical to those that have been previously rejected without addressing the grounds for rejection indicates that she has not acted in good faith, but with an improper

motive—to harass and punish anyone who has frustrated her efforts to take possession of property she believes is rightfully hers").

The Court therefore finds that sanctions are appropriate.

### c.  Sanctions

Having concluded that Rule 11 sanctions are warranted—both for filing and refusing to withdraw the claim that Iovance breached the Finder's Fee Agreement, as well as for the offenses related to the motion for leave to amend—the Court must decide what sanctions are appropriate.  As noted above, the Rule provides that sanctions "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(4).  Although the purpose of sanctions is deterrence, and not reimbursement, *see, e.g.*, *LeFlore v. Marvel Enter. Grp.,* 493 U.S. 120, 126 (1989), sanctions may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation," Fed. R. Civ. P. 11(c)(4).

Iovance asks the Court to strike the motion for leave to amend, dismiss the FAC with prejudice, and to order Plaintiffs and their counsel to pay $620,426 to Iovance for the attorneys' fees and $135,305 for the expenses that Iovance has incurred defending Iovance for the past two-and-a-half years, which includes the $27,369 in attorneys' fees that Iovance has and expects to incur in connection with this Rule 11 Motion.  *See* Doc. 124 at 8.  Iovance further requests that the Court order Plaintiffs, MBA Sharbat, and their counsel to pay a substantial penalty to the Court to deter such misconduct.  *Id.* at 29.

The Court will not dismiss the FAC in its entirety, as the merits of the Plaintiffs' unjust enrichment and indemnification claims have not been argued; such claims may be supportable. The balance of the FAC, however, is dismissed with prejudice.  The motion for leave to amend is

also stricken.  Plaintiffs are further ordered to pay Iovance's attorneys' fees incurred in connection with the Rule 11 motion.[32]  Doc. 124 at 8.  The Court considers such a penalty sufficient to deter future misconduct and will not impose any other penalty.

**IV.    CONCLUSION**

For the foregoing reasons, Defendant's motion for sanctions is GRANTED in part.  The parties are directed to appear for a telephonic status conference on January 19, 2023 at 10:00 a.m.  The parties are directed to dial (877) 411-9748 and to enter access code 3029857.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 111 and 123.

It is SO ORDERED.

Dated:    January 4, 2023
          New York, New York

_____
              Edgardo Ramos, U.S.D.J.

---

[32] Defendant is directed to submit an affirmation attaching an accounting of the attorney hours spent and costs incurred in connection with the instant motion.

41