UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SOLOMON SHARBAT, SOLOMON
CAPITAL LLC, SOLOMON
CAPITAL 401(K) TRUST, *and*
SHELHAV RAFF,

                Plaintiffs,

– against –

IOVANCE BIOTHERAPEUTICS, INC.
*f/k/a* LION BIOTECHNOLOGIES, INC.
*f/k/a* GENESIS BIOPHARMA, INC.,
*and* MANISH SINGH,

                Defendants.

**OPINION & ORDER**

20-cv-1391 (ER)

---

RAMOS, D.J.:

    Solomon Sharbat, Solomon Capital LLC, Solomon Capital 401(K) Trust, and Shelhav Raff (collectively, "Plaintiffs") brought this action against Iovance Biotherapeutics ("Iovance") for the alleged breach of a finder's fee agreement. Doc. 15 (First Am. Compl.). Following a successful motion for sanctions by Iovance that resulted in the dismissal of all other claims, Plaintiffs' only remaining claims were for unjust enrichment and indemnity. Doc. 140 (Jan. 4, 2023 Op.) at 40–41. Iovance thereafter moved for summary judgment on those remaining claims (Doc. 184), which the Court granted (Doc. 209). Plaintiffs appealed.[1] Doc. 222.

    Before the Court are Iovance's (1) submissions for the amount of sanctions, (2) motion for attorney's fees, and (3) motion to require Plaintiffs to post an appeal bond. Docs. 141, 213, 225. For the reasons set forth below, all three applications are granted.

---

[1] Plaintiffs' appealed the Court's decisions granting Iovance's motions for judgment on the pleadings, for sanctions, and summary judgment, as well as its denying Plaintiffs' motion to compel and for reconsideration of the same. Although "the filing of a notice of appeal has jurisdictional implications, . . . notwithstanding a pending appeal, a district court retains residual jurisdiction over collateral matters, including claims for attorneys' fees." *Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 225 (2d Cir. 2004) (internal citations omitted); *accord Neroni v. Becker*, 609 F. App'x 690, 692 (2d Cir. 2015). The Court therefore retains jurisdiction for purposes of deciding the instant motions before the Court.

I.   BACKGROUND

   A. Factual Background

Sharbat and Raff are in the business of helping corporate clients with fundraising, mergers, and strategic alliances, and making introductions to facilitate those ends. Doc. 188 ¶ 5. Sharbat held a Series 7 securities license until November 2012, when FINRA revoked the license and banned him from participating in the securities industry. *Id.* ¶ 7. No other plaintiff has ever been licensed to broker securities. *Id.* ¶¶ 6, 9.

Solomon Capital is a limited liability company, and Solomon Capital 401(K) Trust is a qualified retirement trust, for which Sharbat is the trustee. Doc. 15 ¶¶ 4–5. It is not disputed that Solomon Capital and Solomon Capital 401(K) Trust are owned and controlled by Sharbat; they have no employees and conduct no business activities other than holding assets on Sharbat's behalf. *See* Doc. 140 at 2.

Iovance[2] is a publicly traded biotechnology company focused on the development of cancer therapies. Doc. 188 ¶ 1. On June 15, 2012, it signed a contract with MBA Holdings, LLC ("MBA") "to act as a finder to seek financing and other strategic relationships" by introducing investors to Iovance who would participate in planned equity financing ("the MBA Agreement"). *Id.* ¶ 10–11. Plaintiffs were neither direct parties to, nor intended beneficiaries of, the MBA Agreement, contrary to what Plaintiffs claimed. Doc. 140 at 24. Nor are Plaintiffs indemnified parties within the meaning of the MBA Agreement. Doc. 188 ¶¶ 24–25; *see also* Doc. 186-9 (MBA Agreement) § 4.

Plaintiffs claimed that, beginning in 2012, they began to perform pursuant to the MBA Agreement to seek out investors for Iovance.[3] *Id.* ¶ 15. Specifically, Plaintiffs claimed Sharbat introduced two investors who participated in a financing that closed in

---

[2] In 2012, when the events at issue in this action occurred, the company was named Genesis Biopharma, Inc. Doc. 188 ¶ 2. On September 25, 2013, the company amended and restated its articles of incorporation, which changed the company's name to Lion Biotechnologies, Inc. *Id.* ¶ 3. On June 27, 2017, the company changed its name again to Iovance Biotherapeutics, Inc. *Id.* ¶ 4. For the sake of simplicity, the Court here refers to the company as Iovance, regardless of its actual name at the time.

[3] In their complaint, Plaintiffs alleged that MBA's chief financial officer informed Sharbat and Raff that they could earn substantial fees by working alongside MBA to find investors for Iovance. Doc. 15 ¶¶ 28–29.

November 2013: Joe Edelman of Perceptive Advisors and Wayne Rothbaum of Quogue Capital. *Id.* ¶ 18. But Raff admitted he never met or otherwise communicated with either Edelman or Rothbaum. *Id.* ¶ 16. Sharbat similarly admitted he never met either Edelman or Rothbaum, and his "only way of getting the deal to them" was by talking to another man, but he could not recall if that man was affiliated with either Edelman or Rothbaum. Doc. 186-6 (Dec. 16, 2021 Sharbat Dep. Tr.) at 183:18–185:9. Additionally, Sharbat acknowledged that Iovance's former chief executive officer ("CEO"), Anthony Cataldo, had already been in contact with Edelman about investing in Iovance months before Sharbat's alleged introduction. *Id.* at 186:14–187:4; *see also* Doc. 186-1 (Aug. 19, 2019 Sharbat Dep. Tr.) at 150:16–24. And, likewise, Iovance was introduced to Rothbaum by a mutual friend of Iovance's then-CEO, Manish Singh, not by Sharbat. Doc. 187 (Manish Singh Decl.) ¶ 6; *see also* Doc. 187-1 (email from Richard Lin introducing Singh and Rothbaum to one another). Rothbaum thereafter introduced Edelman to Singh to convince Edelman to invest as well. Doc. 187 ¶ 7.

### B. Procedural History

Plaintiffs filed this suit on September 27, 2019 in New York state court against Iovance and Singh. Doc. 1-1. On February 18, 2020, Iovance removed the case to this Court. Doc. 1. Plaintiffs amended their complaint on May 1, 2020. Doc. 15. Pursuant to that amended complaint, Plaintiffs brought claims for breach of contract, unjust enrichment, and indemnification against Iovance, as well as claims for fraud and conversion against Singh. *Id.*

On May 22, 2020, Iovance moved to dismiss for lack of personal jurisdiction (Doc. 18), and, on June 19, 2020, Singh also moved to dismiss (Doc. 21). The Court denied both motions on March 26, 2021. Doc. 29. Iovance and Singh answered on April 30, 2021. Doc. 37.

Iovance and Singh moved for judgment on the pleadings pursuant to Rule 12(c) on May 26, 2021 (Docs. 42 and 44, respectively), and the Court granted both motions on

3

January 5, 2022 (Doc. 92). As a result, all claims against Singh were dismissed, and the only claims remaining against Iovance were those for breach of contract on the MBA Agreement, unjust enrichment, and indemnification. *Id.* The Court also denied Plaintiffs' request for leave to file a second amended complaint on the basis that they did not exercise diligence or adequately explain why they could not have included the new allegations earlier. *See id.* at 23–25.

On March 28, 2022, Sharbat, Solomon Capital, and Solomon Capital 401(K) Trust (collectively, "the Sharbat Parties")—but not Raff—entered into an assignment agreement ("the Assignment") with MBA and newly-formed MBA Sharbat Holdings Inc., a Wyoming corporation ("MBA Sharbat"). Doc. 111-6. The Assignment provided that:

> *MBA owns all right, title and interest in and to the benefits of* [the MBA Agreement and that] in consideration of the services of the Sharbat Parties in assisting MBA in the performance of MBA's obligations under and pursuant to the MBA [Agreement], MBA agreed that it would pay [the] Sharbat Parties shares of the compensation due to MBA pursuant to the MBA [Agreement].

*Id.* at 2 (emphasis added). Additionally, the Assignment indicated that the Sharbat Parties brought the instant action against Iovance "to recover the sums due pursuant to the MBA [Agreement]" and that, in a separate confidential letter (which was not submitted to the Court), the "Sharbat Parties and MBA . . . agreed to share all recoveries from prosecution of [the instant action]." *Id.* "For that purpose," the Assignment stated that MBA and the Sharbat Parties formed MBA Sharbat, a corporation "whose shares of capital stock are owned by MBA and [the] Sharbat Parties." *Id.* The Court was first advised about the creation of MBA Sharbat on April 1, 2022 when new counsel filed a notice of appearance on behalf of Plaintiffs (Doc. 108) along with a letter stating that counsel "also represent[ed] new proposed Plaintiff MBA Sharbat" (Doc. 112).

That same day, Plaintiffs filed a motion for leave to amend the FAC on behalf of non-party MBA Sharbat. Doc. 111. The proposed second amended complaint would have eliminated the four named plaintiffs and named MBA Sharbat as the sole plaintiff in

4

the action. Doc. 111-2. It also would have brought claims solely for breach of contract and declaratory judgment based on the MBA agreement and revived already-dismissed breach of contract claims based on other agreements with MBA. *Id.* Raff was not mentioned in the motion to amend, and the proposed second amended complaint did not include unjust enrichment or indemnity claims. *Id.* Iovance opposed further amendment of the complaint. Doc. 113. Although the Court granted leave to amend, the Court warned Plaintiffs to "be very careful" in doing so. Doc. 121 (April 15, 2022 Hr'g Tr.) at 11:12–13. Iovance then sought leave to file a Rule 11 motion for sanctions, and the Court granted Iovance leave to file its motion as well. *Id.* at 12:1–21.

On May 16, 2022, Iovance filed its Rule 11 motion, asking the Court to: (1) strike MBA Sharbat's motion for leave to amend; (2) dismiss the FAC; and (3) order Plaintiffs and their counsel to pay $620,426 for attorneys' fees and $135,305 for expenses that Iovance has incurred defending against Plaintiffs' allegations. Doc. 124 at 8.

On January 4, 2023, the Court granted Iovance's motion for sanctions. Doc. 140. The Court declined to dismiss the first amended complaint in its entirety, as the merits of Plaintiffs' unjust enrichment claims and indemnity claims had not been argued (because they were not brought in the proposed second amended complaint) and therefore could be supportable, but the Court dismissed the balance of the complaint with prejudice. *Id.* at 40. The Court reasoned, in part, that the record before it showed that Plaintiffs were neither direct parties to the MBA Agreement, nor intended beneficiaries thereof. *Id.* at 24. The Court also struck the motion for leave to amend and ordered Plaintiffs to pay Iovance's attorneys' fees incurred in connection with the Rule 11 motion. *Id.* at 40–41. The measure of the sanctions award currently remains undetermined.

Iovance moved for summary judgment on the remaining claims on July 10, 2023. Doc. 184. The Court granted the motion on October 26, 2023 and closed the case. Doc. 209. Iovance moved for attorneys' fees under the terms of the MBA Agreement on November 10, 2023. Doc. 213.

5

Plaintiffs appealed the Court's decisions granting Iovance's motions for judgment on the pleadings (Doc. 92) and sanctions (Doc. 140), denying Plaintiffs' motion to compel after the close of discovery (Doc. 142) and motion for reconsideration of the same almost one year later (Doc. 208), and granting Iovance summary judgment (Doc. 209). Doc. 222. Iovance moved to require Plaintiffs to post an appeals bond on December 22, 2023. Doc. 225.

Now before the Court are the parties' submissions with respect to the measure of the previously imposed Rule 11 sanctions, as well as Iovance's motion for attorneys' fees and for Plaintiffs to post an appeals bond.

## II. RULE 11 SANCTIONS

### A. Legal Standard

Once the Court determines that imposition of Rule 11 sanctions is appropriate, they "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). "The sanction may include . . . an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.* Courts "limit the award of [sanctions of attorneys' fees] to those fees that are supported by documentation" such as contemporaneous billing records properly authenticated by affidavit. *See Klein v. Aicher*, No. 19-cv-9172 (RA), 2021 U.S. Dist. LEXIS 92468, at *12 (S.D.N.Y. May 14, 2021) (citation omitted); *Shanchun Yu v. Diguojiaoyu, Inc.*, No. 18-cv-7303 (JMF), 2019 U.S. Dist. LEXIS 201808, at *25 (S.D.N.Y. Nov. 20, 2019).

### B. Discussion

On January 4, 2023, the Court granted Iovance's motion for sanctions and, *inter alia*, ordered Plaintiffs to pay Iovance's attorneys' fees incurred in connection with the Rule 11 motion. Doc. 140 at 40–41.

Iovance submitted an accounting of its fees and costs from the Rule 11 motion, which requested $51,005 in attorneys' fees for 103.2 hours of work. Doc. 141 ¶¶ 2, 4.

6

Those fees represented 28.7 hours of work by partner Russell Glazer, who is lead attorney on the case, at $670/hour; 1.8 hours of work by partner Istvan Benko, who is "a specialist in corporate securities transactional matters," at $690/hour; and 72.7 hours of work by associate Eric M. Sefton, who graduated law school in 2017, at $420/hour. *Id.* ¶¶ 5–7. Iovance represents that its Rule 11 motion "was particularly time consuming because it concerned the merits of Plaintiffs' litigation of their entire case over the course of more than two years and a complex motion to amend involving Plaintiffs' creation of a new entity in an unsuccessful attempt to salvage their claims." *Id.* ¶ 8. And the reply was also time consuming because "Plaintiffs' opposition raised seven independent arguments and was supported by two lengthy declarations, each accompanied by seven exhibits," meaning Iovance therefore had to conduct "substantial legal research, review and analysis of materials from previous litigation involving the parties, and prepar[e] a supplemental declaration and request for judicial notice." *Id.* Iovance submitted billing records substantiating the hours it spent working on the Rule 11 motion and reply. Doc. 141-1.

Plaintiffs respond that Iovance's hours are padded, excessive, redundant, and unnecessary; and they also challenge the requested fee rates as unreasonably high. Doc. 158 at 2. Plaintiffs also argue that the billing records Iovance submitted are insufficiently detailed and consist primarily of block billing. *Id.* Accordingly, Plaintiffs argue that the Rule 11 sanctions award should be limited to "no more than 30 hour[s] of time, 10 hours of Attorney Glazer at $500 an hour and 20 hours of Associate Sefton at $300 an hour, or a total award of $11,000," which they argue is "what a reasonable client would pay for one Rule 11 Motion and Reply." *Id.* at 3. This represents approximately 22% of the total amount Iovance seeks.

First, upon review of Iovance's submitted billing records, the Court does not find that its counsel engaged in padding or unnecessary billing and is satisfied that the number of hours requested are reasonable for a motion of this complexity. Second, courts in this District have approved hourly rates as much as $836/hour for partners, $631.75 for

7

eighth-year associates, and $541.40/hour for fourth-year associates.  *See United States ex rel. Wood v. Avalign Techs., Inc.*, No. 14-cv-4958 (ER), 2020 WL 2555115, at *6–7 (S.D.N.Y. May 20, 2020) (citing *United States, ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, No. 12-cv-275 (DLC), 2015 WL 1726474, at *2 (S.D.N.Y. Apr. 15, 2015)); *see also CBF Industria DE Gusa S/A v. AMCI Holdings, Inc.*, 342 F.R.D. 84, 89 (S.D.N.Y. 2022) (collecting cases and noting that courts in this District have approved hourly billing rates in excess of $1,000 for partners, and as much as $750 for associates, in complex commercial cases).[4]  Accordingly, the requested hourly rates of $670 and $690 for partners Glazer and Benko, respectively, and $420 for senior associate Sefton are reasonable.

The Court therefore approves Iovance's request for $51,005 in attorneys' fees incurred in connection with its Rule 11 motion.

### III.  MOTION FOR ATTORNEYS' FEES

Iovance alleges that § 9.8 of the MBA Agreement requires that the prevailing party in an action to enforce the agreement be awarded costs and attorneys' fees.  Doc. 214 at 6.  And Iovance further argues that, under California law (which indisputably governs), such attorneys' fees provisions apply even where the prevailing party defeats a plaintiff's claims on the basis that the plaintiff lacked standing to enforce the contract as a nonparty thereto.  *Id.* (citing Cal. Civ. Code § 1717(a)).  Accordingly, Iovance seeks $598,100.70 in attorneys' fees.[5]  *Id.* at 7; Doc. 216 (Glazer Aff.) ¶ 4.

Plaintiffs respond that § 1717 merely makes all contractual provisions for attorneys' fees reciprocal, and—since Plaintiffs are third parties to the MBA Agreement, and since they never pled claims for attorneys' fees thereunder—§ 1717 is inapplicable

---

[4] Although Iovance's counsel are located in Los Angeles and billed at rates prevailing there, pursuant to the "forum rule," the Second Circuit generally uses the hourly rates employed in the district in which the reviewing court sits to calculate a presumptively reasonable fee.  *Wood*, 2020 WL 2555115, at *6 (citing *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009)).

[5] This amount excludes fees expended in defense of Singh, fees from local counsel, and fees incurred in connection with its Rule 11 motion.  Doc. 214 at 7.

because there is nothing to reciprocate.  Doc. 236 at 3.  In support, Plaintiffs argue that attorneys' fees as an item of loss in indemnity provisions are not attorneys' fees provisions within the meaning of § 1717.  *Id.* (quoting *Campbell v. Scripps Bank*, 93 Cal. Rptr. 2d 635, 642–43 (2000)).  Moreover, § 1717 is inapplicable to tort or noncontract claims, so, if the Court grants attorneys' fees under § 1717, Plaintiffs ask that time Iovance spent on tort or noncontract claims be excluded from the award.  *Id.* at 3–5.  Finally, Plaintiffs also argue Iovance's submitted billing statements contain excessive, duplicative, and block billing at unreasonable rates, meaning Iovance cannot justify the amount of fees sought.  *Id.* at 5–6.  Plaintiffs do not dispute that Iovance is unambiguously the "prevailing party" in the instant case.

### A. Section 1717 and the MBA Agreement

Section 1717 provides:

> In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Cal. Civ. Code § 1717(a).  This applies even where the litigant prevails "by establishing that the contract is invalid, inapplicable, unenforceable, or nonexistent." *Santisas v. Goodin*, 951 P.2d 399, 407 (Cal. 1998).

Section 9.8 of the MBA Agreement, entitled "Attorneys' Fees," provides in relevant part:

> If any action or proceeding is brought to enforce or interpret any provision of this [a]greement, the prevailing party shall be entitled to recover as an element of its costs, and not its damages, reasonable attorneys' fees to be fixed by the court.

Doc. 18-9 § 9.8.  The MBA Agreement also contains a separate, distinct indemnification provision.  *See id.* § 4.

### B. Iovance is Entitled to Attorneys' Fees Pursuant to § 1717

First, Plaintiffs are correct that California law does not countenance treating indemnity provisions as attorneys' fees awards within the meaning of § 1717. *See Campbell*, 93 Cal. Rptr. 2d at 642–43; *see also 92 Madison Ave., Ltd. Liab. Co. v. Mulberry Thai Silks, Inc.*, No. 03-cv-5364 (LBS), 2003 U.S. Dist. LEXIS 16619, at *4 (S.D.N.Y. Sep. 22, 2003) (collecting cases). But Iovance's claim is based on § 9.8, "Attorneys' Fees," not § 4, "Indemnification." Plaintiffs' arguments are therefore beside the point.

Second, Plaintiffs are also correct that reciprocity is the touchstone of § 1717. *Flowserve Corp. v. BMCE, Inc.*, No. 05-cv-8075, 2008 U.S. Dist. LEXIS 106195, at *4 (S.D.N.Y. Dec. 22, 2008) ("[A] prevailing party is entitled to attorney fees only if it can prove it would have been liable for attorney fees had the opponent prevailed." (quoting *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC*, 76 Cal. Rptr. 3d 325, 357–60 (Cal. Ct. App. 2008)). Moreover, California law specifically contemplates that "third party beneficiaries may be liable for attorneys' fees as provided under a contract even if they are not signatories to the agreement." *Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1071 (9th Cir. 2002) (collecting cases). The principle of reciprocity thus likewise applies where the litigation is between a signatory and a nonsignatory to the contract. *Blickman Turkus*, 76 Cal. Rptr. 3d at 356 ("[A] prevailing signatory defendant is entitled to fees only if the losing nonsignatory plaintiff would have been entitled to its fees if [he] had prevailed." (second alteration in original) (citation and internal quotation marks omitted)).

The Court must therefore consider whether Plaintiffs would have been entitled to seek attorneys' fees under § 9.8 of the MBA Agreement had they prevailed on their claims. Plaintiffs predicated their claims against Iovance on the theory that they were third party beneficiaries of the MBA Agreement. *See* Doc. 15 ¶¶ 28–29 (alleging that MBA's chief financial officer informed Sharbat and Raff that they could earn substantial

10

fees by working alongside MBA to find investors for Iovance pursuant to the MBA Agreement). Consequently, had Plaintiffs been the prevailing party, it necessarily means they would have successfully argued they were third party beneficiaries as finders entitled to the finders' fees provided for in the MBA Agreement. And California law permits third party beneficiaries of a contract to invoke the attorneys' fees provisions of the subject contract, *Cargill, Inc. v. Souza*, 134 Cal. Rptr. 3d 39, 42 (Cal. Ct. App. 2011), so long as "it appears that the contracting parties intended to extend such a right to" third party beneficiaries, *Blickman Turkus*, 76 Cal. Rptr. 3d .at 356. Courts will find that contracting parties did *not* intend to extend the right to invoke attorneys' fees provisions to third parties where, for instance, the contract expressly disclaims third party rights or the attorneys' fees provision contains language allowing only parties to the contract to invoke it. *Cargill*, 134 Cal. Rptr. 3d at 43 (collecting cases). But if the contract is silent as to those issues, the third party beneficiary may seek attorneys' fees pursuant to the contract. *Id.* at 44–45 (collecting cases). In this case, the MBA Agreement does not contain a provision disclaiming third party rights, nor is the availability of the attorneys' fees provision limited to signatories of the contract. *See* Doc. 18-9. Accordingly, had Plaintiffs prevailed, they *would* have been able to attempt to invoke § 9.8 and pursue Iovance for attorneys' fees. *See Cargill*, 134 Cal. Rptr. 3d at 44–45. And the principle of reciprocity in § 1717 therefore provides that, since Iovance is the prevailing party, it may invoke § 9.8 and pursue Plaintiffs for attorneys' fees. *See Blickman Turkus*, 76 Cal. Rptr. 3d at 356.

### C. Iovance is Not Limited to Attorneys' Fees Solely for the Breach of Contract Claim

Plaintiffs next challenge that, even if attorneys' fees are available pursuant to § 1717, they are available only for the contract claims, and Iovance must separate time its counsel spent on contract claims as opposed to tort or noncontract claims. Doc. 236 at 3–

5. Plaintiffs brought claims for breach of contract, unjust enrichment, and indemnification against Iovance, all based on the MBA Agreement. Doc. 15.

California courts liberally construe the question of whether an action is "on a contract" for purposes of § 1717 and generally find that the requirement is satisfied if the dispute "arises out of, is based upon, or relates to an agreement by seeking to define or interpret its terms or to determine or enforce a party's rights or duties under the agreement." *In re Relativity Fashion, LLC*, 565 B.R. 50, 57 (Bankr. S.D.N.Y. 2017) (citations omitted). Prevailing parties "may also recover fees for work performed on non-contract claims that is inextricably intertwined with that done on contract claims." *Bonner v. Redwood Mortg. Corp.*, No. 10-cv-479 (WHA), 2010 U.S. Dist. LEXIS 69625, at *8 (N.D. Cal. June 17, 2010). Thus, courts have found that even causes of actions other than a strict breach of contract claim are "on a contract." *See, e.g., Naif v. Mazzei*, No. 5:18-cv-246-(KK), 2020 U.S. Dist. LEXIS 87212, at *8 (C.D. Cal. Apr. 9, 2020) (breach of contract, unjust enrichment, and money had and received); *In re Relativity Fashion, LLC*, 565 B.R. at 57–58 (challenge to debtors' proper implementation of bankruptcy plan with regard to a licensing agreement); *Hardisty v. Moore*, No. 11-cv-1591 (CAB), 2015 U.S. Dist. LEXIS 148444, at *15 (S.D. Cal. Nov. 2, 2015) (securities fraud and quiet title); *Bonner*, 2010 U.S. Dist. LEXIS 69625, at *8 (fraudulent misrepresentation, breach of fiduciary duty, unjust enrichment, civil conspiracy, quiet title, unfair competition, usury, predatory lending, invasion of privacy, and intentional infliction of emotional distress).

Under this liberal construction, the Court is satisfied that all of Plaintiffs' claims against Iovance[6]—breach of contract, unjust enrichment,[7] and indemnification—are "on

---

[6] The Court need not consider whether the claims against Singh for fraud and conversion are "on a contract," as Iovance excluded fees incurred in Singh's defense. Doc. 214 at 7.

[7] Plaintiffs argue that unjust enrichment causes of action are not "on a contract," citing *Fed. Deposit Ins. Corp. v. Dintino*, 84 Cal. Rptr. 3d 38 (Cal. Ct. App. 2008). Doc. 236 at 4. But *Dintino* holds only that the

a contract" for purposes of § 1717. *See Naif*, 2020 U.S. Dist. LEXIS 87212, at *8, *In re Relativity Fashion, LLC*, 565 B.R. at 57.

### D. The Sought Attorneys' Fees are Not Excessive

Finally, Plaintiffs argue that Iovance's submitted billing statements are indefensibly excessive, redundant, and rife with block billing, and counsel's rates are too high. Doc. 236 at 5–6. Iovance's billing statements reflect 1,162.7 hours of work by attorneys and a paralegal, broken down as follows:

- 504.3 hours by partner Glazer at hourly rates between $610 and $710;
- 53.3 hours by partner Benko at hourly rates between $655 and $730;
- 530 hours by junior associates Benjamin Clements (who graduated law school in 2014) and Sefton at hourly rates between $360 and $495;
- 5.7 hours by junior associate Chinelo Ikem (who graduated law school in 2021) at an hourly rate of $440; and
- 69.5 hours by Regina Dukach, who has been a paralegal for over twenty years, at hourly rates between $280 and $310.

Doc. 216 ¶¶ 5, 12–17; Doc. 216-1 (Invoices).[8] Plaintiffs do not identify any specific examples of excessive or block billing but instead conclusorily state that the invoices are insufficiently detailed for "the Court to evaluate the reasonableness or necessity of the time spent." Doc. 236 at 6.

The Court has reviewed the 175 pages of invoices submitted by counsel for Iovance and is satisfied that the attorney hours for which Iovance seeks payment from Plaintiffs are neither padded or excessive, nor did counsel engage in block billing.

Moreover, this Court has already approved hourly rates of $670 and $690 for partners Glazer and Benko, respectively, and $420 for 2017-graduate associate Sefton.

---

trial court could not properly consider whether a party prevailed on noncontract claims like unjust enrichment "in making its determination of which party, if any, prevailed on the contract cause of action." *Dintino*, 84 Cal. Rptr. 3d at 58. Plaintiffs have not challenged that Iovance is the prevailing party, and the citation to *Dintino* is therefore inapposite here.

[8] The invoices contain some redactions, which Iovance represents reflects either (1) redactions of entries in their entirety where Iovance is not seeking payment from Plaintiffs or (2) redactions of portions of entries to the extent necessary to preserve privilege. Doc. 216 ¶ 3.

Although some of the rates sought in the instant motion for some hours are slightly higher than the rates counsel had charged at the time it brought the Rule 11 motion, they are still within the range of rates approved by Courts in this District, as the Court noted earlier. Thus, an upper range of $710 and $730 for partners Glazer and Blenk, respectively, and $465 for Sefton are still reasonable. Further, Clements is three years more senior than Sefton and seeking the same hourly rates, meaning the hourly rates sought for Clements (which have an upper range of $495) are also reasonable. For associates with three or less years of experience, courts generally approve rates ranging from $180 and $355 per hour. *CBF Industria DE Gusa S/A*, 342 F.R.D. at 88–89; *Wood*, 2020 WL 2555115, at *7; *Inter-American Dev. Bank v. Venti S.A.*, No. 15-cv-4063 (PAE), 2016 U.S. Dist. LEXIS 19327, at *21–22 (S.D.N.Y. Feb. 17, 2016). The Court will therefore reduce Ikem's hourly rate to $355. And courts have held that the prevailing rate for paralegals is between $100 and $200 per hour, *Wood*, 2020 WL 2555115, at *7, with even senior paralegals' rates typically being capped at $200/hour, *In re Grano v. Martin*, No. 19-cv-6970 (CS) (PED), 2021 U.S. Dist. LEXIS 43608, at *13–14 (S.D.N.Y. Mar. 5, 2021) (R&R). Accordingly, the Court will reduce Dukach's hourly rate to $200. In all other respects, Iovance's motion for attorneys' fees is granted.

The billing statements Iovance submitted do not specify the hourly rate charged for each billing entry, nor does Glazer's affidavit disaggregate which portions of the total $598,100.70 sum sought are attributable to which attorney or paralegal. Based on the current submissions alone, the Court therefore cannot calculate the new amount of attorneys' fees after the reduction in Ikem and Dukach's hourly rates. Moreover, the inclusion on the invoices—and therefore in the subtotals listed on individual bills—of redacted entries for which Iovance is not seeking reimbursement prevent the Court from being able to "check Iovance's math," so to speak. The Court therefore directs Iovance to resubmit the relevant billing records (1) with the reduction in Ikem and Dukach's rates

and (2) without including in any calculations therein any entries for which Iovance does not seek payment.

## IV. APPEALS BOND

### A. Legal Standard

Federal Rule of Appellate Procedure 7 provides that "[i]n a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal." Ultimately, whether to impose a bond is within the discretion of the district court. *Chizmar v. Acco Brands Corp.*, No. 14-cv-2181 (PKC), 2015 U.S. Dist. LEXIS 93356, at *8 (S.D.N.Y. July 17, 2015). When determining whether a bond is appropriate, however, courts typically consider the following factors: "(1) the appellant's financial ability to post a bond, (2) the risk that the appellant would not pay appellee's costs if the appeal loses, (3) the merits of the appeal, and (4) whether the appellant has shown any bad faith or vexatious conduct." *Id.* (quoting *Stillman v. Inservice Am., Inc.*, 838 F. Supp. 2d 138, 140 (S.D.N.Y. 2011)). The second factor, the risk of nonpayment, is "perhaps the most important." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, No. 08-cv-411 (NRB), 2012 WL 260231, at *2 (S.D.N.Y. Jan.12, 2012).

A Rule 7 bond "relates to the potential expenses of litigating an appeal." *Adsani v. Miller*, 139 F.3d 67, 70 n.2 (2d Cir. 1998). As its purpose is "to protect the rights of appellees brought into appeals courts," the Second Circuit has said it is not "bizarre or anomalous for the amount of the bond to track the amount the appellee stands to have reimbursed." *Id.* at 72; *see also Stillman*, 838 F. Supp. 2d at 139 ("The purpose of this rule is 'to protect the appellee from the risk of nonpayment by the appellant, if the appellee wins the appeal.'" (quoting *Berry v. Deutsche Bank Trust Co. Ams.*, 632 F. Supp. 2d 300, 307 (S.D.N.Y. 2009))). In setting the amount of a Rule 7 bond, a district court may "prejudge[]" the likelihood of success on appeal. *Adsani*, 139 F.3d at 79 ("A district court, familiar with the contours of the case appealed, has the discretion to impose a bond

which reflects its determination of the likely outcome of the appeal."). But a district court may not create an impermissible barrier to appeal, and the Rule 7 bond may not therefore be "automatically assessed" since that would discriminate against litigants who cannot afford to post a bond. *Id.* at 78. An appellant asserting that the amount of a Rule 7 bond presents a financial barrier to an appeal, however, must make a sufficient showing in support of that assertion and not merely conclusory statements. *In re GE Co. Sec. Litig.*, 998 F. Supp. 2d 145, 151 (S.D.N.Y. 2014)

### B. Discussion

Iovance requests that the Court require Plaintiffs to post a $50,000 bond pursuant to Rule 7. Doc. 226 at 6. Looking to the four factors courts generally consider when determining whether to impose a bond, Iovance notes that there is no evidence Plaintiffs are financially unable to post bond, there is a high risk of nonpayment because Plaintiffs are not U.S. residents, Plaintiffs' claims lack merit, and Plaintiffs have engaged in bad faith and vexatious conduct. *Id.* at 10–14. Moreover, Iovance asserts that $50,000 is an appropriate amount given the pending (at the time it filed its papers) motions for $51,005 in attorneys' fees in connection with its Rule 11 motion, almost $600,000 in additional attorneys' fees, and $7,870.20 filed bill of costs. *Id.* at 6 n.1, 15–17. Moreover, it contends that courts have held that Rule 7 bonds properly include appellate attorneys' fees, and, where such fees are involved, courts in this District regularly impose bonds of at least $50,000. *Id.* at 16.

Plaintiffs respond that they are financially unable to post a bond, there is no high risk of nonpayment because Iovance is not entitled to attorneys' fees and the two corporate entities are residents of New York even if Sharbat and Raff are Israeli residents, their claims are meritorious, and they have never engaged in bad faith or vexatious conduct. Doc. 238 at 2–5. Consequently, Plaintiffs argue there should be no appeals bond. *Id.*

16

As to the first factor, Plaintiffs' financial ability to post the bond, Plaintiffs bear the burden of making a sufficient showing that they cannot afford the bond, and they may not rely on merely conclusory statements. *See In re GE Co. Sec. Litig.*, 998 F. Supp. 2d at 151.  Here, however, Plaintiffs have made no showing at all of their financial inability.  To the contrary, Plaintiffs' entire argument is their inaccurate representation that Iovance argued Plaintiffs are *un*able to post bond, and they state that they "agree" with such assertion.  Doc. 238 at 2.  That is not enough.

Second, the Court agrees that there is a high risk of nonpayment.  The two corporate entities that Plaintiffs state are New York entities are also alleged to be empty shells that do no business and have no assets.  Doc. 226 at 11 n.3.  The other plaintiffs, Shelhav and Raff, are not in the United States.  And courts routinely find that this factor weighs in favor of imposing a bond where the appellants are foreign parties without U.S. assets.  *See Valentini v. Citigroup, Inc.*, No. 11-cv-1355 (JMF), 2014 WL 502066, at *2 (S.D.N.Y. Feb. 7, 2014) (collecting cases).

Third, insofar as the Court may "prejudge[]" the likelihood of appellate success, *see Adsani*, 139 F.3d at 79, the Court believes the appeal is unlikely to be meritorious.  Accordingly, this factor too weighs in favor of the imposition of a bond.

Fourth, a demonstration of bad faith or vexatious conduct is not required for the imposition of a bond.  *Stillman* 838 F. Supp. 2d at 140.  But, in this case, the Court has already imposed Rule 11 sanctions against Plaintiffs.  Doc. 140.  And Iovance charges Plaintiffs with considerably more bad faith and vexatious conduct in its moving papers, which the Court cannot say is entirely unsubstantiated.  *See* Doc. 226 at 12–14.  Plaintiffs' defense—that they have been "perhaps somewhat disorganized" because they "have been dealing with a war in Israel since the early Fall" but that "there has been no bad faith or vexatious conduct"—misstates the record at least insofar as it entirely overlooks the imposition of sanctions against them, and it fails to respond to any of

17

Iovance's other described instances of misconduct. Doc. 238 at 3. Consequently, all four factors weigh in favor of the imposition of a bond.

Finally, the Court finds that $50,000 is an appropriate amount for the bond in light of the Court's ruling above that Plaintiffs are liable for Iovance's attorneys' fees. Courts have imposed $50,000 bonds in similar circumstances where significant amounts of costs and fees remain unpaid. *See, e.g.*, *Baker v. Urb. Outfitters, Inc.*, No. 01-cv-5440 (LAP), 2006 WL 3635392, at *1 (S.D.N.Y. Dec. 12, 2006); *Tri-Star Pictures, Inc. v. Unger*, 32 F. Supp. 2d 144, 150 (S.D.N.Y. 1999); *see also In re Petrobras Sec. Litig.*, 363 F. Supp. 3d 426, 436 (S.D.N.Y. 2019) (stating that a $50,000 appeal bond "is well within the range of those imposed by other courts within this [D]istrict" and collecting cases).

Iovance's motion is therefore granted. Plaintiffs are therefore directed to post a bond in the amount of $50,000.

## V. CONCLUSION

For the reasons set forth above, Iovance's applications are GRANTED:

- Iovance's motion for $51,005 in attorneys' fees incurred in connection with its Rule 11 motion is GRANTED.
- Iovance's motion for attorneys' fees pursuant to the MBA Agreement and § 1717 is also GRANTED, but Iovance is directed to resubmit the relevant billing statements connected to its motion for attorneys' fees, as detailed above, for Court approval by May 24, 2024.
- Iovance's motion for an appeals bond is GRANTED. Plaintiffs are directed to post a $50,000 appeal bond.

The Clerk of Court is respectfully directed to terminate the motions (Docs. 213, 225).

Additionally, the Court respectfully directs the Clerk of Court to issue the bill of costs (Doc. 217).

It is SO ORDERED.

Dated:  May 9, 2024
        New York, New York

                                                    _____
                                                    EDGARDO RAMOS, U.S.D.J.